IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| WILMAR TRADING PTE LTD., *ET AL.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant, ) <br> ) <br> and ) <br> ) <br> NATIONAL BIODIESEL BOARD FAIR ) <br> TRADE COALITION, ) <br> ) <br> Defendant-Intervenor. ) | Consol. Court No. 18-00121 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL FILING

Defendant, the United States, respectfully submits this response to the supplemental brief, titled as a "Notice of Supplemental Authority," filed by Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC (Wilmar.) concerning the decision by the Court of Appeal for the Federal Circuit in *NEXTEEL Co., Ltd. v. United States*, Nos. 2021-1334, 2021-1430, 2022 WL 728512 (Fed. Cir. Mar. 11, 2022) (*NEXTEEL*). See ECF No. 73. Wilmar's filing significantly overstates the relevance of *NEXTEEL* to this case.

*NEXTEEL* involved Commerce's determination that there was a cost-based particular market situation (PMS), pursuant to 19 U.S.C. § 1677b(e), allegedly distorting the respondents' cost of hot-rolled steel coil in an administrative review of Oil Country Tubular Goods (OCTG) from the Republic of Korea. The Federal Circuit in *NEXTEEL* affirmed this Court's decision that Commerce's PMS finding in that case was unsupported by substantial evidence. The nature

of Commerce's findings in that case—in which Commerce sought to show through various interacting factors that Korean steel costs were distorted—is different than Commerce's PMS determinations here based on the government of Indonesia's (GOI's) pervasive intervention in the domestic biodiesel market in Indonesia. Our Rule 56.2 brief described in significant detail the substantial evidence supporting Commerce's two PMS findings in this case. *See* Gov't 56.2 Br. 23-40 (addressing Wilmar's PMS challenges).

Commerce made sales-based and cost-based PMS determinations in this case—neither of which are affected by *NEXTEEL*. First, Wilmar's attempt to apply *NEXTEEL*, which analyzed Commerce's factual finding of a *cost-based* PMS under 19 U.S.C. § 1677b(e), to undermine Commerce's *sales-based* PMS finding in this case that Wilmar's home market biodiesel sale prices are unreliable based on the GOI's pervasive regulation of biodiesel sales in Indonesia is unpersuasive. *See* 19 U.S.C. § 1677b(a)(1)(C)(iii) (Commerce may consider home market sales unusable when PMS "does not permit a proper comparison with the export price or constructed export price"). Indeed, the SAA guidance pre-dating Commerce's 2015 addition of the cost-based PMS provision to the statute specifically identifies the circumstances Congress had in mind with respect to a PMS finding as those "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, at 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 (SAA); *see also NEXTEEL*, 2022 WL 728512 at *4 (quoting SAA). That is precisely what Commerce found in this case.

Specifically, as we detailed in our Rule 56.2 brief, Commerce found that the GOI mandated producer-specific quantities and the prices for domestic biodiesel sales under its Public Service Obligation (PSO) program. This had a *direct* effect on biodiesel prices and production in

Indonesia during the investigation period and meant that the GOI controlled the Indonesian biodiesel market to such an extent that no home market prices can be considered to have been competitively set. *See* Gov't 56.2 Br. 23-26; IDM at 11-16 (P.R. 303). Commerce further found that this government intervention, which mandated pricing based on *petrodiesel* rather than biodiesel, meant that the PSO's programs pricing was set by the GOI in a manner not subject to negotiation, regardless of supply and demand, and rendered sales prices in Indonesia unreliable. *See id.* Hence, this is not a case in which Commerce's factual findings were lacking. Relatedly, Wilmar attempts to re-hash factual arguments from its Rule 56.2 brief claiming (inaccurately) that Commerce "verified" the market-based nature of Wilmar's sales prices. *See* Wilmar Supp. 4. We fully addressed the arguments in the Rule 56.2 briefing and argument, and *NEXTEEL* is no basis to reprise them. *See* Gov't 56.2 Br. 27-28.

