**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| WILMAR TRADING PTE LTD<br>PT WILMAR BIOENERGI INDONESIA, and<br>WILMAR OLEO NORTH AMERICA LLC,<br><br>     Plaintiffs,<br><br>    and<br><br>P.T. MUSIM MAS and GOVERNMENT OF<br>THE REPUBLIC OF INDONESIA,<br><br>     Consolidated<br>     Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>    and<br><br>NATIONAL BIODIESEL BOARD FAIR TRADE<br>COALITION,<br><br>     Defendant-Intervenor. | Consol. Court. No. 18-00121 |

<u>**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFFS' NOTICE OF**</u>
<u>**SUPPLEMENTAL AUTHORITY**</u>

   Defendant-Intervenor the National Biodiesel Board Fair Trade Coalition ("the Coalition")

hereby respectfully responds to the Notice of Supplemental Authority filed on March 25, 2022,

by Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North

America LLC ("Plaintiffs"). *See* Plaintiffs' Notice of Supplemental Authority (Mar. 25, 2022)

("Plaintiffs' Notice"), ECF No. 73. Plaintiffs' Notice goes well beyond informing the Court of

supplemental authority by advancing new arguments based on the recent decision of the U.S.

Court of Appeals for the Federal Circuit ("Federal Circuit") in *NEXTEEL Co., Ltd. v. United*

*States*, Consol. Ct. Nos. 21-1334, -1430, 2022 U.S. App. LEXIS 6325 (Fed. Cir. Mar. 11, 2022)

("*NEXTEEL*") (precedential opinion not yet published in F. 4th).  Notwithstanding Plaintiffs'

inappropriate supplemental briefing disguised as a notice of supplemental authority, the Court

should reject Plaintiffs' arguments that *NEXTEEL* undermines the lawfulness of Commerce's

sales-based and cost-based particular market situation ("PMS") findings, as detailed below.

## I.   NEXTEEL Does Not Bear Upon Commerce's Sales-Based PMS Analysis

As an initial matter, the court in *NEXTEEL* was concerned solely with Commerce's

finding of a cost-based PMS in Korea pursuant to 19 U.S.C. § 1677b(e), not a sales-based PMS

pursuant to 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (a)(1)(C)(iii).  The statutory requirements

attendant to invocation of these provisions are not the same.  *See Hyundai Steel Co. v. United

States*, 19 F.4th 1346, 1355 n.10 (Fed. Cir. 2021) (discussing the "different standards" applicable

to the sales-based and cost-based PMS provisions).  Accordingly, Plaintiffs' contention that

*NEXTEEL* undermines Commerce's sales-based PMS finding in the *Final Determination* is

without merit.  *See Biodiesel from Indonesia: Final Determination of Sales at Less Than Fair

Value*, 83 Fed. Reg. 8,835 (Mar. 1, 2018) ("*Final Determination*") and accompanying IDM

("IDM") (P.R. 303).

## II.  NEXTEEL Confirms Commerce's Interpretation and Application of the Cost-Based PMS Provision

*NEXTEEL* does not support Plaintiffs' invented "bright line rules" in applying the cost-

based PMS provision.  Plaintiffs' Notice at 2.  *NEXTEEL* reviewed the U.S. Court of

International Trade's ("USCIT") opinion and judgment directing Commerce not to find a PMS in

the second administrative review of the antidumping order covering oil country tubular goods

("OCTG") from Korea.  *NEXTEEL* vacated the USCIT's disposition of Commerce's PMS

finding.  *NEXTEEL* at 21-22.  Although the Federal Circuit affirmed the USCIT's bottom-line

holding that all five PMS factors under consideration in that case were not ***each*** supported by

substantial evidence, *NEXTEEL* at 11-19, it did not endorse, adopt, or affirm the USCIT's

analytical approach to ***any*** of the five PMS factors at issue, nor did it impose any bright-line

rules that Commerce would be required to follow in assessing whether a PMS exists in any other

case.  Indeed, the Federal Circuit rejected the USCIT's extensive reliance on the very sort of

bright-line rules that Plaintiffs now seek to reimpose (*e.g.*, requiring that Commerce quantify

every PMS distortion, and requiring that each individual distortion be particular rather than the

"market situation" as a whole).  *See, e.g., NEXTEEL Co., Ltd. v. United States*, 450 F. Supp. 3d

1333, 1339-43 (Ct. Int'l Trade 2020).  Instead, *NEXTEEL* set forth far more flexible "modified

reasoning" that was specific to the facts before it.  *NEXTEEL* at 3; *see also id.* at 7-16.

Plaintiffs' arguments rest upon a sliced-and-diced version of the introductory portion of

the Federal Circuit's analysis, which is as follows:

> The Trade Preferences Extension Act of 2015 (TPEA) allows Commerce to
> consider a "particular market situation" when calculating constructed value.  Pub.
> L. No. 114- 27, § 504, 129 Stat. 362, 385.  Under 19 U.S.C. § 1677b(e), as revised
> by the TPEA,
>
>> if a particular market situation exists such that the cost of materials and
>> fabrication or other processing of any kind does not accurately reflect the
>> cost of production in the ordinary course of trade, the administering
>> authority may use another calculation methodology under this part or any
>> other calculation methodology.
>
> The {antidumping} statute does not define "particular market situation," but the
> plain language of § 1677b(e) identifies the factual support Commerce must provide
> to invoke this provision.  Commerce must find that the cost incurred to produce the
> subject merchandise "does not accurately reflect the cost of production in the
> ordinary course of trade." 19 U.S.C. § 1677b(e).  As the Court of International
> Trade has noted, the circumstances supporting a "particular" market situation also
> must be "particular" to producers of the subject merchandise during the relevant
> period. *See SeAH Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1393 (Ct. Int'l
> Trade 2021).  An ongoing global phenomenon would not alone constitute a
> deviation from the "ordinary course of trade."
>
> Congress provided examples of a particular market situation…in which some
> circumstance distorts costs so that they are not set based on normal market forces

or do not move with the rest of the market. Nothing in the statute requires
Commerce to quantify the distortion precisely. . ..

