Slip Op. 22–64

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| WILMAR TRADING PTE LTD.,<br>PT WILMAR BIOENERGI INDONESIA, and<br>WILMAR OLEO NORTH AMERICA LLC, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| and | : | |
| | : | |
| P.T. MUSIM MAS and GOVERNMENT OF<br>THE REPUBLIC OF INDONESIA, | : | Before: Richard K. Eaton, Judge |
| | : | |
| | : | Consol. Court No. 18-00121 |
| Consolidated Plaintiffs, | : | |
| | : | **PUBLIC VERSION** |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| NATIONAL BIODIESEL BOARD FAIR<br>TRADE COALITION, | : | |
| | : | |
| | : | |
| Defendant-Intervenor. | : | |

## OPINION AND ORDER

[Final Determination is remanded.]

Dated: June 9, 2022

*Devin S. Sikes*, Akin Gump Strauss Hauer & Feld LLP, of Washington, D.C., argued for Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC. With him on the brief was *Bernd G. Janzen*.

*Lynn G. Kamarck*, Hughes Hubbard & Reed LLP, of Washington, D.C., argued for Consolidated Plaintiff the Government of the Republic of Indonesia. With her on the brief were *Matthew R. Nicely* and *Julia K. Eppard*.

*Edmund W. Sim*, Appleton Luff Pte Ltd., of Washington, D.C., argued for Consolidated Plaintiff P.T. Musim Mas. With him on the brief were *Kelly A. Slater* and *Jay Y. Nee*.

*Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *L. Misha Preheim*, Assistant Director. Of counsel on the brief was *Jessica R. DiPietro*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Myles S. Getlan*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for Defendant-Intervenor the National Biodiesel Board Fair Trade Coalition. With him on the brief were *Jeffery B. Denning*, *Jack A. Levy*, *Ulrika K. Swanson*, and *James E. Ransdell*.

Eaton, Judge: This consolidated action involves a challenge to antidumping duties imposed on imports of biodiesel[1] from the Republic of Indonesia, following the U.S. Department of Commerce's ("Commerce" or the "Department") determination that the subject biodiesel was sold into the United States at less than fair value during the period of investigation, *i.e.*, from January 1 through December 31, 2016.[2] *See Biodiesel From Indon.*, 83 Fed. Reg. 8,835 (Dep't Commerce Mar. 1, 2018) ("Final Determination") and accompanying Issues and Decision Mem. (Feb. 20, 2018) ("Final IDM"), PR 303.

---

[1]        Biodiesel "is a fuel comprised of mono-alkyl esters of long chain fatty acids derived from vegetable oils or animal fats, including biologically-based waste oils or greases, and other biologically-based oil or fat sources." *Biodiesel From Indon.*, 83 Fed. Reg. 8,835, 8,836 (Dep't Commerce Mar. 1, 2018). It is "a commodity product that is used almost exclusively in blends for use as transportation fuel or heating oil." Pet'n, vol. I (Mar. 23, 2017) at 100, PR 2.

[2]        In a parallel proceeding, Commerce imposed countervailing duties on shipments of Indonesian biodiesel made by the same respondents during the same period. *See Biodiesel From the Republic of Indon.*, 82 Fed. Reg. 53,471 (Dep't Commerce Nov. 16, 2017) and accompanying Issues and Decision Mem. (Nov. 6, 2017). The appeal of that decision came before this Court in *Wilmar Trading Pte Ltd. v. United States*, Consol. Court No. 18-00006. The Court sustained in part and remanded, for further explanation, the Department's final countervailing duty determination in *Wilmar Trading Pte Ltd. v. United States*, 44 CIT __, 466 F. Supp. 3d 1334 (2020) ("*Wilmar CVD*"). Ultimately, the Court sustained Commerce's remand redetermination in *Wilmar Trading Pte Ltd. v. United States*, No. 18-00006, 2020 WL 7048910, at *1 (CIT Dec. 1, 2020).

By their motions for judgment on the agency record, Plaintiffs Wilmar Trading Pte Ltd. ("Wilmar"), PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC, together with Consolidated Plaintiffs P.T. Musim Mas ("Musim Mas") and the Government of the Republic of Indonesia (collectively, "Plaintiffs") primarily contest the Department's determination of normal value, *i.e.*, the price at which Wilmar sold biodiesel in its home market of Indonesia, and ask the court to remand the Final Determination. *See* Pls.' & Consol. Pls.' Mem. Supp. Jt. Mot. J. Agency R., ECF No. 30 ("Pls.' Br."); Pls.' & Consol. Pls.' Reply Br., ECF No. 55 ("Pls.' Reply"); Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 31-1 ("Musim Mas's Br."); Consol. Pl.'s Reply Br., ECF No. 56.

The antidumping statute provides that a "particular market situation" may render a respondent's home market sales, or its cost of production, outside the ordinary course of trade, and therefore unusable for purposes of determining normal value. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) (sales), (e) (costs) (2018). Plaintiffs challenge Commerce's determination that it could not use Wilmar's home market sales to determine normal value. They thus dispute Commerce's finding of two particular market situations in Indonesia—(1) a "*sales*-based particular market situation"[3] and (2) a "*cost*-based particular market situation."[4]

---

[3]     A particular market situation that takes home market sales outside the ordinary course of trade, rendering them unusable as a basis for normal value, will be referred to in this opinion as a "sales-based particular market situation." *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III); *see also* 19 C.F.R. § 351.404(c)(2)(i) (2019).

