## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| WILMAR TRADING PTE LTD, PT WILMAR BIOENERGI INDONESIA, and WILMAR OLEO NORTH AMERICA LLC, | : : : : |
| Plaintiffs, | : : |
| and | : : |
| P.T. MUSIM MAS and GOVERNMENT OF THE REPUBLIC OF INDONESIA, | : : : |
| Consolidated Plaintiffs, | : : |
| v. | : Consol. Court No. 18-00121 |
| UNITED STATES, | : **NON-CONFIDENTIAL VERSION** |
| Defendant, | : Business Proprietary Information has been removed from pages 9-11, and 13. |
| and | : |
| NATIONAL BIODIESEL BOARD FAIR TRADE COALITION, | : : |
| Defendant-Intervenor. | : : |

### COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Bernd G. Janzen
Devin S. Sikes
Brandon J. Custard
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006

*Counsel to Plaintiffs*

October 24, 2022

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................................. i
INTRODUCTION ...........................................................................................................................1
BACKGROUND .............................................................................................................................1
    I.    Investigation ...............................................................................................................1
    II.    Court's Remand Opinion ...........................................................................................2
    III.    Commerce's Final Remand Results ..........................................................................3
SUMMARY OF THE ARGUMENT ..............................................................................................4
STANDARD OF REVIEW .............................................................................................................4
ARGUMENT ...................................................................................................................................6
    I.    Commerce Fails to Support with Substantial Evidence its Decision to
        Reduce Export Price by the Value of RINs ...............................................................6
    II.    Commerce Arbitrarily and Capriciously Rejected Wilmar's Non-PSO
        Sales as the Basis for Normal Value .........................................................................9
        A.    Wilmar Competitively Set the Prices of its Non-PSO Sales ........................9
        B.    The PSO Did Not Distort the Prices of Non-PSO Sales ..............................9
        C.    The Export Tax and Export Levy on CPO Did Not Distort the
            Prices of Non-PSO Sales ............................................................................13
    III.    Commerce's PMS Determinations Resulted in the Unlawful Imposition of
        Double Remedies .....................................................................................................14
    IV.    Commerce Erred in Calculating Wilmar's Constructed Value ...............................15
CONCLUSION ..............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ANR Storage Co. v. FERC*,
 904 F.3d 1020 (D.C. Cir. 2018)..................................................................................................14

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
 419 U.S. 281 (1974).....................................................................................................................5

*China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*,
 771 F. Supp. 407 (Ct. Int'l Trade 1991) ................................................................................8, 13

*Consol. Edison Co. v. NLRB*,
 305 U.S. 197 (1938)...................................................................................................................10

*CS Wind Vietnam Co., Ltd. v. United States*,
 832 F.3d 1367 (Fed. Cir. 2016)....................................................................................................5

*DuPont Teijin Films USA v. United States*,
 407 F.3d 1211 (Fed. Cir. 2005)..................................................................................................10

*Encino Motorcars, LLC v. Navarro*,
 579 U.S. 211 (2016).....................................................................................................................5

*Gerald Metals, Inc. v. United States*,
 132 F.3d 716 (Fed. Cir. 1997)......................................................................................................5

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*,
 865 F.3d 1348 (Fed. Cir. 2017)..................................................................................................14

*LMI-La Metalli Industriale, S.p.A. v. United States*,
 912 F.2d 455 (Fed. Cir. 1990)...............................................................................................5, 11

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile
 Ins. Co.*, 463 U.S. 29 (1983) .......................................................................5, 8, 10, 11, 12, 13

*NLRB v. Columbian Enameling & Stamping Co.*,
 306 U.S. 292 (1939).....................................................................................................................5

*SeAH Steel VINA Corp. v. United States*,
 950 F.3d 833 (Fed. Cir. 2020)................................................................................................8, 13

*Vicentin S.A.I.C. v. United States*,
 42 F.4th 1372 (Fed. Cir. 2022) ................................................................................................3, 8

