IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| WILMAR TRADING PTE LTD., *ET AL.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Consol. Court No. 18-00121 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| NATIONAL BIODIESEL BOARD FAIR ) | |
| TRADE COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## **ORDER**

Upon consideration of plaintiffs' comments regarding the remand redetermination,

defendants' responses thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained in its entirety.

Dated: _____, 2022        _____
       New York, NY                           SENIOR JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| WILMAR TRADING PTE LTD., *ET AL.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NATIONAL BIODIESEL BOARD FAIR TRADE COALITION,<br><br>Defendant-Intervenor. | Consol. Court No. 18-00121<br><br>**PUBLIC VERSION**<br><br>Business Proprietary Information (BPI) Identified by Brackets [ ] on Pages 14, 15, and 16. |

**DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
ELIO GONZALEZ
Senior Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce

JOSHUA E. KURLAND
Senior Trial Counsel
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel:  (202) 616-0477
Email: Joshua.E.Kurland@usdoj.gov

December 13, 2022

*Attorneys for Defendant United States*

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................1

I.      The Administrative Decision Under Review .....................................................1

II.     The Court's Remand Order And Commerce's Remand Redetermination .........3

ARGUMENT ..................................................................................................................4

I.      Standard Of Review ..........................................................................................4

II.     Commerce's Adjustment For RIN Values As A Deduction To United States Price
        Is Supported By Substantial Evidence And Otherwise Lawful .........................5

III.    Commerce's Determination That Two Particular Market Situations Exist With
        Respect To Wilmar's Non-PSO Sales Is Supported By Substantial Evidence And
        Otherwise Lawful ............................................................................................12

        A.  Commerce's Determination Is Reasonable And Should Be Sustained .......13

        B.  Wilmar's Arguments Lack Merit .............................................................18

CONCLUSION ..............................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                        **Page(s)**

*Atar S.R.L. v. United States*,
   730 F.3d 1320 (Fed. Cir. 2013) ............................................................... 18

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ................................................................................ 4

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ........................................................................... 5, 20

*Daewoo Electronics Co. Ltd. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers*,
   6 F.3d 1511 (Fed. Cir. 1993) ............................................................... 21

*DynaEnergetics U.S., Inc. v. United States*,
   298 F. Supp. 3d 1363 (Ct. Int'l Trade 2018) ...................................... 4

*Fla. Citrus Mut. v. United States*,
   515 F. Supp. 2d 1324 (Ct. Int'l Trade 2007) ...................................... 11

*Gov't of Argentina v. United States*,
   542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ...................................... 18

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
   335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ...................................... 18

*Micron Tech. Inc. v. United States*,
   243 F.3d 1301 (Fed. Cir. 2001) ........................................................... 11

*NEXTEEL Co. v. United States*,
   355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ...................................... 9

*NEXTEEL Co., Ltd. v. United States*,
   28 F.4th 1226 (Fed. Cir. 2022) ........................................... 14, 15, 16, 17

*Nihon Cement Co. v. United States*,
   17 C.I.T. 400 (1993) ............................................................................ 12

*Thai Plastic Bags Industries Co., Ltd. v. United States*,
   853 F. Supp. 2d 1267 (Ct. Int'l Trade 2012) ...................................... 21

*Vicentin S.A.I.C. v. United States*,
   42 F.4th 1372 (Fed. Cir. 2022) ................................................... *passim*

*Vicentin S.A.I.C. v. United States*,
    404 F. Supp. 3d  1332 (Ct. Int'l Trade 2019) ................................................................. 5

*Vicentin S.A.I.C. v. United States,*
    466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020) .............................................................. 5

*Wilmar Trading Pte Ltd. v. United States,*
    466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ........................................ 13, 14, 17, 18

*Wilmar Trading Pte Ltd. v. United States,*
    582 F. Supp. 3d 1243 (Ct. Int'l Trade 2022) ............................................... *passim*

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
    968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) .............................................................. 4

**Statutes**

19 U.S.C. § 1516 ................................................................................................................ 4

19 U.S.C. § 1677 ................................................................................................... *passim*

**Regulations**

19 C.F.R. § 351.102 .................................................................................................. 7, 8, 10

19 C.F.R. § 351.401 ................................................................................................ *passim*

19 C.F.R. § 351.410 ...................................................................................................... 2, 3

**Administrative Determinations**

*Biodiesel from Indonesia,*
    82 Fed. Reg. 50,379 (Dep't of Commerce Oct. 31, 2017) ......................................... 2

*Biodiesel from Indonesia*,
    83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) ........................................... 2

*Certain Frozen Warmwater Shrimp from Thailand*,
    76 Fed. Reg. 40,881 (Dep't of Commerce July 12, 2011) ....................................... 21

*Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*,
    81 Fed. Reg. 15,641 (Dep't of Commerce Mar. 24, 2016) ........................... 7, 10, 11

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | | |
|---|---|---|
| WILMAR TRADING PTE LTD., *ET AL.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Consol. Court No. 18-00121 |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant, | ) | Business Proprietary Information |
| | ) | (BPI) Identified by Brackets [ ] on |
| and | ) | Pages 14, 15, and 16. |
| | ) | |
| NATIONAL BIODIESEL BOARD FAIR | ) | |
| TRADE COALITION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

Defendant, the United States, respectfully submits this response to the comments filed by plaintiffs Wilmar Trading Pte Ltd, PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC (Wilmar) concerning the Department of Commerce's redetermination filed in accordance with this Court's decision and remand order in *Wilmar Trading Pte Ltd. v. United States*, 582 F. Supp. 3d 1243 (Ct. Int'l Trade 2022).  *See* Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 91-1 & 92-1 (Sept. 22, 2022) (Remand Redetermination). For the reasons explained below, this Court should sustain Commerce's remand redetermination.

## BACKGROUND

### I.   The Administrative Decision Under Review

This consolidated case involves challenges to Commerce's final determination in its antidumping duty investigation concerning biodiesel from Indonesia.  *Biodiesel from Indonesia*,

83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) (final determ.), and accompanying Issues and Decision Memorandum (IDM) (P.R. 303).