      Second, contrary to Wilmar's claims, *NEXTEEL* does not provide support for Wilmar's substantial evidence arguments challenging Commerce's second PMS finding of a cost-based PMS distorting Wilmar's Crude Palm Oil (CPO) input costs. *See* Wilmar Supp. 4-5. Again, Wilmar seeks to use *NEXTEEL* as grounds to re-hash unpersuasive factual arguments, which we addressed in the Rule 56.2 briefing and argument, challenging the sufficiency of the evidence Commerce discussed in finding that Indonesian CPO prices were distorted. *See* Gov't 56.2 Br. 34-40. Moreover, unlike Commerce's approach in *NEXTEEL* (combined with what the Federal Circuit found to be weak evidence of Korea's actual subsidization of the relevant steel input), Commerce in this case rooted its determination in clear evidence of the GOI's intervention in the Indonesian CPO market through export restraints that, in the GOI's own words to the World Trade Organization (WTO), "can be used to *reduce the domestic price* . . . in order to guarantee supply of intermediate inputs at *below world market prices* for domestic processing industries."

Gov't 56.2 Br. 34 (emphasis added; citation omitted). Further, going beyond the type of analysis that the Federal Circuit found insufficient in *NEXTEEL*, Commerce analyzed data on the record correspondingly showing that Indonesian CPO prices were artificially lower than world market prices during the period of investigation, such that it was "empirically apparent that Indonesian CPO prices are distorted." *Id.* (quoting IDM at 22 (P.R. 303)). Like the evidence supporting Commerce's sales-based PMS finding, this evidence also fits closely with the SAA's guidance that a particular market situation may exist when a government's intervention is such that "prices cannot be considered to be competitively set." SAA at 822.[1]

Additionally, the circumstances apparent from the record here are precisely the opposite of the "global phenomenon" issue that Wilmar highlights from *NEXTEEL* because in that case Commerce was concerned about a Chinese market overcapacity phenomenon that affected global markets well beyond Korea, whereas in this case Commerce based its PMS determination on an Indonesia-specific phenomenon that is evidenced by the *divergence* of prices in Indonesia from the rest of the world. *See* Wilmar Supp. 5. If there is any analogue to this case, it is this Court's decision sustaining Commerce's similar PMS finding in its investigation of biodiesel from Argentina, in which the Court upheld Commerce's finding that Argentina's export tax on soybeans created a PMS that distorted the respondents' production costs. *See Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1323, 1340-41 & n.27 (Ct. Int'l Trade 2019) (appeal pending on other grounds); *see also NEXTEEL*, 2022 WL 728512, at *4 ("Nothing in the statute requires Commerce to quantify the distortion precisely.").

Finally, given Commerce's empirical comparison of Indonesian versus world market prices, and *NEXTEEL*'s statement that "a quantitative comparison showing a difference between

---

[1] Also unlike *NEXTEEL*, and consistent with its Indonesia-specific finding of distorted CPO prices, Commerce accounted for the PMS in this case by using non-distorted market-based CPO prices in calculating Wilmar's constructed normal value. *See* Gov't 56.2 Br. 35.

4

costs incurred and costs in the ordinary course of trade could be substantial evidence supporting the existence of a particular market situation," *NEXTEEL*, if anything, supports sustaining Commerce's decision in this case. *NEXTEEL*, 2022 WL 728512, at *4.

For these reasons, Wilmar's supplemental arguments based on *NEXTEEL* lack merit and we respectfully request that the Court sustain Commerce's determination.

|  | Respectfully submitted, |
|---|---|
|  | BRIAN M. BOYNTON<br>Principal Deputy Assistant<br>Attorney General |
|  | PATRICIA M. McCARTHY<br>Director |
|  | /s/ L. Misha Preheim<br>L. MISHA PREHEIM<br>Assistant Director |
| OF COUNSEL:<br>ELIO GONZALEZ<br>Senior Attorney<br>Office of the Chief Counsel<br>for Trade Enforcement and Compliance<br>U.S. Department of Commerce | /s/ Joshua E. Kurland<br>JOSHUA E. KURLAND<br>Trial Attorney<br>Commercial Litigation Branch<br>U.S. Department of Justice<br>Civil Division<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, DC 20044<br>Tel: (202) 616-0477<br>Fax: (202) 307-0972 |
| April 7, 2022 | *Attorneys for Defendant United States* |