*NEXTEEL* at 10-10; *see* Plaintiffs' Notice at 2.  Plaintiffs then purport to explain how the Federal
Circuit "appl{ied}" these "rules" but reference only one of the five PMS factors discussed by
*NEXTEEL*.  *Compare* Plaintiffs' Notice at 2-3 (referencing *NEXTEEL*'s discussion of hot-rolled
coil subsidization), *with NEXTEEL* at 10-16 (discussing, in addition, government steel industry
restructuring, government electricity market control, low-priced hot-rolled coil imports, and
strategic alliances).

    Contrary to Plaintiffs' incomplete analysis, the introductory passage of *NEXTEEL* merely
explains the new cost-based PMS provision (*i.e.*, 19 U.S.C. § 1677b(e)), as distinguished from
the older sales-based PMS provisions (*i.e.*, 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (a)(1)(C)(III)).
Per the Federal Circuit, subject merchandise ***production costs*** (rather than sales prices) being
outside the "ordinary course of trade" (as opposed to distorted in some universal fashion) is
"factual support" required of a particular market situation under 19 U.S.C. § 1677b(e).  *See
NEXTEEL* at 8.  *NEXTEEL*'s example, that "{a}n ongoing global phenomenon would not ***alone***
constitute a deviation from the 'ordinary course of trade,'" *NEXTEEL* at 8 (emphasis supplied),
demonstrates that the question of whether a cost-based distortion is out-of-the-ordinary is a low,
qualitative barrier, one that Commerce unambiguously overcame when analyzing distorted crude
palm oil ("CPO") costs in Indonesia, as discussed in the Coalition's Rule 56.2 Brief.  *See*
Defendant Intervenor's Response in Opposition to Plaintiffs' Motion for Judgement on the
Agency Record (July 19, 2019) ("Coalition's Response Brief") at 15-24.

    Plaintiffs' other arguments are similarly without merit.  *NEXTEEL* did not define a PMS
nor did it create a new mandatory standard.  The court simply observed that a "situation{} in
which some circumstance distorts costs so that they are not set based on normal market forces or

do not move with the rest of the market" could constitute a PMS.  *NEXTEEL* at 8-9.  Elsewhere, contrary to Plaintiffs' assertion that "Commerce could not rely on mere government intervention," *see* Plaintiffs' Notice at 2, *NEXTEEL* states that "Government control of…prices is a type of {PMS} distortion expressly contemplated by Congress….," *NEXTEEL* at 15.  Nor did *NEXTEEL*'s statement that "Commerce made no finding that any subsidies were passed through to the prices of" hot-rolled coil occur in a vacuum.  *See* Plaintiffs' Notice at 2 (citing *NEXTEEL* at 10-11).  Rather than setting an abstract governing standard, *NEXTEEL* made a fact-specific observation that the evidence of subsidization of a production input for OCTG was "mixed" insofar as Commerce relied on an earlier determination outside the period of review that showed significant subsidization but more recent evidence showed "de minimis subsidy rates." *NEXTEEL* reasoned that Commerce had not adequately addressed this trend through subsidiary findings.  *See NEXTEEL* at 11.  *NEXTEEL* did not address a situation, as here, where subsidy levels during the period of investigation were sustained and significant.  *See* Coalition's Response Brief at 15-24.

In summary, *NEXTEEL* is consistent with Commerce's reasonable finding in this case of a cost-based PMS due to the Indonesian government's influence on CPO costs through its export tax regime and evidence that such costs are distorted.  As Commerce explained:

> reliable evidence demonstrates that the export tax regime impedes external trade and competitive pricing for CPO, and price comparisons of what Wilmar paid for Indonesian CPO versus world market prices, shows a differential exists…{t}he distortive effects are further evidenced by CPO prices on the record showing that Indonesian  prices were below world market prices in each month since the imposition of the {export tax regime} in 2015, including each month of the POI.

IDM at Comment 3.  Moreover, *NEXTEEL* made perfectly clear that "{n}othing in the statute requires Commerce to quantify the distortion precisely."  *NEXTEEL* at 9.  Especially given that *NEXTEEL* was only published after Commerce's decision, Commerce's rationale need only be

"reasonably discernable." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (noting Commerce's "explanations do not have to be perfect" but only that "the path of Commerce's decision must be reasonably discernable to a reviewing court"). Here, Commerce rendered PMS findings consistent with *NEXTEEL*'s rationale and based on substantial record evidence.

****

For the foregoing reasons, the Court should reject Plaintiffs' arguments that *NEXTEEL* detracts from the lawfulness of Commerce's *Final Determination*.

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Chase J. Dunn
James E. Ransdell

Date:   April 7, 2022