[4]     A particular market situation that causes "the cost of materials and fabrication or other processing of any kind . . . not [to] accurately reflect the cost of production in the ordinary course of trade," will be referred to in this opinion as a "cost-based particular market situation." 19 U.S.C. § 1677b(e). When a cost-based particular market situation prevents the determination of constructed value (as normal value), the Department "may use another calculation methodology under this part or any other calculation methodology." *Id.*

Plaintiffs also dispute an adjustment that the Department made to constructed value (as normal value) to take into account the tradeable credits that a purchaser generates by the importation of biodiesel into the United States.[5]

For its part, Musim Mas contends that Commerce erred when it disregarded all of the company's reported information, and used facts otherwise available, because of alleged deficiencies in its home market sales, cost of production, and U.S. sales information. Musim Mas also contends that the Department erred when it applied an adverse inference to the facts available based on its finding that the company failed to cooperate to the best of its ability with the investigation.

The United States ("Defendant"), on behalf of Commerce, and Petitioner and Defendant-Intervenor the National Biodiesel Board Fair Trade Coalition ask the court to sustain the Final Determination as supported by substantial evidence and otherwise in accordance with law. *See* Def.'s Resp. Pls.' Mots. J. Agency R., ECF No. 50 ("Def.'s Resp."); Def.-Int.'s Resp. Opp'n Pls.' Mots. J. Agency R., ECF No. 49.

Jurisdiction is found under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(i).

For the following reasons, the court remands the Department's finding that one or more particular market situations existed with respect to home market sales that Wilmar made *outside* of a government-subsidized grant program.[6] Commerce must either support its particular market situation finding with substantial evidence or use the price paid for Wilmar's non-program sales to determine normal value. The court also remands Commerce's decision to adjust constructed

---

[5]        The credits, called Renewable Identification Numbers, or RINs, are explained later in the opinion.

[6]        The program, called the Public Service Obligation program, aimed to promote the production of Indonesian biodiesel. It is discussed later in the opinion.

value (as normal value) with instructions to establish the statutory and regulatory basis for its

authority to make this adjustment. Finally, Commerce's findings on remand regarding the

determination of normal value for Wilmar, may, in turn, impact its dumping analysis, including

the calculation of the "highest transaction-specific margin" that Commerce assigned to Musim

Mas as adverse facts available. Accordingly, the court reserves decision on Musim Mas's

challenges to Commerce's use of adverse facts available until the results of redetermination are

before the court.


## BACKGROUND

I.    **Government Programs in Indonesia that Impact the Biodiesel Industry**

    A.    **Direct Payments Through Indonesia's Biodiesel Subsidy Fund**

In 2015, Indonesia implemented a regulatory scheme intended to support its biodiesel

industry. *See Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1338-39. One part of the plan created

the Biodiesel Subsidy Fund (the "Fund"). *See id.* at __, 466 F. Supp. 3d at 1339. In accordance

with the law giving rise to the Fund, when biodiesel producers, such as Wilmar and Musim Mas,

made sales through Indonesia's Public Service Obligation program (the "Program"), they received

payments from the Fund in addition to a government-mandated amount that Program-designated

purchasers paid. That is, Wilmar and Musim Mas received payments for Program sales in two

parts: (1) a payment from the purchaser in a government-mandated amount designated to match

the market price for petrodiesel—a cheaper fuel than biodiesel (the "Petrodiesel Price"); and (2) a

payment from the Indonesian government (through the Fund) intended to make up the difference

between the Petrodiesel Price and what the Indonesian government estimated as the "market price"

for biodiesel (the "Fund Payment"). *See* Wilmar's Resp. Suppl. Secs. B & C Quest. (Aug. 21,

2017) at 5 & Ex. S-6, PR 169. As for the purchasers, they paid a price for the biodiesel that was

lower than its market price. Thus, the aim of the Program was to promote the production of Indonesian biodiesel by allowing Wilmar and Musim Mas to receive a competitive price for their biodiesel, even though their purchasers paid the lower Petrodiesel Price. *See Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1343.

In *Wilmar CVD*, the Court sustained Commerce's determination that Fund Payments were countervailable subsidies: "Commerce was reasonable in its finding that these Fund transfers, clearly distinct from the price paid by the actual purchasers, were financial contributions in the form of grants." *Id.* at __, 466 F. Supp. 3d at 1345. Thus, for each sale of biodiesel through the Program, the Court upheld Commerce's finding that *only the payment made by the customers* represented the selling price.

### B.      Export Restraints on Crude Palm Oil (Biodiesel Input)

At the same time the Biodiesel Subsidy Fund was created, Indonesia enacted the 2015 Export Levy, at $50 per metric ton on all exports of crude palm oil, the primary biodiesel input. *See Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1339. As a result of the levy, more crude palm oil was available for purchase in the Indonesian market, and less was present in the world market. Moreover, the world market price of Indonesian crude palm oil increased, and the price of crude palm oil fell for domestic consumers, including biodiesel producers such as Wilmar and Musim Mas. *See id.* at __, 466 F. Supp. 3d at 1352. Crude palm oil is the primary input in Wilmar's and Musim Mas's biodiesel fuel.

In *Wilmar CVD*, the Court sustained Commerce's determination that, by artificially lowering domestic crude palm oil prices, the 2015 Export Levy "resulted in indirect financial contributions [subsidies] to Wilmar and Musim Mas in the form of goods provided for less than adequate remuneration." *Id.* at __, 466 F. Supp. 3d at 1350. Thus, the Court found that the

Department reasonably countervailed the effects of Indonesia's artificial lowering of crude palm oil prices on Wilmar's and Musim Mas's U.S. sales of biodiesel.