*Vicentin S.A.I.C. v. United States*,
466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020) ....................6

*Wilmar Trading Pte Ltd. v. United States*,
582 F. Supp. 3d 1243 (Ct. Int'l Trade 2022) .................... *passim*

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ....................5

*Zhejiang DunAn Hetian Metal Co. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011)....................5

**Statutes**

5 U.S.C.
§ 706(2)(A) ....................5

19 U.S.C.
§ 1516a(b)(1)(B)(i) ....................4
§ 1677a(a)-(b) ....................6, 7
§ 1677b(a)(1)(A), (B)(ii)(II) ....................9

**Legislative Materials**

H.R. Rep. No. 103-316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 ....................11, 12

**Regulations**

19 C.F.R. § 351.102(b)(38)....................7

19 C.F.R. § 351.401(c)....................6, 7

**Administrative Determinations**

*Biodiesel from Indonesia: Final Determination of Sales at Less Than Fair Value*,
83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018)....................1

*Biodiesel from the Republic of Indonesia: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 53,471 (Dep't of Commerce Nov. 16, 2017) ....................14

*Certain Frozen Warmwater Shrimp from Thailand*, 76 Fed. Reg. 40,881 (Dep't of Commerce Jul. 12, 2011) ....................12

# INTRODUCTION

In the Final Results of Determination Pursuant to Court Remand ("Final Remand Results"), the U.S. Department of Commerce ("Commerce") effectively repudiates the mandates established by Congress to administer the antidumping law in a remedial manner and engage in non-arbitrary decision-making. *See* ECF 91-1. Commerce arbitrarily inflates the dumping margin assigned to Plaintiffs Wilmar Trading Pte Ltd, PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC ("Wilmar") by incorrectly deducting the value of Renewable Identification Numbers ("RINs") from export price. In so doing, Commerce disregards the facts and penalizes Wilmar for having to navigate different regulatory regimes for biodiesel in the United States and Indonesia. On the other side of the calculation, Commerce erroneously refuses to rely on Wilmar's non-Public Service Option ("PSO") sales as the basis for normal value, jettisoning these sales based on particular market situation ("PMS") findings that neither the record nor logic supports. The upshot of the Final Remand Results is a dumping margin calculated for Wilmar that cannot reasonably be described as accurate, but instead reflects a runaway succession of arbitrary, unsupported, and punitive findings. The Court should therefore remand anew.

# BACKGROUND

I. **Investigation**

On March 1, 2018, Commerce published notice of its final determination in the antidumping duty investigation of biodiesel from Indonesia. *Biodiesel from Indonesia: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) ("*Final Determination*"), and the accompanying Issues and Decision Memorandum ("IDM"). Commerce reached two relevant conclusions. First, Commerce adjusted normal value to purportedly ensure a proper comparison between normal value and export price in instances where the U.S. sales price includes the values of biodiesel and embedded RINs. IDM at 6-8.

1

Second, Commerce found that it was necessary to rely on constructed value, rather than Wilmar's home market sales in Indonesia, as the basis for normal value. *Id.* at 7.

With respect to the first issue, Commerce found that the gross starting price for RIN-inclusive U.S. sales of biodiesel included values for both biodiesel and the RINs. *Id.* Commerce added these RIN values to constructed value, even though they are a function of only the U.S. regulatory regime for biodiesel. *Id.*

Regarding the second issue, Commerce found that two bases for a PMS existed in Indonesia during the period of investigation, one that allegedly impacted Wilmar's reported crude palm oil ("CPO") costs and another that purportedly affected Wilmar's sales of biodiesel. *Id.* at 8-24. With respect to the cost-based PMS, Commerce found that the Government of Indonesia's ("GOI") imposition of an export tax and an export levy on CPO resulted in distorted costs for CPO, such that the cost of production for biodiesel does not reflect the cost of production in the ordinary course of trade. *Id.* at 16-24. As to the sales-based PMS, Commerce determined that the GOI's PSO required biodiesel producers like Wilmar to sell a specified quantity of biodiesel in Indonesia at a price established by the GOI, such that the sales prices were not competitively set and, therefore, were outside the ordinary course of trade. *Id.* at 8-16.