In the preliminary determination in its investigation, Commerce found that the United States prices reported by Wilmar included values for both biodiesel and renewable identification numbers (RINs), which are tradeable credits pursuant to a United States regulatory scheme administered by the Environmental Protection Agency (EPA) under which the EPA requires United States biodiesel producers or importers to meet an annual renewable volume obligation. *Biodiesel from Indonesia,* 82 Fed. Reg. 50,379 (Dep't of Commerce Oct. 31, 2017) (prelim. determ.), and accompanying Preliminary Decision Memorandum (PDM) at 27-28 (P.R. 244). Commerce preliminarily determined that an adjustment to normal value was needed to account for RINs and applied a circumstance of sale adjustment to normal value equal to the RIN values, pursuant to 19 U.S.C. § 1677b(a)(6)(C)(iii) and 19 C.F.R. § 351.410.  PDM at 28.  In the final determination, Commerce continued to make an adjustment to normal value to ensure a proper comparison to the RIN value embedded in the United States price; however, Commerce determined that the necessary adjustment was best made as a price adjustment under 19 C.F.R. § 351.401, rather than a circumstance of sale adjustment.  IDM at 6-8.

In addition, in the final determination, consistent with its finding in the preliminary determination, Commerce determined that two particular market situations (PMSs) existed:  (1) a sales-based PMS distorting the respondents' home market biodiesel sales prices due to the government of Indonesia's (GOI) pervasive regulation of the Indonesian biodiesel market, and (2) a cost-based PMS distorting the respondents' purchase prices for crude palm oil (CPO), the primary input of biodiesel, stemming from the GOI's significant intervention in CPO pricing through an export tax regime designed to artificially depress prices by generating a low-cost

surplus of CPO for domestic use.  IDM at 8-24; PDM at 17-23.  To account for the sales-based PMS, Commerce calculated the normal value for its antidumping calculation based on a constructed value; for the cost-based PMS, Commerce used market-determined world market CPO prices in its cost calculations.  *Id.*

Finally, in the final determination, Commerce maintained its determination from the preliminary determination to use facts otherwise available with an adverse inference (AFA) to determine the dumping margin for P.T. Musim Mas (Musim Mas), but revised its selection of the AFA rate.  IDM at 45-55; PDM at 6-9.

## II.    <u>The Court's Remand Order And Commerce's Remand Redetermination</u>

In its remand order, the Court held that Commerce failed to establish the legal basis empowering it to adjust normal value to account for the value of RINs.  *Wilmar Trading,* 582 F. Supp. 3d at 1258-59.  The Court separately sustained Commerce's decision to exclude Wilmar's Public Service Option (PSO) sales from its normal value calculation, but remanded Commerce's determination that non-PSO sales were not made in the ordinary course of trade.  *Id.* at 1253-56. Regarding Commerce's second PMS determination, the Court held that substantial evidence supports the finding that the cost of CPO was distorted by a PMS.  *Id.* at 1356.  However, the Court held that Commerce failed to show how the price paid for biodiesel sold in non-PSO sales was affected by the distorted cost of CPO or that the non-PSO price was not determined by the market.  *Id.*  Thus, the Court ordered Commerce either to support with substantial evidence a finding that one or more PMSs existed with respect to Wilmar's non-PSO sales or to use the price paid for these sales in its normal value determination.  *Id.* at 1259.  Finally, the Court reserved decision on Musim Mas's challenges to Commerce's use of AFA.  *Id.*

On remand, Commerce (consistent with its approach sustained in other litigation concerning biodiesel from Argentina) made an adjustment for RIN values as a deduction to United Sates price, rather than as an addition to normal value, and explained the legal authority empowering it to make such an adjustment.  Remand Redetermination at 3-12, 19-23. Specifically, Commerce explained that the legal authority for making a RIN adjustment to United States price consists of 19 U.S.C. § 1677a(a) and (b), and 19 C.F.R. § 351.401(c).  *Id.* Regarding its PMS determinations, Commerce further explained why it reasonably found that two PMSs existed with respect to Wilmar's non-PSO sales.  Commerce explained that the GOI's pervasive regulation of the domestic biodiesel market amounts to a PMS that renders all of Wilmar's non-PSO home market sales outside the ordinary course of trade.  *Id.* at 14-18, 25-37. Commerce also explained that, absent the PMS with respect to CPO prices in Indonesia, the cost of all sales of biodiesel would likely have been significantly higher, and thus Commerce found that the distortion affects the costs of PSO and non-PSO sales alike.  *Id.*

## ARGUMENT

### I. Standard Of Review

The Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).  The standard applies equally to remand redeterminations.  *See*, *e.g.*, *DynaEnergetics U.S., Inc. v. United States*, 298 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2018). Remand redeterminations are also reviewed for compliance with the Court's order.  *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Substantial evidence may be "less than the weight of the evidence" and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

## II.    Commerce's Adjustment For RIN Values As A Deduction To United States Price Is Supported By Substantial Evidence And Otherwise Lawful

In its remand order, the Court held that Commerce did not "establish the necessary legal authority for applying a price adjustment to normal value when the factual basis for its adjustment concerned U.S. price." *Wilmar Trading*, 582 F. Supp. 3d at 1258.  In its remand redetermination, Commerce clarified that its authority to make price adjustments to account for RINs is derived from 19 U.S.C. § 1677a(a) and (b), and 19 C.F.R. § 351.401(c), and modified its analysis to make the RIN adjustment to United States price instead of normal value.