## II.     Commerce's Antidumping Investigation

In April 2017, Commerce initiated an antidumping investigation on imports of biodiesel from Indonesia in response to a petition filed by Defendant-Intervenor the National Biodiesel Board Fair Trade Coalition. *See Biodiesel From Arg. and Indon.*, 82 Fed. Reg. 18,428 (Dep't Commerce Apr. 19, 2017) (initiation notice). Commerce selected Wilmar and Musim Mas as mandatory respondents because they were the two largest, publicly-identifiable Indonesian exporters of biodiesel, by volume, to the United States during the period of investigation. *See* Respondent Selection Mem. (May 3, 2017), PR 47.

In both the Preliminary and Final Determinations, Commerce concluded that it could not make a "fair comparison," as directed by the antidumping statute, between the price at which Wilmar sold biodiesel in Indonesia (*i.e.*, "normal value" or the home market sales price) and the price at which it sold biodiesel in the United States (*i.e.*, export or constructed export price).[7] Commerce reached this conclusion based on its finding that none of Wilmar's home market sales were made within the ordinary course of trade.[8] *See Biodiesel From Indon.*, 82 Fed. Reg. 50,379,

---

[7]     "In determining . . . whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a).

[8]     Though both Wilmar and Musim Mas were mandatory respondents, Commerce calculated an antidumping duty rate only for Wilmar. Regarding Musim Mas, Commerce concluded that necessary information was missing from the record as to the company's home market sales, cost of production, and U.S. sales, and that it had failed to cooperate to the best of its ability. *See* Preliminary Decision Mem. (Oct. 19, 2017) at 6-8, PR 244; *see also* Final IDM at 52-53. Accordingly, Commerce replaced all of Musim Mas's information with facts available, applying an adverse inference. Commerce, thus, did not calculate an antidumping duty rate for

50,380 (Dep't Commerce Oct. 31, 2017) ("Preliminary Determination") and accompanying

Preliminary Decision Mem. (Oct. 19, 2017) ("PDM") at 17, PR 244; *see also* Final IDM at 11.

Wilmar made two kinds of home market sales during the period of investigation: Program

sales, for which it received payment in two parts (*i.e.*, the Petrodiesel Price and the Fund Payment),

and non-Program sales, which were not subject to the two-part payment system. *See* Final IDM at

11-16. Commerce found that both kinds of sales were made "outside the ordinary course of trade"

because of the two particular market situations. *See* Final IDM at 12-13. Put another way,

Commerce believed that neither the Program sales prices nor the non-Program sales prices were

the result of market forces, and thus rejected using any of Wilmar's home market sales to

determine normal value.

### A.    Commerce's Rejection of Program Sales Because of a Sales-Based Particular Market Situation

For Program sales, Commerce found that the terms of the Program, including the two-part

payment scheme, created a sales-based particular market situation that prevented a fair comparison

between normal value and export price because the Program sales prices were not set by market

conditions. *See* Final IDM at 13 ("The [Program] is operated under a government mandate

whereby the total compensation offered to producers for biodiesel is made up of two

components: . . . the [P]etrodiesel [P]rice [set by Indonesian governmental agencies] . . . [and] the

complete biodiesel price [which is calculated using] a [crude palm oil] price, a conversion cost

and logistics expenses. . . . From the sum total of [the] second component, the price of petrodiesel

. . . is subtracted, and the balance is invoiced to [and paid by] the [Fund]."). Commerce considered

the price paid by the designated purchasers (the Petrodiesel Price) to be the "price" of biodiesel

---

Musim Mas based on the company's own information, but instead, ultimately assigned it a rate based on Wilmar's highest transaction-specific margin. *See* Final IDM at 54.

sold in the home market—*not* the supplemental Fund Payment, since the Indonesian government received nothing in return for its contribution. *See* Final IDM at 14-15 ("The focus of a dumping analysis is *only* the price that the home market customer pays the respondent for biodiesel.").

In the Final Results, Commerce examined the two sources of payment and further found that it was "clear that *neither* component of [Program] pricing is subject to negotiation, regardless of supply and/or demand." Final IDM at 13 (emphasis added). Thus, Commerce reached the conclusion that Wilmar's Program sales were not made in the ordinary course of trade based on its finding that "[b]oth components of the biodiesel price," *i.e.*, the Petrodiesel Price and the Fund Payment, "are set by the [Indonesian government]." Final IDM at 13.

### B.  Commerce's Rejection of Non-Program Sales Because of a Sales-Based Particular Market Situation and a Cost-Based Particular Market Situation

As to Wilmar's non-Program sales, Commerce concluded that, because most Indonesian biodiesel sales were made through the Program (including the majority of Wilmar's sales), even sales made outside it were affected. *See* Final IDM at 15 ("[G]overnment mandated [Program] sales comprise the vast majority of Indonesian biodiesel consumption which is a clear indication that all Indonesian biodiesel prices are distorted due to the [sales-based particular market situation created by the Program]."). In other words, according to Commerce, because of the overwhelming presence of non-market sales in the marketplace, even sales prices that might otherwise have been determined by market forces were distorted.

In addition, Commerce rejected using Wilmar's non-Program sales as the basis of normal value on another ground: its finding that the cost of biodiesel's main input, crude palm oil, was itself distorted by a particular market situation. This cost-based particular market situation finding resulted from the existence of export restraints on crude palm oil—specifically, that the Indonesian government "imposes export taxes and levies on [crude palm oil] that impede external trade and

competitive pricing for [crude palm oil]." Final IDM at 22. These "taxes and levies" included the 2015 Export Levy that Commerce determined, in its countervailing duty investigation, had resulted in indirect subsidies to Wilmar and Musim Mas. *See Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1350; *see also* PDM at 22.