## II.     Court's Remand Opinion

In *Wilmar Trading Pte Ltd. v. United States*, 582 F. Supp. 3d 1243 (Ct. Int'l Trade 2022), the Court remanded Commerce's determinations on the RIN values and PMS. As to the RIN issue, the Court ordered Commerce to explain the statutory and regulatory basis for its authority to adjust normal value for RINs or, alternatively, defend the proposed adjustment on a different basis. *Id.* at 1257.

Turning to the sales-based PMS determination, the Court remanded Commerce's determination that "Wilmar's non-{PSO} sales were not made in the ordinary course of trade, and

2

therefore could not serve as the basis for normal value." *Id.* at 1255. In particular, the Court reasoned that, "{d}espite record evidence that Commerce might have been able to cite of a price effect on non-{PSO} sales resulting from {PSO} sales, it . . . failed to do so" and, instead, "merely made a claim and stated it as a fact." *Id.* at 1256.

As to the cost-based PMS, although the Court found that "it was not necessarily unreasonable for Commerce to assume that a cost-based {PMS} contributed to non-{PSO} sales being outside the ordinary course of trade," Commerce nevertheless "failed to show just how the price paid for the biodiesel in non-{PSO} sales was affected by the distorted cost of {CPO} or that the non-{PSO} price was not determined by the market." *Id.*

### III.    Commerce's Final Remand Results

Following the release of draft remand results and comments from interested parties, Commerce submitted its Final Remand Results to the Court on September 22, 2022. Changing course from the *Final Determination*, Commerce deducted the values of RINs from export price. Final Remand Results at 21. Commerce based its decision in large part on *Vicentin S.A.I.C. v. United States*, 42 F.4th 1372 (Fed. Cir. 2022), which (in Commerce's view) upheld Commerce's deduction of RIN values from export price under similar facts. *Id.* at 22-23.

Apart from its decision on RIN values, Commerce also declined to rely on Wilmar's non-PSO sales as the basis for normal value. Commerce found that, "as a whole," the biodiesel market in Indonesia was distorted by the sales-based PMS (stemming from the GOI's PSO) and the cost-based PMS (resulting from the export tax and export levy on CPO), "such that prices of all biodiesel sales in that market" (including sales made outside of the PSO) were "outside the ordinary course of trade" and therefore not an appropriate basis for normal value. *Id.* at 31-32.

3

## SUMMARY OF THE ARGUMENT

In the Final Remand Results, Commerce once again fails to reconcile its conclusions with substantial record evidence and the law. The Court therefore should remand anew.

With respect to RIN values, Commerce divorces its approach from Wilmar's actual commercial experience, instead calculating a dumping margin that is arbitrary and punitive rather than accurate. Because Commerce has deducted the RIN values from export price without record support, it has unlawfully inflated Wilmar's dumping margin.

Regarding its determination as to non-PSO sales, Commerce fails to provide a reasoned, evidence-supported basis for its decision to reject them as the basis for normal value. Commerce likewise does not meaningfully grapple with substantial record evidence that detracts from its conclusions, such as the significant price differential between PSO and non-PSO sales. Finally, Commerce does not show any distortive effect that the export tax and export levy on CPO had on the market for non-PSO sales in Indonesia.

Finally, the Court should remand to Commerce for two additional reasons. First, Commerce's PMS determinations impose an unlawful double remedy. Second, if the Court agrees that Commerce should rely on Wilmar's non-PSO sales as the basis for normal value, the Court should order Commerce to recalculate Wilmar's constructed value profit ratio. Wilmar raised these arguments in its opening and reply briefs, but the Court did not rule on them in *Wilmar*. The Court should decide them now in Wilmar's favor.