As an initial matter, the Court referenced another case involving the antidumping duty investigation concerning biodiesel from Argentina, in which Commerce addressed similar facts. *See Wilmar Trading*, 582 F. Supp. 3d at 1256-59 (citing *Vicentin S.A.I.C. v. United States*, 404 F. Supp. 3d 1332 (Ct. Int'l Trade 2019) (*Vicentin I*); *Vicentin S.A.I.C. v. United States,* 466 F. Supp. 3d 1227 (Ct. Int'l Trade 2020) (*Vicentin II*)).  The Court stated that "{o}n remand, after *Vicentin I*, Commerce modified its determination and 'accounted for RINs by decreasing export and constructed export price,' a determination that was sustained by the Court because Commerce had supported with substantial evidence its authority to adjust export price for RIN values." *Id.* (quoting *Vicentin II*, 466 F. Supp. 3d at 1230).  The Court found it "worth noting that the statutory path for an adjustment to export price (U.S. price) appears to be clear." *Id.* at 1258.

On remand in this case, Commerce modified its approach in precisely the same manner that this Court sustained in *Vicentin II*, *i.e.*, Commerce accounted for RINs by decreasing export

and constructed export price, rather than making a price adjustment to normal value.  Remand

Redetermination at 6-12.  Moreover, subsequent to the Court's remand decision in this case, the

Court of Appeals for the Federal Circuit affirmed the decision with respect to RINs in *Vicentin*

*II. Vicentin S.A.I.C. v. United States,* 42 F.4th 1372 (Fed. Cir. 2022) (*Vicentin III*).  Thus, both

this Court and the Federal Circuit have agreed that Commerce has the legal authority, under 19

U.S.C. § 1677a(a) and (b), and 19 C.F.R. § 351.401(c), to account for RINs by correspondingly

decreasing export and constructed export price.  Accordingly, the Court should sustain

Commerce's modified approach on this issue.

Regarding the specifics on Commerce's redetermination, Commerce explained that its

determination to adjust RIN values as a deduction to United States price is derived from 19

U.S.C. § 1677a(a) and (b), and 19 C.F.R. § 351.401(c).  Section 1677a(a), in relevant part,

defines "export price" as "the price at which the subject merchandise is first sold . . . by the

producer or exporter of the subject merchandise outside of the United States . . . as adjusted

under subsection (c)."  Section 1677a(b) defines constructed export price as "the price at which

the subject merchandise is first sold . . . in the United States . . . by or for the account of the

producer or exporter of such merchandise . . . to a purchaser not affiliated with the producer or

exporter, as adjusted under subsections (c) and (d)."  In turn, 19 U.S.C. § 1677a(c), provides for

various adjustments that shall be made to export price and constructed export price, such as "the

cost of all containers and coverings and all other costs, charges, and expenses incident to placing

the subject merchandise in condition packed ready for shipment to the United States" when such

costs are not included in the price.  Additionally, 19 U.S.C. § 1677a(d) enumerates other

adjustments that Commerce must make to constructed export price.

Pursuant to sections 1677a(a) and (b), Commerce promulgated 19 C.F.R. § 351.401(c). The regulation provides that "{i}n calculating export price, constructed export price, and normal value (where normal value is based on price)," Commerce normally will "use a price that is net of price adjustments . . . that are reasonably attributable to the subject merchandise{.}"  *Id.* "Price adjustment"  is defined as "a change in the price charged for subject merchandise . . . such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale . . . that is reflected in the purchaser's net outlay."  19 C.F.R. § 351.102(b)(38).  Section 351.102(b)(38) is not limited to discounts and rebates; the term "price adjustment" "encompasses other adjustments as well."  *Vicentin III*, 42 F.4th at 1378 ("The two phrases 'such as' and 'or other adjustment' convey that the definition is not limited to discounts and rebates.") (citing *Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 Fed. Reg. 15,641, 15,644 (Dep't of Commerce Mar. 24, 2016)).

Commerce determined that RIN values embedded in United States biodiesel prices are best characterized as a price adjustment "already included in the reported invoice price for biodiesel" and, therefore, that they must be netted out under section 351.401(c) because RIN-eligible biodiesel prices are adjusted upwards by the buyer and seller to account for the RINs. Remand Redetermination at 7-10.  Failing to use a United States price that is "net of price adjustments" would thus prevent a fair comparison between the United States price and normal value, as is required.  *See* 19 C.F.R. §§ 351.401(c), 351.102(b)(38).  Put another way, sections 1677a(a) and (b) require Commerce to base its United States price calculations on the price of the *subject merchandise*, not the price of the subject merchandise plus RIN values.

Commerce also relied on substantial record evidence demonstrating that Wilmar's reported export prices and constructed export prices include RIN values.  In its questionnaire

response, Wilmar described the RIN value as "embedded in the total value of each sale.  The

value is composed of the value of the physical RINless liquid biodiesel, plus the value of the

RIN, plus the value of the Blenders' Tax Credit ('BTC'), if applicable."  Wilmar Supp. Section

A Resp. at 20 (Aug. 11, 2017) (P.R. 159-60; C.R. 165-73).  As Commerce explained, Wilmar

described the price adjustments as follows:  "{if} the RIN value is $0.75 per gallon, industry

participants generally assume that a gallon of RINless B100 should be $0.75 per gallon less

expensive than a gallon of B100 with K1 RINs attached."  Remand Redetermination at 10 (citing

Wilmar Supp. Section A Resp. at 21 (P.R. 159-60; C.R. 165-73)).  Indeed, U.S. International

Trade Commission data on the record demonstrates that, in 2016, RIN-eligible biodiesel was

sold in the United States on average for $2.27 per gallon, while RIN-less biodiesel sold for just

$1.01 per gallon.  *Id.* at 9.  Thus, RIN-eligible biodiesel costs more than RIN-less biodiesel

because the price with RINs attached is adjusted upwards to reflect RIN values.  *Id.* at 9-10.