For purposes of evaluating whether Wilmar's non-Program sales were in the ordinary course of trade (and thus affected normal value), Commerce stated that "the prices of [non-Program] sales are also based on . . . the distorted price of domestic [crude palm oil]. The price of [crude palm oil] comprises the vast majority of the cost to produce biodiesel in Indonesia," and thus the non-Program sales "also are outside the ordinary course of trade." Final IDM at 15.

Therefore, in the Final Determination, Commerce rejected Wilmar's Program sales because of a sales-based particular market situation, and rejected its non-Program sales because of a sales-based particular market situation *and* a cost-based particular market situation. Since it rejected these sales, the Department looked for another means to determine normal value.

### C.    Commerce's Adjustment of Constructed Value to Account for Renewable Identification Numbers (RINs)

Having determined that particular market situations prevented "a proper comparison [between normal value and] export price or constructed export price," the Department calculated Wilmar's antidumping margin using constructed value as normal value. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) & (a)(4). The process of determining constructed value (as normal value) involves putting a price or value on the subject merchandise's inputs.

Here, Commerce determined that Wilmar's actual costs for biodiesel's main input, crude palm oil, were distorted by the cost-based particular market situation created by Indonesia's export tax scheme, and thus, those costs were outside the ordinary course of trade. *See* Final IDM at 21-24. Accordingly, Commerce did not use Wilmar's reported crude palm oil costs, but rather

constructed normal value using a world market price for crude palm oil "as 'adjusted for transportation and other costs.'" *See* Final IDM at 24.

In addition, Commerce adjusted constructed value (as normal value) by accounting for the value of Renewable Identification Numbers ("RINs") associated with Wilmar's U.S. sales of biodiesel.[9] *See* Final IDM at 6-8. As will be discussed more fully, RINs are "tradeable credits [created] pursuant to a U.S. regulatory scheme administered by the Environmental Protection Agency." *Vicentin S.A.I.C. v. United States*, 43 CIT __, __, 404 F. Supp. 3d 1323, 1328 (2019) ("*Vicentin I*"). When adjusting constructed value to account for RINs, Commerce acknowledged that RINs were a feature of U.S. regulatory law and were entirely independent of Indonesian law. *See* Final IDM at 6.

---

[9]        Plaintiffs primarily challenge Commerce's adjustment of constructed value for RINs. They also challenge Commerce's decision *not* to "deduct international freight from [the] world market price" for crude palm oil. *See* Pls.' Br. at 29. In the Final Determination, Commerce declined to make this adjustment because "no information on the record" demonstrated that "the world market [crude palm oil] price is for [crude palm oil] that originated in Malaysia or Indonesia." Final IDM at 24. In other words, the record in this proceeding did not support the adjustment. Plaintiffs disagree that *no* evidence supports the adjustment and point to an exhibit that was attached to the petitions in both the countervailing and dumping investigations, labeled Exhibit CVD-IND-35. *See* Particular Market Situation Allegation (July 25, 2017), Ex. 15, PR 116. Plaintiffs assert that "[i]n the companion CVD investigation, based on [Exhibit CVD-IND-35] *and additional record evidence*, Commerce concluded that 'the CIF Rotterdam prices . . . represent shipments from Malaysia' and made the adjustment Commerce declined to make here." Pls.' Reply at 12 (emphasis added) (quoting *Biodiesel From the Republic of Indon.*, 82 Fed. Reg. 53,471 (Dep't Commerce Nov. 16, 2017) (final determination) and accompanying Issues and Decision Mem. (Nov. 6, 2017) at 22). For Plaintiffs, Commerce acted arbitrarily by failing to make the adjustment here when it found it could make the adjustment in the countervailing duty case. It is difficult to see how Exhibit CVD-IND-35, on its own, could support Plaintiffs' desired freight adjustment. The exhibit consists essentially of two separate charts of crude palm oil prices, one of which sets out Malaysian prices. It simply does not indicate that the world market price used by Commerce was for crude palm oil that originated in Malaysia. Plaintiffs do not claim that the "additional record evidence" that Commerce found supported the adjustment in the countervailing duty case is on the record here. Thus, the court cannot find Commerce acted unreasonably in declining to make a freight adjustment here.

### D.    Commerce's Use of Adverse Facts Available for Musim Mas

As for Musim Mas, Commerce found that it could not determine the normal value of the company's sales in Indonesia or its U.S. sales prices because the company had failed to provide necessary information in response to the Department's questionnaires, warranting the use of facts available. *See* Final IDM at 49-55. Specifically, the Department found that the record was missing a home market sales reconciliation, CONNUM-specific production quantities sought as a part of the company's cost of production information, and estimated RIN values for Musim Mas's U.S. sales. *See* Final IDM at 49.

Commerce further found that Musim Mas failed to cooperate to the best of its ability with the Department's requests for information. *See* Final IDM at 53-54. Accordingly, applying "total" adverse facts available,[10] the Department did not calculate an individual antidumping duty rate for Musim Mas, but instead, in the Preliminary Determination, assigned Wilmar's 50.71 percent rate to Musim Mas. *See* PDM at 9 (preliminarily assigning "the calculated estimated weighted-average dumping margin calculated for Wilmar, 50.71 percent, to Musim Mas as an [adverse facts available] rate").

In the Final Determination, Commerce made certain changes to Wilmar's and Musim Mas's antidumping duty rates. The final rate for Wilmar was 92.52 percent. *See* Final Determination, 83 Fed. Reg. at 8,836. The final adverse facts available rate for Musim Mas was 276.65 percent, *i.e.*, Wilmar's "highest transaction-specific margin." *See* Final IDM at 55.