## STANDARD OF REVIEW

The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence

4

as a reasonable mind might accept as adequate to support a conclusion{.}" *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939) (cleaned up); *accord Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011). The standard "requires more than mere assertion of evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (cleaned up). Commerce may also not rely upon mere speculation or assumptions unsupported by substantial evidence and, instead, "must yield" to the substantial evidence in the record. *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990).

Under the Administrative Procedure Act, the Court may separately set aside a Commerce decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Commerce acts arbitrarily and therefore unlawfully when it fails to provide "a reasoned basis" for its choices. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Commerce has a reasoned basis for its choices when it provides an "A-to-Z explanation" grounded in "evidence-based factual findings." *CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016). Proffering "conclusory statements," however, will not do. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). Instead, Commerce "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

Finally, the Court reviews Commerce's remand determinations "for compliance with the Court's remand order." *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d

5

1255, 1259 (Ct. Int'l Trade 2014) (cleaned up). Commerce's failure to comport with the Court's remand order provides grounds for another remand. *See, e.g.*, *Vicentin S.A.I.C. v. United States*, 466 F. Supp. 3d 1227, 1245 (Ct. Int'l Trade 2020).

## ARGUMENT

**I.    Commerce Fails to Support with Substantial Evidence its Decision to Reduce Export Price by the Value of RINs**

In the Final Remand Results, Commerce reduced export price by Wilmar's RIN values, claiming that the attendant increase in the dumping margin was justified under 19 U.S.C. § 1677a(a)-(b) and 19 C.F.R. § 351.401(c). Final Remand Results at 21. However, Commerce's approach ignores substantial evidence regarding a key element of value that Wilmar receives on its U.S. sales through the normal operation of the legal framework governing the U.S. biodiesel market.

In *Wilmar*, the Court confirmed that "RIN values were embedded in U.S. {biodiesel} prices" and that U.S. biodiesel prices "actually contain RIN values." 582 F. Supp. 3d at 1257, 1258. Along with the physical biodiesel, the RIN is one of the three components of the full U.S. price received by Wilmar. P.R. 104 at C-21 ("For CEP sales, the total price received by Wilmar represents the sum of the three components of the sale, i.e., the physical product, the RIN, and the blender's tax credit.").[1] In view of these facts, the Court remanded this issue to Commerce so that it could reach a conclusion "supported by substantial evidence and in accordance with law." *Wilmar*, 582 F. Supp. 3d at 1259. Commerce has flunked that test.

The statute requires Commerce to use "the price at which the subject merchandise is first sold" as the export price. 19 U.S.C. § 1677a(a), (b). Commerce may adjust that price to account

---

[1] "P.R." refers to a document in the public record, whereas "C.R." refers to a document in the confidential record. All record citations refer to the item number in the relevant index.

6

for "price adjustments," 19 C.F.R. § 351.401(c), which constitute "a change in the price charged for the subject merchandise . . . , such as a discount, rebate, or other adjustment . . . that is reflected in the purchaser's net outlay." *Id.* § 351.102(b)(38).

Commerce fails to reconcile these legal authorities with its own prior findings and the record facts. In the final determination, Commerce found that RINs are "actual values" that are included in "the gross or starting prices reported to Commerce for RIN-inclusive U.S. sales of biodiesel{.}" IDM at 7. Commerce's finding in the final determination aligns with its verification results, which confirmed that RINs are not adjustments to the buyer's "net outlay," but rather an integral component of the full price (or "net outlay") paid to the buyer. P.R. 266 at 5-6 ("RINs are attached to the product and included in the invoice price and thus recorded with the sale of the product."). Stated differently, the value of RINs formed a fundamental and inextricable component of the full value of the imported biodiesel—whether or not Wilmar detached the RINs upon importation for resale to third parties—and each gallon of imported biodiesel had an associated RIN value for which Wilmar realized revenue. *Id.* Thus, Commerce's prior findings and the record evidence demonstrate that RIN values do not reflect "a change" in the buyer's net outlay under 19 C.F.R. § 351.102(b)(38), but rather form part of "the price at which the subject merchandise is first sold" under 19 U.S.C. § 1677a(a), (b).