Wilmar argues that Commerce's finding that RINs are actual values included in the gross

or starting prices reported to Commerce means that they form a part of the price at which the

subject merchandise is first sold, and that the RIN values do not reflect a change in the buyer's

net outlay under 19 C.F.R. § 351.102(b)(38).  Wilmar Br. 6-8.  It likewise argues that the starting

price necessarily includes some value attributable to RINs, that Wilmar's invoices do not include

a separate line item for RIN value, and that Wilmar did not separately negotiate the RIN value

with its customers.  *Id.* at 8.  Contrary to these arguments, however, Commerce explained that

the invoice price is not the true starting price because it has been adjusted upwards to include the

RIN value.  As Commerce stated in the remand redetermination:

> {T}he RIN issue is best characterized as an adjustment already
> included in the reported invoice price for biodiesel, as opposed to
> an intangible embedded value in U.S. price, which may have
> caused some unintended confusion.  *Although the invoice does not*

> *segregate a biodiesel price from a RIN value, the record demonstrates that the invoice price does not reflect the true "starting price" of biodiesel or "price at which the subject merchandise is first sold" because it includes a RIN value.* In other words, the invoice price is a price for biodiesel which has already been "adjusted" upwards to include the RIN value. Therefore, to isolate a U.S. starting price for biodiesel, Commerce must deduct the RIN value from the invoice price.

Remand Redetermination at 7-8 (emphasis added).

As Commerce explained, the adjustment for RIN values in this case is not an adjustment to the starting price of the subject merchandise; rather, it is an adjustment to the *invoice price* reported by Wilmar, which includes values for both the biodiesel and the RINs. Remand Redetermination at 7-8, 9-10. As Commerce further explained, "regardless of the fact that the RIN value is not a separate line item on the invoice and regardless of the fact that the RIN value is not separately negotiated between the Indonesian seller and the U.S. customer, the invoice price (and entered value) is the price of biodiesel adjusted upwards to reflect the value of the RIN." *Id.* at 9-10. Thus, Commerce must net out the RIN value so that it can isolate the starting price of the biodiesel, pursuant to 19 U.S.C. § 1677a(a) and 19 C.F.R. § 351.401(c), which then allows Commerce to achieve the apples-to-apples comparison required under the statute. *See NEXTEEL Co. v. United States,* 355 F. Supp. 3d 1336, 1359 (Ct. Int'l Trade 2019) ("Section 1677a requires Commerce to make adjustments when calculating export price or constructed export price to create a fair, apples-to-apples comparison between U.S. price and foreign market value." (citation and quotation marks omitted)).

Wilmar attempts to distinguish the Federal Circuit's decision in *Vicentin III*, stating that the decision does not address that the starting price for Wilmar's RIN-inclusive biodiesel includes the value of RINs. *See* Wilmar Br. 8. However, contrary to Wilmar's argument, in *Vicentin III,* the Court acknowledged Commerce's explanation "that the value of RINs is a price

adjustment as defined in 19 C.F.R. § 351.102(b)(38) because the invoice price does not reflect

the true starting price of biodiesel or price at which the *subject merchandise* is first sold because

it includes a RIN value." *Vicentin III*, 42 F.4th at 1375 (citations omitted).  The Court then

rejected the appellant's argument that the regulations require a "starting price actually paid by a

customer" (*i.e.,* the invoice price that Wilmar argues is the starting price), and an "adjusted price

agreed between the buyer and seller." *Id.* at 1379.  The Court in *Vicentin III* thus upheld

Commerce's deduction of RIN values from export price as a price adjustment under virtually

identical facts as here, and held that "{g}iven the similarities between RINs and rebates, the non-

limiting language of the regulation, and the fact that Commerce's calculation effects the overall

statutory scheme, the regulation *unambiguously* permits Commerce to subtract the RIN values."

*Id.*  Thus, *Vicentin III* is entirely on point, and it affirmed that Commerce can adjust United

States price to account for RIN values in the same manner as it did in this case.

Wilmar also argues that Congress never instructed Commerce to account in its dumping

margin calculations for differences in regulatory mechanisms between the markets subject to

comparison, and that Commerce may only make those adjustments enumerated under the statue

and regulations.  Wilmar Br. 8.  Again, the Federal Circuit has already held that the regulation

permits Commerce to subtract the RIN values.  *Vicentin III*, 42 F.4th at 1379.  There is no

language in the statute and regulations that limits the types of adjustments Commerce may make

to only those specifically enumerated.  *See id*. at 1378 (interpreting the definition of "price

adjustment" in 19 C.F.R. § 351.102 (b)(38) as not limited to only the enumerated examples).[1]  In

---

[1] Indeed, Commerce has long interpreted the statutory language defining export price,
constructed export price, and normal value as the prices at which merchandise is "first sold" as
authorizing Commerce to make various "price adjustments" to achieve a fair, apples-to-apples
comparison between home market and United States prices.  *See Modification of Regulations
Regarding Price Adjustments in Antidumping Duty Proceedings, Final Rule*, 81 Fed. Reg.

fact, in addition to including the broad phrase "or other adjustment," Commerce in promulgating the current version of section 351.102(b)(38) specifically stated that the examples it lists are not exhaustive.  *See Modification Regarding Price Adjustments*, 81 Fed. Reg. at 15,644 ("a price adjustment is not just limited to discounts or rebates, but encompasses other adjustments as well"); *Vicentin III*, 42 F.4th at 1378 (quoting same).

Likewise, interpreting section 1677a as limiting what adjustments Commerce can make is contrary to the antidumping statute's purpose to "permit a fair, apples-to-apples comparison" between export prices and normal value.  *Micron Tech. Inc. v. United States*, 243 F.3d 1301, 1313 (Fed. Cir. 2001).  Consistent with this purpose, Commerce determined that it must net out the RIN value from the invoice price to isolate the starting price of the subject merchandise in accordance with the requirements of sections 1677a(a) and (b).  *See* Remand Redetermination at 7-8, 10, 22-23.  If Commerce did not remove the RIN value from Wilmar's reported prices, Commerce would not be basing its calculations on export prices and constructed export prices in accordance with sections 1677a(a) and (b), which refer to the price of *subject merchandise*; instead, Commerce would be basing its calculations inaccurately on the reported gross invoice value that includes an upward adjustment for RIN values.