---

[10]    "Total adverse facts available" is not defined by statute or agency regulation. Commerce uses this term "to refer to [its] application of adverse facts available . . . to the facts respecting *all of respondents' production and sales information that the Department concludes is needed for an investigation or review.*" *Nat'l Nail Corp. v. United States*, 43 CIT __, __, 390 F. Supp. 3d 1356, 1374 (2019) (emphasis added) (citation omitted).

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

Under the antidumping statute, Commerce determines if merchandise is being sold, or is likely to be sold, in the United States at less than fair value by comparing a respondent's sales price in its home market (normal value) and its sales price in the United States (export price). *See* 19 U.S.C. §§ 1673, 1677b(a). The margin between the two is used to calculate an antidumping duty rate imposed on dumped U.S. imports of subject merchandise. *Id.* § 1677(35)(A). Commerce's normal value determination is at issue here.

Normal value is defined by the antidumping statute as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities[11] and *in the ordinary course of trade* and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(B)(i) (emphasis added); *see also* 19 C.F.R. § 351.404(a) ("[I]n most circumstances sales of the foreign like product in the home market are the most appropriate basis for determining normal value."). "Ordinary course of trade" means "the conditions and practices which, for a

---

[11]     When determining whether to use a respondent's home market sales as the basis of normal value, Commerce must determine the viability of that market. A market is "viable" if "sales of the foreign like product in that country are of sufficient quantity to form the basis of normal value," *i.e.*, if "the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by an exporter or producer in a country is 5 percent or more of the aggregate quantity (or value) of its sales of the subject merchandise to the United States." 19 C.F.R. § 351.404(b)(1)-(2).

reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15).

Under the statute, Commerce "shall consider the . . . sales and transactions [enumerated in the statute], among others, to be outside the ordinary course of trade," where a "particular market situation prevents a proper comparison" with U.S. price. *Id.* § 1677(15)(C) (emphasis added). "Particular market situation" is not defined by the statute or Commerce's regulations. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"),[12] however, gives guidance as to how Commerce may determine if one exists. The SAA provides:

> [A] "particular market situation" . . . might exist . . . where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set. It also may be the case that a particular market situation could arise from differing patterns of demand in the United States and in the foreign market. For example, if significant price changes are closely correlated with holidays which occur at different times of the year in the two markets, the prices in the foreign market may not be suitable for comparison to prices to the United States.

SAA at 822, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162; *see also Nexteel Co. v. United States*, 28 F.4th 1226, 1234 (Fed. Cir. 2022) (citing SAA examples). Thus, while the statute does not mention the idea that prices must be competitively set to avoid a finding of a "particular market situation," the SAA does.

Where Commerce determines that a particular market situation renders a respondent's home market sales prices outside the ordinary course of trade (a "sales-based particular market

---

[12]     The SAA was adopted by Congress with the Uruguay Round Agreements Act. *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, 656 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040; *see also* 19 U.S.C. § 3511(a) (approving the SAA). By statute, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

situation"), and thus unusable as a basis for normal value, Commerce may construct normal value based on a respondent's production costs. *See* 19 U.S.C. § 1677b(a)(4) & (a)(1)(B)(ii)(III); *see also* 19 C.F.R. § 351.404(c)(2)(i). The statute defines "constructed value" as the sum of "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade" and "the actual amounts incurred and realized by the specific exporter or producer being examined . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(1)-(2)(A).

A particular market situation (specifically, a "cost-based particular market situation") can also render a respondent's costs outside the ordinary course of trade. Where "the cost of materials and fabrication or other processing of any kind . . . [do] not accurately reflect the cost of production in the ordinary course of trade," and are therefore unusable to determine constructed value, the statute provides that the Department "may use another calculation methodology under this part or any other calculation methodology." *See id.* § 1677b(e).

## DISCUSSION

I.   **Commerce's Decision to Rely on Constructed Value (as Normal Value) Based on Its Particular Market Situation Findings Is Sustained as to Program Sales, and Remanded as to Non-Program Sales**

Plaintiffs first challenge Commerce's finding that none of Wilmar's home market sales— *i.e.*, neither the company's Program sales nor its non-Program sales—were made in the ordinary course of trade, and therefore could not be used as a basis for normal value.[13] *See* Pls.' Br. at 13-29.

---

[13]      Because Commerce determined that the use of facts available, applying an adverse inference, was warranted to disregard all of Musim Mas's information, it did not address Musim

**A.     Wilmar's Program Sales**

In the Final Determination, Commerce found that a sales-based particular market situation was created through the implementation of the Program because the Indonesian government "control[led] the Indonesian biodiesel market to such an extent that no home market prices [could] be considered to have been competitively set and, therefore, [were] outside the ordinary course of trade." *See* Final IDM at 13. Commerce based this finding on the record evidence demonstrating that under the Program, participating producers, including Wilmar, sold biodiesel to designated purchasers in quantities, and at a price, set by the Indonesian government. *See* Final IDM at 12 ("It is undisputed and verified that Wilmar (or any other biodiesel producer) has no discretion to modify the prices or the volume [of biodiesel] to be supplied as mandated by the government.").

Plaintiffs argue that Wilmar's Program sales should have been used as the basis for normal value (1) "because government intervention alone cannot serve as the basis for a [particular market situation] finding," *i.e.*, Commerce unlawfully failed to determine whether the government's control had any effect on pricing; (2) because the Department ignored "substantial record evidence that the [P]rogram in fact based biodiesel prices on market indices"; and (3) because Commerce decided, without evidence, that the second component of the Program payments, *i.e.*, the Fund Payment, was not market-based. *See* Pls.' Br. at 13.