Commerce brushes past these facts and deducts the RIN value from export price because RIN-inclusive biodiesel purportedly "does not reflect the true 'starting price' of biodiesel." Final Remand Results at 22. That conclusion ignores what the record shows (and what Commerce concedes elsewhere in the Final Remand Results): "RIN values constitute part of the purchase price of biodiesel sold with RINs by Wilmar as RIN-eligible biodiesel sold to the United States." *Id.* at 21; *see also* P.R. 266 at 5-6. In other words, RIN-inclusive biodiesel *necessarily* includes in

7

its starting price some value attributable to RINs. *See* P.R. 104 at C-21; P.R. 266 at 5-6. Indeed, as Commerce acknowledges, Wilmar's invoices do not include a separate line item for RIN value, and Wilmar did not separately negotiate the RIN value with its customers. Final Remand Results at 9. Commerce cites no evidence demonstrating that the starting price for RIN-inclusive biodiesel is something other than what Wilmar reported, and its "{g}uesswork is no substitute for substantial evidence in justifying decisions." *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 847 (Fed. Cir. 2020) (quoting *China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 771 F. Supp. 407, 413 (Ct. Int'l Trade 1991)). Because Commerce's "decision {} runs counter to the evidence before the agency," the Court should set it aside. *State Farm*, 463 U.S. at 43.

Setting aside this evidentiary gap, Commerce invites the Court to rubber stamp its decision because the Federal Circuit in *Vicentin* "upheld Commerce's deduction of RIN values from export price . . . under similar facts." Final Remand Results at 23. Commerce does not bother to identify the relevant facts or discuss their similarities. *See id.* Regardless, *Vicentin* does not address the undisputed fact that the starting price for Wilmar's RIN-inclusive biodiesel includes the value of RINs, such that *Vicentin* is inapposite. *See generally* 42 F.4th 1372.

In the end, Commerce seeks to adjust export price by RIN values to account for regulatory differences in markets. But Commerce cites no legal basis for such an adjustment. Congress never instructed Commerce to somehow account in its dumping margin calculations for differences in regulatory mechanisms between the markets subject to comparison. Commerce may not make adjustments for every difference that may exist between the comparison market and the U.S. market, but rather may only make those adjustments enumerated under the statute and regulations. The Court should remand this issue anew to Commerce, with instructions to not adjust export price to account for RIN values.

**II.     Commerce Arbitrarily and Capriciously Rejected Wilmar's Non-PSO Sales as the Basis for Normal Value**

In *Wilmar*, the Court found that Commerce "failed to show . . . how the price paid for the biodiesel sold in non-{PSO} sales was affected by the distorted cost of {CPO} or" by the PSO. 582 F. Supp. 3d at 1256.  As a result, the Court ordered Commerce to either (1) "support with substantial evidence a finding that one or more {PMS} existed with respect to the non-{PSO} sales," or (2) "use the price paid for these sales in its normal value determination." *Id.*  Faced with these options, Commerce chose the first and attempted to demonstrate that a PMS existed in Indonesia that prevented Wilmar's non-PSO sales from serving as the basis for normal value.  *See* Final Remand Results at 31-37.  In so doing, Commerce failed to support its findings with substantial evidence, reconcile its decisions with what the law demands, and provide a reasoned explanation for its choices.