Moreover, this Court has rejected similar arguments that Commerce is limited to the adjustments expressly enumerated by the statute or regulations.  *See, e.g.*, *Vicentin III,* 42 F.4th at 1378 ("The two phrases 'such as' and 'or other adjustment' {in section 351.102(b)(38)} convey that the definition is not limited to discounts and rebates."); *Fla. Citrus Mut. v. United States*, 515 F. Supp. 2d 1324, 1333 (Ct. Int'l Trade 2007), *aff'd,* 550 F.3d 1105 (Fed. Cir. 2008)

---

15,641, 15,643 (Dep't of Commerce Mar. 24, 2016) (*Modification Regarding Price Adjustments*) (stating that statutory basis for price adjustments rooted in "first sold" language).  Hence, it is common for Commerce to make adjustments to invoice prices to achieve fair comparisons.

PUBLIC VERSION

(reasoning that statute "does not bar Commerce" from making adjustments if those costs are not reflected in the purchaser's net outlay); *Nihon Cement Co. v. United States*, 17 C.I.T. 400, 415 (1993) (sustaining Commerce's decision to deduct pre-sale movement expenses from the foreign market price, reasoning that "plaintiff's position {that Commerce has no inherent authority to apply adjustments that it feels are necessary to ensure a fair price comparison beyond those explicitly enumerated in the statute} ignores the purpose of the antidumping statute").

In conclusion, Commerce clarified that the legal basis for making a RIN adjustment to United States price consists of 19 U.S.C. § 1677a(a) and (b), and 19 C.F.R. § 351.401(c), and accordingly modified its approach on remand to account for RINs by decreasing export price and constructed export price, rather than making a price adjustment to normal value. This complies with the Court's remand order and is consistent with this Court's statement that "the statutory path for an adjustment to export price (U.S. price) appears to be clear." *Wilmar Trading*, 582 F. Supp. 3d at 1258. Moreover, since issuance of the remand order, the Federal Circuit affirmed this Court's decision in *Vicentin II,* which sustained the exact approach Commerce took in this remand. Thus, the Court should sustain Commerce's remand results.

## III.    Commerce's Determination That Two Particular Market Situations Exist With Respect To Wilmar's Non-PSO Sales Is Supported By Substantial Evidence And Otherwise Lawful

The Court sustained Commerce's determination that PSO sales were outside the ordinary course of trade. *Wilmar Trading,* 582 F. Supp. 3d at 1254. The Court likewise sustained Commerce's determination that the cost of CPO, the main input in biodiesel, was distorted by a PMS created by the GOI's export taxes and levies. *Id.* at 1256. However, the Court remanded Commerce's determination that non-PSO sales were not made in the ordinary course of trade, and therefore, could not serve as a basis for normal value. *Id.* at 1255-56. The Court found that

Commerce had not shown how the price paid for biodiesel sold in non-PSO sales was affected by the distorted cost of CPO or that the non-PSO price was not determined by the market. *Id.* at 1256. Consequently, on remand, Commerce further explained why it reasonably found that a sales-based PMS and a cost-based PMS affected Wilmar's non-PSO sales.

A. **Commerce's Determination Is Reasonable And Should Be Sustained**

Commerce's determination is reasonable because it flows from this Court's holdings and the record evidence. In the remand order, the Court upheld Commerce's finding that the GOI does not establish PSO prices based on a market price for biodiesel. *Wilmar Trading*, 582 F. Supp. 3d at 1253-54. Specifically, the Court sustained Commerce's determination to exclude Wilmar's PSO sales because both components of PSO pricing—the Biodiesel Subsidy Fund (BSF) payment and price of petrodiesel—are determined by the GOI and are not competitively set. *Id.* at 1254. In addition, the Court recognized that, in litigation involving the companion CVD investigation of biodiesel from Indonesia, it sustained Commerce's determination that the BSF "provided grants that were tied (*i.e.,* attributed) to all sales of biodiesel by Wilmar . . . not just those made in the Indonesian market." *Id.* at 1255 (quoting *Wilmar Trading Pte Ltd. v. United States*, 466 F. Supp. 3d 1334, 1347 (Ct. Int'l Trade 2020) (*Wilmar CVD*)). The Court further explained that "{t}he basis for this determination, which the Court found reasonable, was Commerce's finding that 'the purpose of the {BSF} was to subsidize biodiesel *as a product,* whether sold domestically or exported." *Id.* Thus, "the benefit of the {BSF p}ayments applied to *all* of Wilmar's domestic sales, irrespective of whether they were {PSO} or {non-PSO} sales because the grants were paid to the company." *Id.* (citing *Wilmar CVD*, 466 F. Supp. 3d at 1347-48). In consideration of this holding in *Wilmar CVD* and of the factual record in this case, the Court stated that "it is entirely possible that Commerce might be able to find a price effect on the

non-PSO sales resulting from the grants," but that Commerce had not adequately explained and supported with evidence its decision to disregard Wilmar's non-PSO sales.  *Id.*

With this background in mind, Commerce provided further explanation on remand and continued to find that the GOI's pervasive regulation of the domestic biodiesel market amounts to a PMS that renders *all* of Wilmar's non-PSO sales outside the ordinary course of trade.  As a threshold matter, Commerce explained that the statutory term "particular market situation" indicates that such a situation exists in a *market*, and Commerce's analysis thus focuses on the Indonesian biodiesel market as a whole.  Remand Redetermination at 17.  Commerce elaborated that a PMS analysis is concerned with distortions in the overall market, rather than distortions on particular sales or transactions of a particular company, such that "{c}ompanies like Wilmar and its non-PSO customers do not operate in a vacuum, but, rather, make sales and purchases of biodiesel in a market."  *Id.*  The Federal Circuit has similarly explained that a PMS may exist when "some circumstance distorts costs so that they are not set based on normal market forces or do not move with the rest of the market."  *NEXTEEL Co., Ltd. v. United States,* 28 F.4th 1226, 1234 (Fed. Cir. 2022).