Commerce's finding that a sales-based particular market situation rendered Wilmar's Program sales outside the ordinary course of trade, and therefore unusable as a basis for normal value, is supported by substantial evidence and otherwise in accordance with law.

---

Mas individually in its particular market situation analysis. Before the court, Musim Mas "incorporates by reference" Wilmar's arguments addressed here, challenging Commerce's particular market situation determinations. *See* Musim Mas's Br. at 11 ("[S]hould this Court order a remand, it should direct Commerce to use the actual home market sales and costs of both Wilmar and [Musim Mas].").

The SAA provides that a particular market situation might exist "where there is government control over pricing *to such an extent* that home market prices cannot be considered to be competitively set." SAA at 822 (emphasis added). Here, Commerce reasonably found that, through the Program, "the government's interventions have had a direct effect on biodiesel prices and production in Indonesia during the [period of investigation]" that justified finding the existence of a sales-based particular market situation. *See* Final IDM at 13. Commerce found that "neither component of [Program] pricing [*i.e.*, the Petrodiesel Price or the Fund Payment] is subject to negotiation, regardless of supply and/or demand," and "[b]oth components of the biodiesel price are set by the [Indonesian government]." Final IDM at 13. The record supports this finding.

As an initial matter, there can be no serious argument that the Fund Payment component of the Program pricing is competitively set. In *Wilmar CVD*, this Court sustained Commerce's finding that the Fund Payments are subsidies in the form of grants from the Indonesian government. *See* 44 CIT at __, 466 F. Supp. 3d at 1344 ("The Government, through the Fund, [paid] to Wilmar and Musim Mas roughly the difference between the payment they had received [from sales of their biodiesel at the *Petrodiesel Price*] and the domestic market price for biodiesel."). Indeed, Wilmar itself concedes that the price paid by the purchasers was not a market price for biodiesel or "normal in trade," because it acknowledges that the Fund Payment is necessary to make biodiesel producers "whole." *See* Pls.' Br. at 20-21 (emphasis added) ("[T]he [Indonesian government] does not confer 'supplemental payments' on [Program] sales, but rather pays *one portion of the biodiesel sales price*."). Thus, Fund Payments cannot be said to have been determined by the market.

Additionally, with regard to the Petrodiesel Price component, Commerce cited record evidence showing that the Petrodiesel Price per metric ton of biodiesel—that is, the "price" for

Program sales—was significantly lower than the price for biodiesel sold *outside* the Program in

Indonesia.[14] *See* Wilmar Prelim. Analysis Mem. (Oct. 19, 2017) at 3 & attach. 4, CR 289, 297, PR

246 ("Prelim. Analysis Mem."). Here too, the Petrodiesel Price was set by the Indonesian

government. *See* Final IDM at 12.

Because both the Fund Payment and the Petrodiesel Price are determined by the Indonesian

government, the payments made for petrodiesel were not competitively set. The court, therefore,

sustains Commerce's decision to exclude Wilmar's Program sales from its normal value

determination.

### B.  Non-Program Sales

Plaintiffs insist that even if the court should find that the Petrodiesel Price and Fund

Payments resulted in home market sales prices that were not based on market forces, Wilmar's

non-Program sales could provide a usable price because they were made in the ordinary course of

trade. Plaintiffs argue that (1) the prices and terms of Wilmar's non-Program sales were negotiated

at arm's length; (2) non-Program sales "constitute[d], in both quantity and value terms, more than

five percent of the volume of Wilmar's U.S. sales," and thus the home market was "viable" under

Commerce's regulations; and (3) prices of domestic crude palm oil were not distorted, but even if

they were, Commerce violated the statute by turning to the question of input costs (*i.e.*, an aspect

of constructed value) before evaluating Wilmar's sales (*i.e.*, normal value based on price). *See*

Pls.' Br. at 21-22.

The court remands Commerce's determination that Wilmar's non-Program sales were not

made in the ordinary course of trade, and therefore could not serve as a basis for normal value.

---

[14]      The average price per metric ton of biodiesel sales outside of the Program was
roughly half the average price per metric ton of sales made under the Program. *See* Prelim.
Analysis Mem. at 3.

Arriving at this conclusion, however, is not entirely straightforward. As an initial matter, the court notes that in *Wilmar CVD*, the Court upheld Commerce's determination regarding attribution[15]— *i.e.*, that the Fund "provided grants that were tied (*i.e.*, attributed) to all sales of biodiesel by Wilmar . . . not just those made in the Indonesian market." 44 CIT at __, 466 F. Supp. 3d at 1347. The basis for this determination, which the Court found reasonable, was Commerce's finding that "the purpose of the Fund was to subsidize biodiesel *as a product*, whether sold domestically or exported." *Id.* at __, 466 F. Supp. 3d at 1347. In other words, the benefit of the Fund Payments applied to *all* of Wilmar's domestic sales, irrespective of whether they were Program or non-Program sales because the grants were paid to the company, and although they were paid on account of the Program sales, the result was that all sales, Program and non-Program, benefitted. *See id.* at __, 466 F. Supp. 3d at 1347-48 ("Commerce [was] right that the Fund subsidies should be attributed to all of Wilmar's . . . sales of biodiesel (*i.e.*, in Indonesia and the United States) during the period of investigation." (citation omitted)).