**A.     Wilmar Competitively Set the Prices of its Non-PSO Sales**

The record shows that Wilmar competitively set the prices of its non-PSO sales.  The PSO did not administratively set the price and quantity for these sales.  Indeed, as Commerce acknowledges, the non-PSO sales commanded an average price nearly **[      ]** the average price of PSO-sales, thus demonstrating that the PSO did not, in fact, impact sales outside of the PSO. Final Remand Results at 36. As Commerce elsewhere acknowledges, the non-PSO sales comprise **[   ]** percent of Wilmar's biodiesel sales. *Id.* at 34.  Under the law, Commerce "shall" rely on these non-PSO sales as the basis for normal value.  19 U.S.C. § 1677b(a)(1)(A), (B)(ii)(II).

**B.     The PSO Did Not Distort the Prices of Non-PSO Sales**

Notwithstanding the representativeness of Wilmar's non-PSO sales, Commerce decided to disregard them in the Final Remand Results. At the outset of its analysis, Commerce predicates its examination of the non-PSO sales on the view that "a PMS analysis is concerned with

9

distortions in the overall market, rather than distortions on particular sales or transactions of a particular company." Final Remand Results at 32. Commerce's adopted analytic framework, however, ignores the Court's remand order, which directed Commerce to either (1) "support with substantial evidence a finding that one or more {PMS} existed with respect to the non-{PSO} sales," or (2) "use the price paid for these sales in its normal value determination." *Wilmar*, 582 F. Supp. 3d at 1256. In reframing the inquiry as it prefers, Commerce attempts to circumvent its obligation to address important aspects of the problem and base its fact-finding on "*relevant evidence {that} a reasonable mind might accept as adequate to support a conclusion.*" *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (emphasis added); *accord DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Commerce has no license to employ a test that by design avoids a threshold issue and eschews relevant facts. *See State Farm*, 463 U.S. at 43 (holding that an agency acts arbitrarily and capriciously if it "entirely fail{s} to consider an important aspect of the problem").

Instead of comporting with the Court's remand order and providing a straightforward answer to an important problem, Commerce attempts to short-circuit the inquiry altogether by focusing on the PSO. Because "the GOI dramatically redirects the supply of domestically-produced biodiesel" through the PSO, Commerce found that the GOI "distort{ed} the part of the market comprised of non-PSO sales by removing the [     ] biodiesel customers . . . in Indonesia and the vast majority of available biodiesel." Final Remand Results at 34. According to Commerce, it would be "unreasonable to consider this substantial redirection of the supply of biodiesel available from non-PSO to PSO consumers in isolation . . . given that the market functions as a whole. PSO sales and non-PSO sales exist in a single market, subject to the same market forces{.}" *Id.*

Commerce's findings suffer from several flaws. As an initial matter, the record belies Commerce's findings that "the market functions as a whole" and that all sales were "subject to the same market forces." *Id.* Commerce does not cite a single shred of evidence for the proposition that the biodiesel market in Indonesia "functions as a whole." *Id.* In fact, the record points to the opposition conclusion: the average prices for PSO and non-PSO sales "are different," with the average non-PSO sales price nearly **[     ]** the average sales price for PSO sales. *Id.* at 36. Moreover, "the GOI does not place any limitations on how much biodiesel producers may sell outside of the PSO," nor does it have any control over the price of non-PSO sales. *Id.* at 37. These record facts therefore confirm that the same market forces do not govern PSO and non-PSO sales.

Apart from making findings that conflict with the record, Commerce also advances unexplained and arbitrary reasons in support of its conclusions. For example, Commerce does not provide an evidence-based reason why a PMS exists as to non-PSO sales simply because certain customers purchase non-PSO sales at certain volumes. *See id.* at 34. Indeed, Commerce assumes (without record support) that purchases by certain customers at certain volumes would not reflect market forces. *See id.* Such speculation does not amount to substantial evidence in support of a fact-finding. *See LMI-La Metalli Indus.*, 912 F.2d at 460 (holding that an agency "must yield" to the substantial evidence in the record).