In analyzing the conditions of the Indonesian biodiesel market, Commerce determined that PSO sales are the overwhelming majority of sales and affect the prices for the entire market. *See* Remand Redetermination at 33-34, 36-37.  Commerce explained that the GOI mandates producer-specific minimum sales quantities for PSO sales, going as far as specifying the minimum quantity of biodiesel that producers must sell to [     ] PSO customers in each six-month period, as well as the price at which the producers must then sell that biodiesel.  *See id.* at 16, 33-34, 36-37.  Given these quantity requirements, PSO sales comprise the vast majority of Indonesian biodiesel consumption at the country-wide level.  *See id.*  In fact, as this Court

observed, the record demonstrates that 89 percent of Wilmar's home market sales were sold

under the PSO program. *Id.* (discussing *Wilmar Trading,* 582 F. Supp. 3d at 1255-56 & n.16;

Wilmar Prelim. Calc. Memo at 3 (Oct. 19, 2017) (P.R. 246; C.R. 289)).  This is further supported

by record evidence demonstrating that PSO sales comprise the vast majority of Indonesian

biodiesel sales when considering that, from November 2015 to October 2016, the biodiesel

procured by the PSO program totaled 2,132,289 metric tons (MT), versus estimated total

consumption of biodiesel in Indonesia for 2016 of 1,958,225 MT.  *Id.* at 16 n.64, 37 n.160

(discussing Wilmar Prelim. Calc. Memo at 2); *see also Wilmar Trading*, 582 F. Supp. 3d at

1255-56.  Commerce reasoned that, by dramatically redirecting the supply of domestically-

produced biodiesel, the GOI distorted the part of the market comprised of non-PSO sales as well.

*Id*. at 16, 33-34, 36-37.  Thus, non-PSO prices are not competitively set because the market for

non-PSO sales does not include the [       ] biodiesel customers in Indonesia (*i.e.,* [       ]

]), or the vast majority of available biodiesel.  *Id.*

     As Commerce put it, given that the market functions as a whole, it "would be

unreasonable to consider this substantial redirection of the supply of biodiesel available from

non-PSO to PSO customers in isolation."  *Id.* at 34.  In fact, "PSO sales and non-PSO sales exist

in a single market, subject to the same market forces, where the GOI mandates the price and

volume of the vast majority of the biodiesel sold at the country-wide level every six months

through the PSO program."  *Id.* at 34.  Commerce considered the effect of the distorted PSO

sales on the non-PSO sales and reasonably determined that, when a particular market such as the

biodiesel market in Indonesia is distorted as a whole, it is implausible that a small portion of

sales in that market (here, Wilmar's non-PSO sales) are somehow insulated or immune from the

market distortions.  *Id.* at 17, 34.

Next, Commerce considered how the GOI's export tax distortions on CPO (the primary input of biodiesel) further distort the price of all biodiesel produced in the Indonesian market and sold to all customers.  In its remand order, this Court held that substantial evidence supports Commerce's determination that the cost of CPO was distorted by a PMS created by the GOI's export taxes and levies.  *Wilmar Trading,* 582 F. Supp. 3d at 1256.  On remand, Commerce explained that, absent the distortion of CPO prices by this PMS, the costs of all biodiesel sales in Indonesia likely would have been significantly higher.  Remand Redetermination at 17.  Moreover, as with the sales-based PMS, the distortion to a primary input affects the costs of both PSO and non-PSO sales alike, and there is no reason to believe that Wilmar's non-PSO sales are somehow insulated or immune from that market distortion.  *Id.* at 17-18.  As Commerce explained, "{t}he link between costs and sales prices is axiomatic. . . . The cost-based PMS in Indonesia affects PSO sales and non-PSO sales alike because the distortion in input costs is country-wide and not specific to PSO or non-PSO sales in the domestic market."  *Id.* at 35.

Additionally, although "{n}othing in the statute requires Commerce to quantify the distortion precisely," *NEXTEEL Co. Ltd.*, 28 F.4th at 1234, Commerce in this case was able to quantify the difference between the costs actually incurred by Wilmar and what its costs *would have been* in the ordinary course of trade, and it determined that the costs would likely have increased by [     ] percent.  *See* Remand Redetermination at 17, 34 (citing Wilmar Prelim. Cost Memo at 2 & Att. 1, 6) (Oct. 19, 2017) (P.R. 249; C.R. 298)).[2]  While the average price for Wilmar's non-PSO sales was $[     ]/MT, Commerce's analysis demonstrates that Wilmar's weighted average cost of manufacturing for biodiesel sold in the home market would increase from $[     ]/MT to $[     ]/MT, which is significantly higher than the average price for

---

[2] The remand redetermination on pages 34 and 35 contains a typo citing to the preliminary cost analysis memorandum at page 12 instead of page 2.

Wilmar's non-PSO sales. *Id.* at 34-35 (citing Wilmar Prelim. Cost Memo at 2 & Att. 1, 6)).  As

Commerce explained, the record demonstrates that, when Wilmar determines the prices of its

products, it considers its manufacturing costs, including the cost of raw materials. *Id.* at 35

(citing Wilmar Sales Verification Report at 6 (Nov. 22, 2017) (P.R. 265; C.R. 335)).  Thus,

absent the PMS with respect to CPO costs in Indonesia, Wilmar would face significantly higher

manufacturing costs and would need to increase its prices to cover those higher costs. *Id.*  This

further demonstrates that Wilmar's non-PSO sales are outside the ordinary course of trade.

Finally, several additional facts support Commerce's determination that the GOI's BSF

payments affect the price of all sales, including both PSO and non-PSO sales.  The Court

sustained Commerce's finding that the GOI does not establish PSO prices based on a market

price, but rather bases PSO prices on a reference price for petrodiesel and the product cost for

petrodiesel in Indonesia, which is also set by the GOI. *Wilmar Trading,* 582 F. Supp. 3d at 1254.