Against this backdrop, and considering the facts of record in this case, it is entirely possible that Commerce might be able to find a price effect on the non-Program sales resulting from the grants. Even considering this possibility, though, Commerce has not adequately explained and supported with evidence its decision to disregard Wilmar's non-Program sales. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Commerce, of course, found that "[Program] sales comprise the vast majority of Indonesian biodiesel consumption at the

---

[15]        Under Commerce's regulations, "[a]ttribution means that, if the Department finds that a subsidy is 'tied to a particular market,' it will 'attribute the subsidy only to the products sold by the [respondent] to that market.'" *Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1342 (quoting 19 C.F.R. § 351.525(b)(4)). "On the other hand, if a subsidy is 'tied to a particular product,' it will be attributable to all sales of that product," including exports to the United States. *Id.* at __, 466 F. Supp. 3d at 1342 (citing 19 C.F.R. § 351.525(b)(5)(i)).

country-wide level, with a significant portion allocated to Wilmar." Final IDM at 12. The record

appears to support this finding.[16] *See* Prelim. Analysis Mem. at 2 ("Record information shows that

biodiesel procured by the [crude palm oil] subsidy fund totaled 2,132,289 metric tons for the

period November 2015 through October 2016, whereas the estimated total consumption of

biodiesel in Indonesia was projected at 1,958,225 metric tons for 2016. This indicates that the

[Program] sales comprised the vast majority of Indonesian biodiesel sales.").

     Despite record evidence that Commerce might have been able to cite of a price effect on

non-Program sales resulting from Program sales, it has failed to do so. It has merely made a claim

and stated it as a fact. *See* Final IDM at 15 ("[G]overnment mandated [Program] sales comprise

the vast majority of Indonesian biodiesel consumption which is a clear indication that all

Indonesian biodiesel prices are distorted due to the [sales-based particular market situation created

by the Program].") Remand is thus required for Commerce to provide the necessary explanation

and support it with substantial evidence.

     Turning to Commerce's second reason for finding that non-Program sales were not

competitively set, substantial evidence supports the finding that the cost of crude palm oil—the

main input in biodiesel—was distorted by the particular market situation created by Indonesia's

export taxes and levies, including the 2015 Export Levy. In the Final Determination, Commerce

compared the world market price for crude palm oil with the average Indonesian price for crude

palm oil and found that, on average, "during the [period of investigation], the world market price

for [crude palm oil] was $681/MT, while the average price in Indonesia was $649/MT"—a

roughly $30 difference per metric ton. *See* PDM at 23. That is, "Indonesian [crude palm oil] prices

---

[16]     With respect to Wilmar, in particular, the evidence showed that "of Wilmar's total
home market sales 89 percent was sold under the [Program]." Prelim. Analysis Mem. at 3.

were below world market prices in each month since the imposition of the levy (including each month of the [period of investigation]).” PDM at 23 (noting that the Indonesian government’s levy “lower[ed] the cost of [crude palm oil] for the production of biodiesel by increasing the supply of [crude palm oil] available in the domestic market,” Commerce compared “the prices paid by Wilmar for Indonesian [crude palm oil] to the world market price, and determined that such a price differential exists.”). Thus, it was not necessarily unreasonable for Commerce to assume that a cost-based particular market situation contributed to non-Program sales being outside the ordinary course of trade. *See Nexteel*, 28 F.4th at 1234 (“[A] quantitative comparison showing a difference between costs incurred and costs in the ordinary course of trade could be substantial evidence supporting the existence of a particular market situation.”).

The problem is that here Commerce has failed to show just how the price paid for the biodiesel sold in non-Program sales was affected by the distorted cost of crude palm oil or that the non-Program price was not determined by the market. Again, Commerce has made a statement but failed to explain and support it with substantial evidence. *See* Final IDM at 15 (“[T]he prices of [non-Program] sales are also based on . . . the distorted price of domestic [crude palm oil]. The price of [crude palm oil] comprises the vast majority of the cost to produce biodiesel in Indonesia,” and thus the non-Program sales “also are outside the ordinary course of trade.”).

On remand, the Department shall either support with substantial evidence a finding that one or more particular market situations existed with respect to the non-Program sales or use the price paid for these sales in its normal value determination.

## II. The Legal Authority for Commerce's Adjustment to Constructed Value (as Normal Value) to Account for Renewable Identification Numbers (RINs) Requires Explanation

Next, Plaintiffs challenge the manner in which the Department adjusted constructed value to account for RINs associated with Wilmar's U.S. sales. As noted above, RINs are

> tradeable credits pursuant to a U.S. regulatory scheme administered by the [Environmental Protection Agency, or "EPA"]. The EPA requires that biodiesel producers or importers ("obligated parties") meet an annual "renewable volume obligation," pursuant to which obligated parties must submit RINs equal to the number of gallons of renewable fuel comprising their renewable volume obligation. RINs are generated through biodiesel production in the United States or importation of biodiesel. The obligated party that generates RINs may use them to satisfy its renewable volume obligation, or it may trade or sell them to other obligated parties.

*Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1328. At the time they are created, RINs have no denominated dollar value. When certain biodiesel is imported into the United States, the purchaser of the biodiesel receives an amount of RINs in addition to the biodiesel itself. Despite having no denominated value, since the RINs have actual value and can be traded, the purchaser receives something of value in addition to the fuel.

In the Final Determination, Commerce found that it was necessary to inflate constructed value (as normal value) to ensure a proper comparison with U.S. price, although RIN values were embedded in U.S. prices, not Indonesian prices. Commerce cited as authority for its adjustment 19 C.F.R. § 351.401(c). *See* Final IDM at 7 ("In order to account for this upward adjustment in the RIN-inclusive [U.S.] sales, an offsetting addition to [normal value] is appropriate under 19 CFR 351.401(c) to match the adjustment already embedded or included in the U.S. price."). Subsection 351.401(c) of Commerce's regulations states:

> In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable).