Setting aside these flaws, Commerce's findings rest on a misapplication of the governing legal standard. As a matter of law, the GOI's mere involvement in the market does not satisfy the threshold for finding that a PMS existed with respect to non-PSO sales. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") explains that a PMS may exist "where there is government control over pricing *to such an extent* that home market prices cannot be considered to be competitively set." H.R. Rep. No. 103-316, at 822

(1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 (emphasis added). Commerce has interpreted the phrase "to such an extent" to mean that the relevant factor in determining whether a PMS exists is "*the effect* of government control on pricing, not *the existence* of government intervention." *See Certain Frozen Warmwater Shrimp from Thailand*, 76 Fed. Reg. 40,881 (Dep't of Commerce Jul. 12, 2011), accompanying Issues and Decision Memorandum at Comment 3.

The GOI's mere redirection of supply in the Indonesian biodiesel market does not show that it impacted prices to such an extent that a PMS existed as to non-PSO sales. Final Remand Results at 33-34. If the PSO had a distortive effect on the prices of non-PSO sales, the prices should fall within the same range as PSO sales. But Commerce acknowledges that the record tells a different story. *Id.* at 36; *see also* C.R. 289 at 3 (comparing average sales prices among PSO, non-PSO, and world market sales).

Commerce attempts to sidestep this fact, asserting that "the difference does not prove, in and of itself, that the prices for non-PSO sales were competitively set nor that they were otherwise made in the ordinary course of trade." Final Remand Results at 36. Instead of straightforwardly explaining why this difference does not matter from a *sales* perspective, Commerce pivots and identifies alleged issues with Wilmar's reported CPO costs. *See id.* Here too Commerce unlawfully ducks an important aspect of the problem. *See State Farm*, 463 U.S. at 43 (holding that an agency acts arbitrarily and capriciously if it "entirely fail{s} to consider an important aspect of the problem"). Regardless, as explained below in Section II.C, neither the law nor the facts support Commerce's tortured analysis of CPO costs.

Finally, Commerce states that a PMS existed as to non-PSO sales because the GOI "inten{ded} . . . to ensure the existence and growth of the biodiesel industry as a whole" through various government programs. Final Remand Results at 33. However, Commerce fails to explain

12

how the GOI's aspirations as to the biodiesel industry demonstrate the requisite distortive impact on non-PSO sales prices, such that a PMS existed as non-PSO sales.

### C. The Export Tax and Export Levy on CPO Did Not Distort the Prices of Non-PSO Sales

Apart from its erroneous finding that the PSO established a PMS as to non-PSO sales, Commerce also found that the export tax and export levy on CPO establish that a PMS exists as to non-PSO sales. Final Remand Results at 34-36. However, Commerce fails to support its finding with substantial evidence.

For starters, Commerce advances in the Final Remand Results an entirely new theory based on Wilmar's reported CPO costs. Commerce states that, "absent the cost-based PMS with respect to CPO, Wilmar's weighted average cost of manufacture (COM) for all biodiesel, including that sold in the home market{,} would *likely* have increased by **[     ]** percent." *Id.* at 34 (emphasis added). Commerce continues, stating that "Wilmar's weighted-average COM for biodiesel sold in the home market would increase from $**[     ]**/MT to $**[     ]**/MT," which would put "Wilmar's average price for its non-PSO sales" **[     ]** its COM. *Id.* at 34-35. Because "Wilmar would face significantly higher manufacturing costs" in the absence of the cost-based PMS, Commerce concludes that "{t}he cost-based PMS in Indonesia affects PSO sales and non-PSO sales alike{.}" *Id.* at 35; *see also id.* at 36 (discussing same).