The GOI then makes an additional payment to biodiesel producers under the BSF. *See* Remand

Redetermination at 15.  Taking this into account, Commerce determined that "the funding

mechanism and configuration of the BSF payments suggest that the GOI's intent is to ensure the

existence and growth of the biodiesel industry *as a whole*." *Id.* (emphasis added).  In addition, as

this Court recognized, in *Wilmar CVD* the Court sustained Commerce's determination that the

BSF provided grants that were tied to all sales of biodiesel by Wilmar, not just those made in the

Indonesian market, and that "the purpose of the {BSF} was to subsidize biodiesel *as a product*,

whether sold domestically or exported." *Wilmar Trading,* 582 F. Supp. 3d at 1255 (quoting

*Wilmar CVD*, 466 F. Supp. 3d at 1347).  Thus, "the benefit of the {BSF} applied to *all* of

Wilmar's domestic sales, irrespective of whether they were {PSO} or {non-PSO} sales because

the grants were paid to the company, and although they were paid on account of the {PSO} sales,

17

the result was that all sales, {PSO} and {non-PSO} benefitted." *Id.* (citing *Wilmar CVD*, 466 F. Supp. 3d at 1347-48). Based on these circumstances, Commerce reasonably concluded that the GOI's BSF payments affected the price of all sales made by Indonesian producers, including Wilmar, whether they were PSO or non-PSO sales. *See* Remand Redetermination at 15-16. Commerce's reasonable determination should be sustained.

### B. Wilmar's Arguments Lack Merit

Wilmar argues that Commerce arbitrarily and capriciously rejected Wilmar's non-PSO sales as the basis for normal value, arguing in support that it competitively set the prices for its non-PSO sales and that PSO sales did not distort the non-PSO sales prices. Wilmar Br. 9. To review the reasonableness of agency action "{c}ourts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Atar S.R.L. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013) (citation omitted). Although Wilmar might disagree with Commerce's determinations, its disagreement does not render Commerce's explanation unreasonable. Commerce explained at length why Wilmar's non-PSO sales are outside the ordinary course of trade, and its explanation is reasonable. *See Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement" with Commerce's weighing of evidence insufficient basis for challenge); *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (same).

Specifically, Commerce considered that the market functions as a whole and explained that PSO sales comprise the vast majority of all sales, which necessarily affects non-PSO sales. Although Wilmar argues that Commerce did not support this proposition with evidence, Wilmar Br. 10-11, Commerce explained that PSO and non-PSO sales exist in a single market, subject to

the same market forces, where the GOI mandates the price and volume of the vast majority of biodiesel sold at the country-wide level every six months through the PSO program.  Remand Redetermination at 34 (citing Wilmar Supp. Section B-C Resp. at 5, Ex. S-6 (Aug. 18, 2017) (P.R. 169-170, C.R. 180-181); Petition, Ex. GEN-31 at 6 (Mar. 23, 2017) (P.R. 5; C.R. 6)).  This is a reasonable determination that is reinforced by evidence in the record, which demonstrates that the GOI intervenes heavily in the biodiesel market through the PSO program and through its export tax on CPO, which in turn, distorts the biodiesel industry as a whole.  *Id.* at 14-16. 33-37; *see also* Wilmar Prelim. Calc. Memo at 2-3 & Att. 4 (P.R. 246-48; C.R. 289-97); Wilmar Prelim. Cost Memo at 2 & Att. 1, 6 (P.R. 249; C.R. 298); Wilmar Supp. Section B-C Resp. at 5, Ex. S-6 (P.R. 169-170; C.R. 180-181); Petition, Ex. GEN-31 at 1-6 (P.R. 5; C.R. 6); PMS Allegation at Exs. 1, 15 (July 25, 2017) (P.R. 114-16; C.R. 138-40).  As Commerce stated, the "combination of the effect of the export tax on CPO . . . and subsequently on biodiesel, and the fact that the domestic market is almost exclusively constituted of PSO sales . . . means that the GOI interventions have resulted in a distorted market that impacts all biodiesel sales."  *Id.* at 16.  Wilmar's disagreement notwithstanding, this Court recognized that "it is entirely possible that Commerce might be able to find a price effect on the non-{PSO} sales resulting from the grants" and Commerce reasonably explained why it found that to be the case.

Moreover, despite Wilmar's belief that the GOI's redirection of supply in the Indonesian biodiesel market does not demonstrate that prices were impacted to such an extent that a PMS existed for non-PSO sales, Commerce explained at length how the GOI's interventions impacted all biodiesel sales, including PSO and non-PSO sales.  Remand Redetermination at 14-18, 31-37.  There is no reason to believe that Wilmar's non-PSO sales are somehow insulated or immune from the market distortions affecting biodiesel and its primary input.  *Id.* at 17, 17-18.

Further, neither the statute nor the Statement of Administrative Action mandate that Commerce find a pattern or correlation between the prices of Wilmar's PSO and non-PSO sales to be able to determine that a sales-based and cost-based PMS exist with respect to biodiesel in Indonesia. *Id.* at 36.  Nonetheless, Commerce explained why a simple comparison of the average price for Wilmar's PSO and non-PSO sales is insufficient to demonstrate that non-PSO sales are in the ordinary course of trade. *Id*.  Commerce acknowledged that a difference in prices exists, but found that the difference does not in and of itself establish that the prices for non-PSO sales were competitively set, nor that they were otherwise made in the ordinary course of trade. *Id*.  Clearly, even if the non-PSO prices are different they can still be distorted. *See id.*  In fact, Commerce explained how other record evidence detracts from Wilmar's argument and supports Commerce's determination that non-PSO sales are not usable for normal value.  Commerce explained that "because the {cost of manufacturing} for the products sold outside of the PSO process was impacted significantly due to the government's intervention in the CPO market, and because Wilmar considered that {cost of manufacturing} when setting its prices, we find it is reasonable to conclude that the biodiesel market in Indonesia as a whole is distorted." *Id*. "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo,* 383 U.S. at 620.  Hence, Commerce's determination should be sustained.