19 C.F.R. § 351.401(c). Subsection 351.102(b) defines "price adjustment" as "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale (see § 351.401(c)), that is reflected in the purchaser's net outlay." *Id.* § 351.102(b)(38). Simply put, Commerce's regulations permit adjustments to U.S. price and normal value to enable it to make an apples-to-apples comparison between the two.

The Department insists it has the authority to make an addition to constructed value (as normal value) to account for the value of the RINs. Because, however, Commerce has failed to explain adequately the reason why it made the adjustment to constructed value, rather than export price or constructed export price, or cite sufficient legal authority for the adjustment, remand is required.

This Court addressed circumstances like those present here in *Vicentin I*, where Commerce made a price adjustment to constructed value (as normal value) to account for RIN values embedded in U.S. prices. *See* 43 CIT at __, 404 F. Supp. 3d at 1332-34. At the preliminary determination stage of both *Vicentin I* and this case, Commerce adjusted for RIN values by making a "circumstances of sale" adjustment to normal value, pursuant to 19 U.S.C. § 1677b(a)(6)(C)(iii) and 19 C.F.R. § 351.410. *See id.* at __, 404 F. Supp. 3d at 1332-34; *see also* Final IDM at 6. At the final determination stage of both *Vicentin I* and the present case, however, Commerce changed its analysis and adjusted normal value based on 19 C.F.R. § 351.401(c) (price adjustments). *See Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1332; *see also* Final IDM at 6.

The *Vicentin I* Court remanded the case to Commerce because it could not find statutory authority for Commerce's determination that the adjustment for RINs could be made to normal value instead of to export price. *See* 43 CIT at __, 404 F. Supp. 3d at 1333 (footnote omitted)

("[E]ven if it were reasonably discernable that Commerce relied upon 19 C.F.R. § 351.401(c)
[price adjustments] to offset an embedded RIN adjustment, Commerce has not explained why it
can adjust the normal value as opposed to the U.S. price."). In other words, the Court found that
the Department had not clearly tied its normal value adjustment to the law. *Id.* at __, 404 F. Supp.
3d at 1334 ("In light of Commerce's failure to clearly explain the statutory authority empowering
it to adjust normal value for RIN values . . . the court remands Commerce's determination for
further consideration or explanation.").

On remand, after *Vicentin I*, Commerce modified its determination and "accounted for
RINs by decreasing export and constructed export price," a determination that was sustained by
the Court because Commerce had supported with substantial evidence its authority to adjust export
price for RIN values. *See Vicentin S.A.I.C. v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1227,
1230 (2020).

The court finds that Commerce's adjustment to constructed value (as normal value) is
similarly unexplained here. In the Final Determination, Commerce cited no provision in the statute
or in its own regulations authorizing the addition of an amount to constructed value (as normal
value) to account for increases in U.S. price. Subsection 351.401(c) of Commerce's regulations
permits adjustments for "a change that is made after the time of sale," provided that "the interested
party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment," but
does not authorize adjusting normal value where the change in price affected *U.S. sales*. *See* 19
C.F.R. §§ 351.102(b)(38), 351.401(c). Rather, the regulation expressly authorizes the adjustment
of normal value where normal value is based on price. *See* 19 C.F.R. § 351.401(c) (emphasis
added) ("In calculating export price, constructed export price, and normal value (*where normal
value is based on price*), the Secretary normally will use a price that is net of price

adjustments . . . ."). Here, Commerce stated by way of explanation that "by not affecting the U.S. sales denominator, an addition to [normal value] results in a dumping margin based on a denominator that is proportional to entered value, which is inclusive of the RIN markup." Final IDM at 7. This explanation, however, does not demonstrate why Commerce left U.S. sales unaffected in its calculations, when those are the sales that actually contain RIN values. As in *Vicentin I*, Commerce's decision fails to establish the necessary legal authority for applying a price adjustment to normal value when the factual basis for its adjustment concerned U.S. price. It is worth noting that the statutory path for an adjustment to export price (U.S. price) appears to be clear.

Accordingly, this issue is remanded for the Department to establish the statutory and regulatory basis for its authority to adjust constructed value (as normal value) for RINs. In the event that Commerce can provide no such justification, and chooses to make an alternative adjustment (such as an adjustment to U.S. price), its determination must be supported by substantial evidence and in accordance with law. "[T]he path of Commerce's decision must be reasonably discernable to [the] reviewing court." *NMB Sing.*, 557 F.3d at 1319 (citation omitted).

## CONCLUSION AND ORDER

Based on the foregoing, it hereby

**ORDERED** that the court reserves decision on Musim Mas's challenges to Commerce's use of adverse facts available until the results of redetermination are before the court; it is further

**ORDERED** that the Final Determination is sustained in part and remanded; it is further

**ORDERED** that Commerce shall submit a redetermination upon remand that complies in all respects with this Opinion and Order; it is further

**ORDERED** that Commerce shall either support with substantial evidence a finding that one or more particular market situations existed with respect to Wilmar's non-Program sales or use the price paid for these sales in its normal value determination; it is further

**ORDERED** that Commerce shall establish the statutory and regulatory basis for its authority to adjust constructed value (as normal value) for RINs. In the event that Commerce can provide no such justification, and chooses to make an alternative adjustment (such as an adjustment to U.S. price), its determination must be supported by substantial evidence and in accordance with law; and it is further

**ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be due fifteen (15) days following the filing of the comments.

                                                              /s/ Richard K. Eaton
                                                                          Judge

Dated:              June 9, 2022
                    New York, New York