Commerce's finding is as unsupported as its logic is irrational. As an initial matter, Commerce speculates that Wilmar's CPO costs "likely" would increase, but such speculation cannot "substitute for substantial evidence in justifying decisions." *SeAH Steel VINA Corp.*, 950 F.3d at 847 (quoting *China Nat'l Arts & Crafts Imp. & Exp.*, 771 F. Supp. at 413). In any event, Commerce disregarded Wilmar's reported CPO costs based on its finding of a cost-based PMS, *see* IDM at 21-24, but now Commerce finds those costs sufficiently reliable to demonstrate a PMS

13

for non-PSO sales, *see* Final Remand Results at 34-36.  Evidence is either reliable or it is not, and Commerce acts arbitrarily and capriciously when it advances such "internally inconsistent" reasoning.  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018); *see also Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (finding the Patent Trial and Appeal Board's analysis arbitrary and capricious because its reasoning on an issue was "internally inconsistent").

Even if Commerce could irrationally and inequitably flip-flop in the manner it proposes, Commerce offers a distinction without a difference under its own logic.  In discussing PSO and non-PSO sales prices, Commerce concedes that a "difference exists" between them, but concludes (erroneously) that "the difference does not prove, in and of itself, that the prices . . . were competitively set nor that they were otherwise made in the ordinary course of trade."  Final Remand Results at 36.  If the Court held Commerce to its own logic, purported differences in prices and costs would not "in and of itself" establish that a PMS existed as to non-PSO sales.  *Id.*

\* \* \*

In sum, neither the law nor the facts support Commerce's determination that a PMS exists as to non-PSO sales.  The Court should remand this matter anew to Commerce with instructions to rely on Wilmar's non-PSO sales as the basis for normal value.

## III. Commerce's PMS Determinations Resulted in the Unlawful Imposition of Double Remedies

In the companion countervailing duty investigation on biodiesel from Indonesia, Commerce countervailed the same two GOI programs that formed the basis of the cost-based and sales-based PMS at issue in this litigation.  *Compare Biodiesel from the Republic of Indonesia: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 53,471 (Dep't of Commerce Nov. 16, 2017), and the accompanying Issues and Decision Memorandum at 6-22, *with* IDM at 8-

24. As Wilmar explained in its opening and reply briefs, Commerce's actions amounted to an impermissible and unlawful double remedy. *See* ECF 30 at 30-37; ECF 55 at 12-16. In *Wilmar*, the Court declined to rule on Wilmar's arguments. *See generally* 582 F. Supp. 3d 1243. Wilmar respectfully requests that the Court address those arguments in its next decision and hold that Commerce imposed an unlawful double remedy.

### IV. Commerce Erred in Calculating Wilmar's Constructed Value

Finally, if the Court agrees that Commerce should rely on Wilmar's non-PSO sales as the basis for normal value, the Court should order Commerce to recalculate Wilmar's constructed value profit ratio. Wilmar raised arguments on this issue in its opening and reply briefs, *see* ECF 30 at 37-38; ECF 55 at 16-17, but the Court declined to rule on them, *see Wilmar*, 582 F. Supp. 3d 1243. Wilmar respectfully requests that the Court address them in its next decision and, if necessary, order Commerce to recalculate Wilmar's constructed value profit ratio.

### CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court vacate the Final Remand Results and remand anew to Commerce for further proceedings consistent with the Court's order and opinion in this matter.

        Respectfully submitted,

        Bernd G. Janzen
        Devin S. Sikes
        Brandon J. Custard
        AKIN GUMP STRAUSS HAUER & FELD LLP
        2001 K Street, NW
        Washington, D.C. 20006

October 24, 2022        *Counsel to Plaintiffs*

# CERTIFICATE OF COMPLIANCE

I, Bernd G. Janzen, an attorney with Akin Gump Strauss Hauer & Feld LLP, certify that Plaintiffs' Comments in Opposition to the Final Results of Redetermination Pursuant to Court Remand contains 5,467 words (according to the word count feature of the Microsoft Word processing program) and therefore complies with the word count limitation set forth in Paragraph 2(B)(1)(b) of the Court's Standard Chambers Procedures.

Dated:  October 24, 2022                /s/ Bernd G. Janzen
                                        Bernd G. Janzen

                                        *Counsel to Plaintiffs*