Wilmar also argues that the GOI's "mere involvement" in the market does not satisfy the threshold for finding that a PMS existed with respect to non-PSO sales.  Wilmar Br. 11-12.  However, this misunderstands Commerce's findings.  As Commerce explained, "{t}he record of the underlying investigation demonstrates that the GOI intervenes heavily in *all* aspects of the Indonesia biodiesel market."  Remand Redetermination at 35.  Wilmar cites Commerce's

determination in *Shrimp from Thailand* in this regard, *see* Wilmar Br. 12 (citing *Certain Frozen Warmwater Shrimp from Thailand*, 76 Fed. Reg. 40,881 (Dep't of Commerce July 12, 2011), at IDM Cmt. 3 (*Shrimp from Thailand*)), but Commerce explained that Wilmar's reliance on that proceeding is misplaced.  Remand Redetermination at 35-36.  In *Shrimp from Thailand*, the Thai government's program at issue affected only 2.5 percent of Thailand's production of raw shrimp (the main input for frozen shrimp), and the program was only in effect for two and a half months during the period under consideration.  Here, by contrast, the GOI's pervasive interventions through the PSO program and its export tax, which distorted the price of CPO, affected all biodiesel sales and production in Indonesia during the entire period of investigation.  *Id.*

Wilmar takes issue with Commerce's statement that the GOI's intent is to ensure the existence and growth of the biodiesel industry as a whole, and argues that this does not demonstrate a distortive impact on non-PSO sales.  Wilmar Br. 12-13.  However, Wilmar's selective citation takes Commerce's analysis out of context and simply expresses Wilmar's disagreement with Commerce's observation that the GOI's intent in intervening in the biodiesel market is further support for the distortions on non-PSO sales.  *See* Remand Redetermination at 15, 33.  Commerce is allowed to make reasonable inferences from the record, and it did so here in concluding that the non-PSO sales were also distorted.  *See Thai Plastic Bags Industries Co., Ltd. v. United States,* 853 F. Supp. 2d 1267, 1281 (Ct. Int'l Trade 2012) ("Commerce may make reasonable inferences based on the record. . . . The question is whether the record adequately supports the decision of {Commerce}, not whether some other inference could reasonably have been drawn.") (quoting *Daewoo Electronics Co. Ltd. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (citation omitted)).

According to Wilmar, Commerce speculates that Wilmar's CPO costs would likely increase absent the cost-based PMS and claims that this finding is irrational. Wilmar Br. 13-14. It argues that Commerce disregarded the CPO costs based on its finding of a cost-based PMS, but then uses those same costs to demonstrate a PMS for non-PSO sales. *Id.* In fact, Commerce explained how the GOI's export tax distortions on CPO (a determination sustained by this Court) further distort the price of all biodiesel produced in Indonesia and sold to all customers. Although it is not required to quantify the PMS, Commerce was able to do so in this case and determined that Wilmar would face significantly higher manufacturing costs and would need to increase its prices to cover those higher costs. Remand Redetermination at 17-18, 34-35. This was not speculation, but a reasonable calculation by Commerce based on data submitted on the record. *See* Wilmar Prelim. Cost Memo at 2 & Att. 1, 6  (P.R. 249; C.R. 298).

Next, Wilmar argues that Commerce imposed double remedies because in the companion countervailing duty investigation on biodiesel from Indonesia, Commerce countervailed the same GOI programs that formed the basis of the sales-based and cost-based PMS at issue in this litigation. Wilmar Br. 14-15. In doing so, Wilmar refers back to its arguments in the opening and reply briefs and asks the Court to rule on those arguments. *Id.* Commerce refers the Court to the Government's response brief addressing these arguments. *See* Gov't Rule 56.2 Br. 40-46, ECF No. 50. As we explained in that brief, Commerce's actions here do not amount to a double remedy for several reasons, including that antidumping and countervailing duty investigations are conducted under two different statutes, concern different behavior, and involve separate administrative records.[3]

---

[3] In a second remand in the biodiesel from Argentina litigation, Commerce, under protest, provided further explanation for why there were no double remedies in a similar situation where certain programs were countervailed in the companion countervailing duty investigation.  This

Finally, Wilmar argues that if the Court agrees that Commerce should rely on Wilmar's non-PSO sales as the basis for normal value, the Court should order Commerce to recalculate Wilmar's constructed value profit ratio.  Wilmar Br. 15.  Wilmar states that the Court declined to rule on this argument in its remand order.  *Id.*  As we previously responded, because we have demonstrated that Commerce's determinations are lawful, Wilmar's argument on this issue is meritless.  *See* Gov't Rule 56.2 Br. 46.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

---

Court sustained Commerce's explanation in *Vicentin II*, and the Federal Circuit affirmed in *Vicentin III*, finding that "there is no risk of double counting in this case." *Vicentin III,* 42 F.4th at 1382.  In the remand order, the Court did not opine on the double remedy arguments, and thus, Commerce's remand redetermination does not further address double remedies beyond the explanation provided in the final determination.  *See* IDM at 27-29.  As we previously argued, Commerce does not agree that double counting occurred and explained that antidumping and countervailing duty remedies address different behaviors.  *See* Gov't Rule 56.2 Br. 40-46.  In addition to the arguments in our response brief, we submit that the Federal Circuit's decision in *Vicentin III* is instructive, and this Court should likewise find no double remedy concern.

PUBLIC VERSION

OF COUNSEL:                                    /s/ Joshua E. Kurland
ELIO GONZALEZ                                  JOSHUA E. KURLAND
Senior Attorney                                Senior Trial Counsel
Office of the Chief Counsel                    Commercial Litigation Branch
for Trade Enforcement and Compliance           U.S. Department of Justice
U.S. Department of Commerce                    Civil Division
                                               P.O. Box 480, Ben Franklin Station
                                               Washington, DC 20044
                                               Tel:  (202) 616-0477
                                               Email: Joshua.E.Kurland@usdoj.gov

December 13, 2022                              *Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Defendant's Response to Comments on Remand Results complies with the word count limitation under the Court's standard chambers procedures, and contains 7,298 words, including text, footnotes, and headings.

<u>/s/ Joshua E. Kurland</u>