Slip Op. 23–165

UNITED STATES COURT OF INTERNATIONAL TRADE

---

|  |  |  |
|---|---|---|
| WILMAR TRADING PTE LTD.,<br>PT WILMAR BIOENERGI INDONESIA, and<br>WILMAR OLEO NORTH AMERICA LLC, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| and | : | |
| | : | |
| P.T. MUSIM MAS and GOVERNMENT OF<br>THE REPUBLIC OF INDONESIA, | : | Before: Richard K. Eaton, Judge |
| | : | |
| | : | Consol. Court No. 18-00121 |
| Consolidated Plaintiffs, | : | |
| | : | **PUBLIC VERSION** |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| NATIONAL BIODIESEL BOARD FAIR<br>TRADE COALITION, | : | |
| | : | |
| | : | |
| Defendant-Intervenor. | : | |

---

## OPINION AND ORDER

[U.S. Department of Commerce's remand results are sustained, in part, and remanded. Commerce's final adverse facts available determination with respect to Consolidated Plaintiff P.T. Musim Mas is sustained.]

Dated: November 21, 2023

*Devin S. Sikes*, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, D.C., argued for Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC. With him on the brief was *Bernd G. Janzen*.

*Lynn G. Kamarck*, Hughes Hubbard & Reed LLP, of Washington, D.C., argued for Consolidated Plaintiff Government of the Republic of Indonesia. With her on the brief were *Matthew R. Nicely* and *Julia K. Eppard*.

*Edmund W. Sim*, Appleton Luff Pte Ltd., of Washington, D.C., argued for Consolidated Plaintiff P.T. Musim Mas. With him on the brief were *Kelly A. Slater* and *Jay Y. Nee*.

*Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *L. Misha Preheim*, Assistant Director. Of counsel on the brief was *Jessica R. DiPietro*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Myles S. Getlan*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for Defendant-Intervenor National Biodiesel Board Fair Trade Coalition. With him on the brief were *Jeffery B. Denning*, *Jack A. Levy*, *Ulrika K. Swanson*, and *James E. Ransdell*.

Eaton, Judge: Before the court is the U.S. Department of Commerce's ("Commerce" or the "Department") remand redetermination pursuant to the court's order in *Wilmar Trading Pte Ltd. v. United States*, 46 CIT __, 582 F. Supp. 3d 1243 (2022) ("*Wilmar I*"). *See* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF Nos. 91 (Confidential) & 92 (Public). In *Wilmar I*, the court sustained in part, and remanded, Commerce's final determination in the less-than-fair-value investigation of biodiesel from Indonesia. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1259; *see also Biodiesel From Indon.*, 83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) ("Final Determination") and accompanying Issues and Decision Mem. (Feb. 20, 2018) ("Final IDM"), PR 303.

Specifically, the court remanded, for further consideration or explanation, Commerce's determination that multiple particular market situations existed with respect to Wilmar's sales of biodiesel made outside of Indonesia's Public Service Obligation program (the "Program").[1] In

---

[1]     Wilmar's domestic sales made outside the Program are referred to herein as "non-Program" sales.

addition, the court remanded, for further consideration or explanation, Commerce's adjustment to

constructed value (as normal value[2]) to account for the value of Renewable Identification Numbers

("RINs").[3] *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1259. The court reserved decision on

Consolidated Plaintiff P.T. Musim Mas's ("Musim Mas") challenges to Commerce's use of

adverse facts available, pending the results of the redetermination. *See id.*

On remand, Commerce continued to find that multiple particular market situations existed

with respect to Wilmar's non-Program sales, rendering them outside the ordinary course of trade

and, therefore unusable for purposes of determining normal value. *See* Remand Results at 14-18.

Commerce reconsidered, however, its decision to account for RINs by increasing constructed

---

[2]        Normal value refers to:

the price at which the foreign like product is first sold (or, in the absence of a sale,
offered for sale) for consumption in the exporting country, in the usual commercial
quantities and in the ordinary course of trade and, to the extent practicable, at the
same level of trade as the export price or constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i) (2018).

[3]        As shall be seen, Renewable Identification Numbers or "RINs" are "tradeable
credits [created] pursuant to a U.S. regulatory scheme administered by the Environmental
Protection Agency." *Vicentin S.A.I.C. v. United States*, 43 CIT __, __, 404 F. Supp. 3d 1323, 1328
(2019) ("*Vicentin I*").

value (as normal value), and instead accounted for RINs by decreasing U.S. price (i.e., export price[4] or constructed export price[5]). *See* Remand Results at 6-12.

Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC (collectively, "Wilmar") challenge the Department's remand redeterminations. *See* Pls.' Cmts. Opp'n to Final Results of Redetermination Pursuant to Ct. Remand ("Pls.' Cmts."), ECF Nos. 96 (Confidential) & 97 (Public). Defendant the United States, on behalf of Commerce, and Defendant-Intervenor National Biodiesel Board Fair Trade Coalition, urge the court to sustain the Remand Results. *See* Def.'s Resp. to Cmts. Remand Results ("Def.'s Cmts."), ECF Nos. 104 (Confidential) & 105 (Public); Def.-Int.'s Cmts. Supp. of Final Results of Redetermination Pursuant to Ct. Remand ("Def.-Int.'s Cmts."), ECF Nos. 106 (Confidential) & 107 (Public).

For the following reasons, the court sustains, in part, and remands Commerce's Remand Results. The court sustains Commerce's particular market situation finding based on the export

---

[4]       Export price refers to:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under [19 U.S.C. § 1677a(c)].

19 U.S.C. § 1677a(a).

[5]       Constructed export price refers to:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under [19 U.S.C. § 1677a(c), (d)].

19 U.S.C. § 1677a(b).

levy imposed by the Government of Indonesia in 2015 ("2015 Export Levy"). The court also sustains Commerce's method of accounting for RINs as an adjustment to U.S. price. The court remands, however, on one issue—the potential imposition of a double remedy. Specifically, Commerce shall reconsider its decision to disregard Indonesian crude palm oil prices—when constructing normal value for Wilmar—based on the existence of a particular market situation (i.e., the 2015 Export Levy), or explain why doing so does not result in a double remedy.

With respect to Musim Mas's challenge to its adverse facts available rate, which is being considered for the first time, the court finds that Commerce's adverse facts available determination for Musim Mas was supported by substantial evidence and otherwise in accordance with law.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2018) and will uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## BACKGROUND

This opinion presumes familiarity with *Wilmar I*, which concerned the less-than-fair-value investigation of biodiesel from Indonesia covering the period of January 1, 2016, through December 31, 2016. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1245. The following facts are relevant to the court's review of the Remand Results.

## I.       Measures Taken by the Government of Indonesia to Strengthen Its Biodiesel Industry

### A.       Indonesia's Biodiesel Subsidy Fund

In 2015, the Government of Indonesia implemented a regulatory system with the intention of bolstering its biodiesel industry. *Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1247. As part of this system, the Indonesian government created the Biodiesel Subsidy Fund (the "Fund"). *Id.* The Fund was structured so that "when biodiesel producers, such as Wilmar and Musim Mas, made sales through [the Program], they received payments from the Fund in addition to a government-mandated amount that Program-designated purchasers paid." *Id.* As a result, when Wilmar and Musim Mas made sales through the Program, they received payment for those sales in two parts:

> (1) a payment from the purchaser in a government-mandated amount designated to match the market price for petrodiesel—a cheaper fuel than biodiesel (the "Petrodiesel Price"); and (2) a payment from the Indonesian government (through the Fund) intended to make up the difference between the Petrodiesel Price and what the Indonesian government estimated as the "market price" for biodiesel (the "Fund Payment").

*Id.*

The aim of the Program was to support Indonesia's biodiesel market by allowing domestic producers of biodiesel, like Wilmar and Musim Mas, "to receive a competitive price for their biodiesel, even though their purchasers paid the lower Petrodiesel Price." *Id.*

### B.       Export Restraints on Crude Palm Oil (Primary Biodiesel Input)

Also in 2015, the Government of Indonesia imposed an export levy on all exports of crude palm oil—the primary input in producing biodiesel in Indonesia. The amount of the levy was $50

per metric ton.[6] *Id.* "As a result of the levy, more crude palm oil was available for purchase in the Indonesian market, and less was present in the world market." *Id.* Furthermore, "the world market price of Indonesian crude palm oil increased, and the price of crude palm oil fell for domestic consumers, including biodiesel producers such as Wilmar and Musim Mas." *Id.*

## II.    Commerce's Antidumping Duty Investigation

On March 1, 2018, Commerce published its Final Determination pursuant to its antidumping duty investigation of biodiesel from Indonesia. *See* Final Determination, 83 Fed. Reg. at 8,835. Commerce selected Wilmar and Musim Mas as mandatory respondents because they were the two largest, publicly identifiable Indonesian exporters of biodiesel by volume, to the United States during the period of investigation. *See* Respondent Selection Mem. (May 3, 2017), PR 47.

In the Final Determination, Commerce determined Wilmar's normal value by using constructed value, after finding that multiple particular market situations in Indonesia (arising from both the Program and 2015 Export Levy) rendered all of Wilmar's home market sales[7] of biodiesel (i.e., its Program sales *and* non-Program sales) outside the ordinary course of trade. *See* Final IDM at 11-16. Additionally, when calculating Wilmar's dumping margin, Commerce increased the

---

[6]       Crude palm oil is the primary input in the biodiesel fuel produced by Wilmar and Musim Mas. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1247.

[7]       Wilmar made two kinds of home market sales during the period of investigation: (1) Program sales (i.e., sales made through the Government of Indonesia's Program, for which it received payment in, the above described, two parts), and (2) non-Program sales (i.e., sales made outside the Program, which were not subject to the two-part payment system). *See* Final IDM at 11-16.

constructed value (as normal value) of the subject merchandise to account for the estimated value of RINs associated with Wilmar's U.S. sales of biodiesel. *See* Final IDM at 6-8.

As for Musim Mas, Commerce found that it could not determine the normal value of the company's sales in Indonesia or its U.S. sales prices because the company failed to provide necessary information in response to the Department's questionnaires, thus warranting the use of facts available.[8] *See* Final IDM at 49-55. Commerce further found that Musim Mas failed to cooperate to the best of its ability to comply with the Department's requests for such information, warranting the use of an adverse inference[9] in selecting from among the facts otherwise available. *See* Final IDM at 53-55. Thus, Commerce did not calculate an individual antidumping duty rate for Musim Mas, but instead, applied what it called "total" adverse facts available and selected a 276.65% rate (i.e., Wilmar's highest transaction-specific margin) for Musim Mas. *See id.* at 54-55.

## III.    *Wilmar I*

In *Wilmar I*, the court sustained, in part, and remanded Commerce's Final Determination. Relevant here, the court found that Commerce had not adequately explained and supported with evidence (1) its decision to disregard Wilmar's non-Program sales when determining normal value, and rely instead on constructed value (as normal value); and (2) its decision to adjust constructed

---

[8]    "If . . . necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]," "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," or "significantly impedes a proceeding," Commerce uses the facts otherwise available in place of the missing information. 19 U.S.C. § 1677e(a)(1)-(2).

[9]    "If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the [Department]," then "[Commerce] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1).

value (as normal value) to account for RINs associated with Wilmar's U.S. sales. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1253-59.

Because Commerce's findings on remand regarding the determination of normal value for Wilmar had the potential to impact the Department's dumping analysis, the court reserved decision on Musim Mas's challenges to Commerce's use of adverse facts available until the results of redetermination were before the court. *See id.* at __, 582 F. Supp. 3d at 1259.

## IV.    Remand Results

On September 22, 2022, the Department issued the Remand Results. On remand, Commerce continued to find that multiple particular market situations existed with respect to Wilmar's non-Program sales, rendering them outside the ordinary course of trade and, therefore unusable for purposes of determining normal value. *See* Remand Results at 14-18. Commerce reconsidered, however, its decision to account for RINs by increasing constructed value (as normal value), and instead accounted for RINs by adjusting U.S. price. *See* Remand Results at 7-12.

Wilmar opposes the Remand Results and argues that Commerce once again failed to explain how its particular market situation and RIN value determinations are supported by substantial evidence and in accordance with law. *See* Pls.' Cmts. at 4. Wilmar further contends that Commerce's particular market situation determinations impose an unlawful double remedy. *See id.* Defendant and Defendant-Intervenor insist that Commerce got it right, and ask the court to sustain the Remand Results. *See* Def.'s Cmts. at 23; *see also* Def.-Int.'s Cmts. at 20.

## DISCUSSION

**I.     Commerce's Particular Market Situation Determination**

The antidumping statute provides that a "particular market situation" may render a respondent's home market sales, or its cost of production, outside the ordinary course of trade, and therefore unusable for purposes of determining normal value. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III) (sales), (e) (costs). While the statute does not explicitly define "particular market situation," the Statement of Administrative Action accompanying the Uruguay Round Agreements Act of 1994 ("SAA")[10] provides some guidance as to how Commerce may determine whether one exists: "[A] particular market situation . . . might exist . . . where there is government control over pricing to such an extent that home market prices cannot be considered to be competitively set." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162; *see also NEXTEEL Co. v. United States*, 28 F.4th 1226, 1234 (Fed. Cir. 2022) (citing SAA examples). Thus, broadly speaking, "a [particular market situation] exists when the market under investigation possesses a unique set of circumstances that 'prevents a proper comparison' between a product's normal value and its export price or constructed export price." *HiSteel Co. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1233, 1239 (2021).

When Commerce determines that a particular market situation takes home market sales outside the ordinary course of trade ("sales-based particular market situation"), rendering them

---

[10]     The SAA was adopted by Congress with the Uruguay Round Agreements Act. *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, 656 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040; *see also* 19 U.S.C. § 3511(a) (approving the SAA). By statute, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

unusable as a basis for normal value, the Department may construct normal value based on a respondent's production costs (i.e., constructed value).[11] *See* 19 U.S.C. § 1677b(a)(4); *see also* 19 C.F.R. § 351.404(c)(2)(i) (2019).

When calculating constructed value, another type of particular market situation can render a respondent's costs of production themselves outside the ordinary course of trade ("cost-based particular market situation"). This occurs where "the cost of materials and fabrication or other processing of any kind . . . [do] not accurately reflect the cost of production in the ordinary course of trade," and are therefore unusable to determine constructed value. 19 U.S.C. § 1677b(e). In this instance, the statute permits Commerce to "use another calculation methodology under this part or any other calculation methodology" to determine the cost of production in the exporting country for purposes of calculating constructed value. *Id.* Thus, if a single particular market situation distorts both a respondent's home market sales and its cost of production it may result in Commerce (1) disregarding home market sales as the basis for determining normal value and (2) disregarding the actual cost of production values when constructing an alternative normal value.

On remand, Commerce found that the Government of Indonesia's Program and the 2015 Export Levy each created a sales-based particular market situation that, on its own, rendered Wilmar's non-Program sales outside the ordinary course of trade and thus unusable for purposes

---

[11]     The statute defines "constructed value" as the sum of "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade" and "the actual amounts incurred and realized by the specific exporter or producer being examined . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(1)-(2)(A).

of determining normal value. *See* Remand Results at 14-18. Commerce therefore disregarded Wilmar's non-Program sales and relied on constructed value (as normal value).[12]

Commerce also found that the 2015 Export Levy created a cost-based particular market situation that caused Wilmar's crude palm oil costs to inaccurately reflect the cost of production of biodiesel in the ordinary course of trade and therefore unusable for determining constructed value. *Id.* at 18. Consequently, Commerce relied on the world market prices for crude palm oil instead of domestic Indonesian crude palm oil prices when constructing normal value for Wilmar. Wilmar opposes Commerce's determinations on remand. For Wilmar, the Department once again failed to reconcile its determinations with substantial record evidence and the law.

### A.     Commerce's Finding That the Public Service Obligation Program Created a Particular Market Situation That Distorted Wilmar's Non-Program Sales Price Is Not Supported by Substantial Evidence

In *Wilmar I*, the court found that Commerce failed to provide substantial evidence of a price effect by the Program sales on the non-Program sales sufficient to cause the non-Program sales to be outside the ordinary course of trade. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1256. That is, Commerce failed to show just how the Government of Indonesia's regulation of biodiesel sold through the Program, resulted in a particular market situation affecting the non-Program sales prices to such an extent that they, too, could not be considered competitively set. The court remanded to Commerce with instructions to "support with substantial evidence a finding that one or more particular market situations existed with respect to Wilmar's non-Program sales or use the price paid for these sales in its normal value determination." *Id.* at __, 582 F. Supp. 3d at 1259.

---

[12]     The Program sales were also unusable because the sales prices were determined by the Government of Indonesia and not the market. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1254.

As has been noted, sales made through the Program paid the sellers in two parts: (1) a government set payment from the purchaser and (2) a payment from the Fund. The idea was for the purchaser to pay no more than the lower Petrodiesel Price and for the seller to profitably sell its product.

In the Remand Results, Commerce makes two related arguments in support of its determination that the Government of Indonesia's Program results in a particular market situation that renders Wilmar's non-Program sales outside the ordinary course of trade. First, Commerce argues that "the funding mechanism and the configuration of the [Program] payments *suggest* that the [Government of Indonesia's] *intent* is to ensure the existence and growth of the biodiesel industry as a whole," and therefore "it is *reasonable to conclude* that the [Government of Indonesia's Program] payments affect the price of all sales (*i.e.*, [Program] and non-[Program] sales) made by Indonesian biodiesel producers, including Wilmar." Remand Results at 15-16 (emphasis added). For Commerce, substantial evidence supports this conclusion because (1) the Government of Indonesia makes payments to biodiesel producers under the Program for their Program sales; (2) the Government of Indonesia's export tax on crude palm oil is the source of funding[13] for the Program payments to biodiesel producers; and (3) the Government of Indonesia stated[14] that an "export taxes on primary commodities can be used to reduce the domestic price of

---

[13]     "The record demonstrates that the [Government of Indonesia]'s export tax on [crude palm oil] is the source of funds for the [Government of Indonesia]'s [biodiesel subsidy fund] payments to biodiesel producers." Remand Results at 15.

[14]     The Government of Indonesia's statement, as relied upon by Commerce, provides:

export taxes on primary commodities can be used to reduce the domestic price of primary products in order to guarantee supply of intermediate inputs at below world market prices for domestic processing industries. In this way, export taxes provide

primary products in order to guarantee supply of intermediate inputs at below world market prices for domestic processing industries." *See* Remand Results at 15.

Thus, according to Commerce, the Government of Indonesia's Program payments affect all Indonesian sales of biodiesel (i.e., Program and non-Program sales prices), and not just sales of biodiesel made under the Program. The Department insists that this is the case because the Government of Indonesia's stated *purpose* for imposing export taxes on primary commodities is to "reduce the domestic price of primary products," and because the proceeds from the export tax on crude palm oil is the source of funding for the Program payments.

Despite the Department's further explanation on remand, it has nevertheless failed to support with substantial evidence just how the Program payments distorted the price of Wilmar's non-Program sales. That the proceeds from the export tax on crude palm oil are used to finance the Program payments, and that the Government of Indonesia's stated purpose for imposing export taxes on primary commodities is "to reduce the domestic price of primary products in order to guarantee supply of intermediate inputs at below world market prices for domestic processing industries," does not demonstrate with substantial evidence that the non-Program sales prices were, in fact, affected by the Program payments.

While the facts appear to support the idea that export taxes on primary commodities, like crude palm oil, are intended to benefit the domestic biodiesel industry as a whole (i.e., by keeping more crude palm oil in the country, which results in cheaper domestic crude palm oil prices and thus lowering the cost of manufacture for all biodiesel), it does not explain how using the proceeds

---

an incentive for the development of domestic manufacturing or processing industries with higher value-added exports.

Remand Results at 15.

from the export tax to fund the Program payments furthered that intent. This is particularly true considering that the payments are limited to biodiesel sales made through the Program, and Commerce did not provide any further evidence indicating that the Program payments somehow impacted the price of non-Program biodiesel.

Instead, Commerce directs the court's attention to what it believes is "reasonable to conclude" without any evidence that there was any actual affect. The Department has merely made a claim and stated it as fact. *See* Remand Results at 15-16 ("[T]he funding mechanism and the configuration of the [Program] payments suggest that the [Government of Indonesia's] intent is to ensure the existence and growth of the biodiesel industry as a whole . . . . Thus, it is reasonable to conclude that the [Government of Indonesia's Program] payments affect the price of all sales (*i.e.*, [Program] and non-[Program] sales) made by Indonesian biodiesel producers, including Wilmar.").

As for Commerce's second argument, it asserts that Wilmar's non-Program sales prices are "not competitively set" because the Government of Indonesia, through the Program, "redirects the supply of available biodiesel from non-Program [customers] to [two] Program [customers]"[15] and, as a result, "the part of the market comprised of non-[Program] sales does not include the [largest] biodiesel customers . . . or the vast majority of available biodiesel." Remand Results at 16. Commerce found this to be sufficient evidence that a particular market situation existed because it claims the Indonesian biodiesel market "functions as a whole," and therefore "it would be illogical to conclude that a small portion of Wilmar's sales in that market (*i.e.*, its non-

---

[15]     The two customers are PT Pertamina (Perseo) and PT AKR Corporindo Tbk. *See* Pet'r's Particular Market Situation Allegation Regarding Resp't's Home Market Sales and Costs of Production (July 25, 2017) ("PMS Allegation") Ex. 1, PR 114-16. PT Pertamina is a large state-owned oil and gas company that purchases and supplies biodiesel, while PT AKR is a fuel distribution company that owns petrol stations. *See id.*

[Program] sales) are somehow insulated from the market distortions," caused by the Government

of Indonesia's pervasive regulation of the domestic biodiesel market through the Program.

Remand Results at 17. Importantly, Commerce cites record evidence that the price of the

overwhelming majority of biodiesel in Indonesia is not set by the market. And that the two largest

purchasers do not make non-Program purchases. *See* Remand Results at 16 ("[T]he record of the

underlying investigation shows that the [Government of Indonesia] mandates producer-specific

minimum sale quantity requirements for [Program] sales," and "[a]s a result of these quantity

requirements, [Program] sales comprise the vast majority of Indonesian biodiesel consumption at

the country-wide level. All [Program] sales, including those made by Wilmar, are made to [two

Indonesian customers]. Thus . . . the [Government of Indonesia] substantially redirects the supply

of biodiesel available from non-[Program] to [Program] consumers. This means that

non-[Program] prices are not competitively set because the part of the market comprised of

non-[Program] sales does not include the [largest] biodiesel customers . . . in Indonesia or the vast

majority of available biodiesel."). Though Commerce comes awfully close to satisfying the

substantial evidence standard of review, the court finds that it has not cited substantial evidence

that the prices for non-Program sales are not set by the market.

Although, with respect to this second argument, Commerce cites some actual evidence, it

nevertheless has failed to adequately explain just how the non-Program sales prices were affected

(i.e., rendered outside the "ordinary course of trade") by the Government of Indonesia's redirection

of the biodiesel supply through the Program, or muster evidence that the sales prices for

non-Program sales were actually distorted. For example, Commerce has offered no evidence-based

explanation for its proposition that the Program and non-Program sales were subject to the same

market forces, or that the non-Program sales prices were distorted because two large customers

did not purchase non-Program biodiesel. Moreover, Commerce failed to meaningfully address contradictory record evidence—specifically, that the Government of Indonesia does not place any limitations on how much biodiesel producers may sell outside of the Program, or that the Government of Indonesia exerts no control over the price of the non-Program sales. *See* Remand Results at 37; *see also* Verification Report for Pls.' Sales Responses (Nov. 22, 2017) at 6, PR 265. This evidence tends to support a finding that, with respect to the non-Program market, the Government of Indonesia does not have control over pricing "to such an extent that home market prices cannot be considered to be competitively set." SAA at 822.

The result of all this is that Commerce has not supported with substantial evidence its finding that the Government of Indonesia's distortive control of the Program sales market impacted the Indonesian biodiesel market as a whole (i.e., Program and non-Program sales of biodiesel). It is worth keeping in mind that, under the statute, the mere existence of government intervention in the market is not enough for Commerce to disregard a respondent's home market sales. That is, even though Commerce has established that the Government of Indonesia intervened in the domestic biodiesel market through its implementation of the Program, it also must show, through reasonable explanation and evidentiary support, just how that intervention prevented a proper comparison between the home market sales price and export price. *See, e.g.*, *Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1335 ("Commerce determines normal value based upon constructed value, rather than home market sales, where a [particular market situation] exists that *prevents a proper comparison with the export price or constructed export [price]* because such sales occurred outside the ordinary course of trade." (emphasis added)); *see also, e.g.*, 19 U.S.C. § 1677(15) ("[Commerce] shall consider the following sales and transactions, among others, to be outside the ordinary course of trade: . . . Situations in which [Commerce] determines that the particular market

situation *prevents a proper comparison with the export price or constructed export price*." (emphasis added)).

While Commerce did support a finding that the Government of Indonesia has intervened in the domestic biodiesel industry through the Program, it did not explain, by use of substantial evidence, how this government intervention caused the non-Program sales to be outside the ordinary course of trade (i.e., prevents a proper comparison with export price or constructed export price). Instead, Commerce merely speculates that "it would be illogical to conclude that a small portion of Wilmar's sales in that market (*i.e.*, its non-[Program] sales) are somehow insulated from the market distortions," created by the Program sales. Remand Results at 17. Such speculation does not amount to substantial evidence. Therefore, the court finds that substantial evidence does not support Commerce's finding that the non-Program sales prices were not within the ordinary course of trade.

> **B.     Commerce's Finding That the 2015 Export Levy Created Both a Sales-Based and a Cost-Based Particular Market Situation That Distorted Wilmar's Non-Program Sales Prices and Domestic Crude Palm Oil Prices Is Supported by Substantial Evidence**

In the Remand Results, Commerce found that the 2015 Export Levy created a sales-based particular market situation warranting its disregard of Wilmar's non-Program home market sales information and reliance instead on constructed value to determine normal value. Commerce also found that the 2015 Export Levy created a cost-based particular market situation warranting its use of world market crude palm oil prices instead of domestic Indonesian crude palm oil prices when constructing normal value.

Commerce determined that a sales-based particular market situation existed with respect to Wilmar's non-Program home market sales because the cost of crude palm oil—the main input used to produce biodiesel in Indonesia—was distorted by the 2015 Export Levy and "[a]bsent the

[particular market situation] with respect to [crude palm oil] prices in Indonesia, the cost of all sales of biodiesel would likely have been significantly higher." Remand Results at 17. When making this finding, Commerce calculated the difference between the costs actually incurred by Wilmar (i.e., based on domestic Indonesian crude palm oil values) and what the company's costs would have been in the ordinary course of trade (i.e., based on the world market prices for crude palm oil), and found that "Wilmar's weighted-average cost for biodiesel sold in the home market would likely have increased,[16]" if not for the distortion of crude palm oil prices caused by the 2015 Export Levy. Remand Results at 17.

For Commerce, "because the [cost of manufacture] for the [non-Program] products . . . was impacted significantly due to the government's intervention in the [crude palm oil] market, and because Wilmar considered that [cost of manufacture] when setting its prices, [Commerce found] it [was] reasonable to conclude that the biodiesel market in Indonesia as a whole is distorted," and "[i]t would be illogical to conclude that Wilmar's non-[Program] sales are immune to distorted [crude palm oil] costs that affect all production of biodiesel in Indonesia." Remand Results at 17-18, 36.

Commerce thus found that the 2015 Export Levy's distortion of domestic crude palm oil prices resulted in a sales-based particular market situation that affected the price of Wilmar's non-Program sales, such that the non-Program sales could not be considered within the ordinary course of trade. Therefore, Commerce disregarded Wilmar's non-Program sales values when determining normal value and relied instead on constructed value (as normal value).

---

16      Specifically, Commerce determined that Wilmar's weighted-average cost for biodiesel sold in the home market would likely have increased by [[          ]]%. *See* Remand Results at 17.

Furthermore, when determining constructed value, Commerce found that the 2015 Export Levy also created a separate cost-based particular market situation that caused Wilmar's crude palm oil costs to not accurately reflect the cost of production of biodiesel in the ordinary course of trade. Consequently, Commerce used the world market prices for crude palm oil instead of domestic Indonesian crude palm oil prices for purposes of constructing normal value.

Wilmar challenges Commerce's 2015 Export Levy particular market situation determinations on remand as unsupported by substantial evidence. Pls.' Cmts. at 13.

The court, for the following reasons, rejects Wilmar's various arguments and concludes that Commerce has supported with substantial evidence its findings that the 2015 Export Levy created a sales-based particular market situation that rendered Wilmar's non-Program sales unusable for purposes of normal value, as well as a cost-based particular market situation that rendered Wilmar's reported crude palm oil costs unusable for calculating constructed value.

Wilmar first argues that Commerce raised "an entirely new theory" on remand. *See* Pls.' Cmts. at 13 ("For starters, Commerce advances in the Final Remand Results an entirely new theory based on Wilmar's reported [crude palm oil] costs."). This is not the case. The court's remand instructions explicitly acknowledged Commerce's argument that the "cost of crude palm oil—the main input in biodiesel—was distorted by the particular market situation created by Indonesia's export taxes and levies, including the 2015 Export Levy." *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1256. In fact, the court said that "it was not necessarily unreasonable for Commerce to assume that a cost-based particular market situation contributed to non-Program sales being outside the ordinary course of trade." *Id.* (citation omitted). Here, Commerce's quantification of the difference between the costs actually incurred by Wilmar and what the company's costs would have been in the ordinary course of trade does not amount to a "new theory." Rather, the

Department is simply addressing the court's concerns about just how the 2015 Export Levy affected the non-Program sales prices. Thus, Wilmar's claim is without merit.

Next, Wilmar argues that Commerce merely "speculate[d] that Wilmar's [crude palm oil] costs 'likely' would increase, [and] such speculation cannot 'substitute for substantial evidence in justifying decisions.'" Pls.' Cmts. at 13. Again, Wilmar's claim cannot be credited.

In the Remand Results, Commerce presented its evidence and analysis. It

> compared the [period of investigation] world market price of [crude palm oil] to Wilmar's [period of investigation] weighted-average [crude palm oil] value, and then adjusted the [crude palm oil] portion of Wilmar's [cost of manufacture] by the resulting percentage. This calculation showed that Wilmar's weighted-average [cost of manufacture] for biodiesel sold in the home market would increase.[17]

Remand Results at 34-35.

Thus, Commerce did not merely speculate that "Wilmar's weighted-average [cost] for biodiesel sold in the home market would [likely have] increase[d],[18]" but rather arrived at this conclusion by comparing Wilmar's domestic crude palm oil prices against a benchmark of world market crude palm oil prices. *Id.* Commerce showed that the domestic price for crude palm oil was significantly less than the world market price.[19] *See* Cost of Production & Constructed Value Calculation Adjustments (Oct. 19, 2017), CR 298. Accordingly, the result of this comparison

---

[17]      Specifically, Commerce's calculation showed that Wilmar's weighted-average cost of manufacture for biodiesel sold in the home market would increase from $[[      ]] per metric ton to $[[      ]] per metric ton. For reference, Wilmar's average price for its non-Program sales was $[[      ]] per metric ton. Remand Results at 34-35.

[18]      Commerce determined that Wilmar's weighted-average cost for biodiesel sold in the home market would likely have increased by [[      ]]%. Remand Results at 34.

[19]      Commerce showed that the weighted-average domestic crude palm oil price from Wilmar's reported cost of production information was $[[      ]] per metric ton during the period of investigation, whereas the world market price of crude palm oil during the period of investigation was $681.06 per metric ton. *See* Cost of Production & Constructed Value Calculation Adjustments (Oct. 19, 2017), CR 298.

demonstrated that the domestic price of crude palm oil in Indonesia was distorted by the 2015 Export Levy. Wilmar does not dispute its reported crude palm oil costs or the world market price for crude palm oil during the relevant time period. It is apparent, then, that Commerce reasonably relied on substantial evidence to demonstrate that Wilmar's weighted-average cost of manufacture for biodiesel sold in the home market would increase significantly[20] if the company paid the world market prices for crude palm oil.[21]

Finally, Wilmar argues that Commerce's reliance on the "purported differences in prices and costs [does] not 'in and of itself' establish that a [particular market situation] existed as to non-[Program] sales." Pls.' Cmts. at 14. The Department, however, did not find the existence of a particular market situation based solely on these "purported differences in prices and costs." Instead, Commerce emphasized that "[t]he [Government of Indonesia] has stated that: export taxes [(i.e., the 2015 Export Levy)] on primary commodities [(i.e., crude palm oil)] can be used to reduce the domestic price of primary products [(i.e., biodiesel)] . . . ." Remand Results at 15. Commerce then demonstrated that the Government of Indonesia's 2015 Export Levy had that desired effect (i.e., reducing crude palm oil costs, which also had the effect of reducing domestic biodiesel sales prices) by quantifying the differences between Wilmar's crude palm oil costs and the world market price for crude palm oil and linking Wilmar's distorted crude palm oil costs to the company's

---

[20]     Commerce's calculations showed that Wilmar's weighted-average cost of manufacture for biodiesel sold in the home market would increase from approximately $[[          ]] per metric ton to $[[          ]] per metric ton if the company paid the world market prices for crude palm oil. Remand Results at 35.

[21]     If Wilmar's crude palm oil costs were within the ordinary course of trade, the cost of manufacturing the biodiesel would be more than Wilmar's average price for its non-Program sales ($[[          ]] per metric ton). Therefore, Wilmar would necessarily have to increase its sales prices to cover the higher manufacturing costs to sell the biodiesel in the ordinary course of trade (i.e., at above-cost prices). *See* Remand Results at 35.

non-Program sales prices. *See id.* at 34-35; *see, e.g.*, *NEXTEEL Co.*, 28 F.4th at 1234 ("[A] quantitative comparison showing a difference between costs incurred and costs in the ordinary course of trade could be substantial evidence supporting the existence of a particular market situation.").

It is worth noting that, in *Wilmar I*, the court concluded that "substantial evidence supports the finding that the cost of crude palm oil . . . was distorted by the particular market situation created by Indonesia's export taxes and levies, including the 2015 Export Levy." *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1256 ("Indonesian [crude palm oil] prices were below world market prices in each month since the imposition of the levy (including each month of the [period of investigation])."). The court remanded the issue, however, because "Commerce ha[d] failed to show just how the price paid for the biodiesel sold in non-Program sales was affected by the distorted cost of crude palm oil." *Id.*

Here, Commerce provided substantial evidence linking the distorted costs of Indonesian crude palm oil to the price paid for Wilmar's non-Program biodiesel. On remand, Commerce calculated Wilmar's cost of manufacture, using non-distorted world market crude palm oil prices, and then compared it to Wilmar's reported cost of manufacture, which was based on the Indonesian crude palm oil prices that were distorted as a result of the 2015 Export Levy. The results of this comparison showed that, by replacing the distorted Indonesian crude palm oil prices with crude palm oil prices found in the ordinary course of trade, Wilmar's weighted-average cost of manufacture for its biodiesel sold in the domestic market would increase.[22] Thus, the *cost of*

---

[22]     Specifically, Wilmar's weighted-average cost of manufacture for its biodiesel sold in the domestic market would increase from $[[        ]] per metric ton to $[[        ]] per metric ton. Remand Results at 35.

*manufacture*[23] calculated using crude palm oil prices found in the ordinary course of trade is more than the average price paid for Wilmar's non-Program *sales*[24] during the period of investigation. *See* Remand Results at 34–35. That is, if Wilmar's crude palm oil costs were not distorted, the company's cost of manufacture would exceed its sales price for non-Program sales. If the cost of manufacture (the majority of which is based on the price of crude palm oil)[25] did not, in any way, impact Wilmar's non-Program sales prices, then this would result in Wilmar selling its biodiesel at a loss because it would cost more to produce the biodiesel than what the company's non-Program customers would pay for it.[26]

Commerce also noted that Wilmar's average price per metric ton for its non-Program sales of biodiesel was nearly identical to the average world market price per metric ton for crude palm oil. Put another way, the average price for Wilmar's non-Program sales was approximately the same as the non-distorted price of crude palm oil alone—the major input in producing biodiesel, but an input, nonetheless. This evidence led Commerce to reasonably conclude that the lowered costs of crude palm oil in the Indonesian domestic market resulted in lowered domestic sales prices for biodiesel, such that Wilmar's non-Program sales prices were not competitively set.

---

[23]    Wilmar's estimated cost of manufacture, if it were to rely on crude palm oil prices found in the ordinary course of trade (i.e., world market crude palm oil prices), would be $[[      ]] per metric ton. Remand Results at 35.

[24]    The average price paid for Wilmar's non-Program sales was $[[      ]] per metric ton. Remand Results at 35.

[25]    Crude palm oil comprises [[           ]] of Wilmar's total biodiesel cost of manufacture. *See* Cost of Production & Constructed Value Calculation Adjustments.

[26]    "This calculation showed that Wilmar's weighted-average [cost of manufacture] for biodiesel sold in the home market would increase from $[[        ]]/[metric ton] to $[[      ]]/[metric ton]. For reference, Wilmar's average price for its non-[Program] sales was $[[      ]]/[metric ton]." Remand Results at 34–35.

The court concludes that Commerce has provided substantial evidence that a particular market situation distorted the domestic costs of crude palm oil and that Wilmar's non-Program sales prices were impacted by those distorted costs of crude palm oil, rendering the company's non-Program sales outside the ordinary course of trade and unreliable as a basis for determining normal value under 19 U.S.C. § 1677b(a)(1).

As a result of this finding, Commerce reasonably determined normal value based upon constructed value, instead of using Wilmar's distorted home market sales values. Furthermore, when calculating constructed value, Commerce has shown that another particular market situation existed such that the cost of crude palm oil does not accurately reflect the cost of production of biodiesel in the ordinary course of trade. Based on this finding, Commerce reasonably relied on an alternative method for constructing normal value under 19 U.S.C. § 1677b(e), which used world market prices for crude palm oil—instead of domestic crude palm oil prices—when calculating constructed value. *See* 19 U.S.C. § 1677b(e) ("[I]f a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, [Commerce] may use another calculation methodology under this part or any other calculation methodology.").

Commerce's alternative calculation method, however, appears to correct for a distortion in home market prices caused by a domestic subsidy (i.e., the 2015 Export Levy) that has potentially already been accounted for in the companion countervailing duty case. *See generally Wilmar Trading Pte Ltd. v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1334 (2020) ("*Wilmar CVD*"). In other words, Commerce has failed to explain why its alternative method for constructing normal value—using world market crude palm oil prices—is reasonable given the possibility that it results in the imposition of a double remedy. Accordingly, for the reasons discussed in the following

section, Commerce's chosen alternative method for constructing Wilmar's normal value is remanded for further explanation or reconsideration.

## II.     Commerce's Chosen Method for Constructing Wilmar's Normal Value Is Remanded for Further Explanation or Reconsideration of the Potential Imposition of a Double Remedy

Wilmar claims that Commerce's particular market situation findings resulted in the imposition of a double remedy because the Department, "[i]n the companion countervailing duty investigation . . . countervailed the same two . . . programs that formed the basis of the cost-based and sales-based [particular market situations] at issue in this litigation." Pls.' Cmts. at 14. For Wilmar, "the imposition of a higher antidumping duty margin due to the rejection of Wilmar's home market sales and costs, as well as a [countervailing duty] rate based on the same government programs, amounts to the imposition of double remedies by Commerce." Pls.' Br. at 30.[27]

For its part, Defendant insists that the law does not require Commerce to consider the possibility of a double remedy when adjusting constructed value based on a particular market situation. Nevertheless, Commerce claims that its use of world market prices instead of Indonesian crude palm oil prices when constructing normal value does not result in a double remedy. For the following reasons, Commerce's determination is remanded for further explanation or reconsideration.

As an initial matter, it is worth noting that this Court has recently addressed Wilmar's arguments in the *Vicentin* line of cases. In the *Vicentin* cases, the Court considered, among other

---

[27]        The court only considers the potential imposition of a doubly remedy related to Commerce's 2015 Export Levy particular market situation determination because Commerce's Public Service Obligation Program particular market situation determination is unsupported by substantial evidence.

things, whether Commerce's use of an alternative method under 19 U.S.C. § 1677b(e)[28] for

determining constructed value remedied the effects of domestic subsidization already remedied by

a concurrent countervailing duty case.[29] *Vicentin S.A.I.C. v. United States*, 44 CIT __, __ 466 F.

Supp. 3d 1227, 1242-45 (2020) ("*Vicentin II*"). There, Commerce found that the Government of

Argentina's export tax on soybeans resulted in a particular market situation, which caused

Argentine domestic soybean prices—the major input for Argentine biodiesel—to inaccurately

reflect the cost of production in the ordinary course of trade. *Id.* at 1231. Commerce therefore used

an alternative method[30] for calculating constructed value under 19 U.S.C.§ 1677(e). *Id.*

As part of its alternative method, Commerce relied on market-determined soybean prices

instead of domestic Argentine soybean prices. This reliance resulted in an increased dumping

margin for the respondent. *Id.* at 1245. The Court remanded, holding that "[a]lthough the statute

contains no prohibition on imposing [countervailing duties] and [antidumping duties] in relation

to the same conduct," Commerce's chosen alternative method must be a reasonable one, and the

---

[28]     19 U.S.C. § 1677b(e) concerns the calculation of constructed value. It states, in relevant part, that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, [Commerce] may use another calculation methodology under this part or any other calculation methodology." 19 U.S.C. § 1677b(e).

[29]     In the concurrent countervailing duty case in the *Vicentin* line of cases, "Commerce imposed a [countervailing duty], apparently based upon a finding that the [Government of Argentina's] export tax regime artificially decreased Argentine soybean prices, and that the policy met the statutory requirements to constitute a countervailable subsidy." *Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1342 n.29. In the companion antidumping duty investigation, the double remedy issue arose because Commerce relied on that same export tax regime as the basis for its particular market situation finding and subsequent disregard of Argentine soybean prices as part of its chosen method for constructing normal value. *Id.* at 1342.

[30]     Here, like in the *Vicentin* cases, Commerce used an alternative method in constructing normal value for Wilmar because the Department found that a particular market situation distorted the price of Indonesian crude palm oil (as a factor of cost of manufacture) such that the cost of manufacture for biodiesel was not within the ordinary course of trade.

Department "failed to explain . . . why its rejection of Argentine soybean costs—part of its chosen methodology—is reasonable given that Commerce seem[ed] to have remedied the export tax regime in the [countervailing duty] determination." *Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1342 ("Given that the subsidies distorting the Argentine soybean market seemingly were remedied in the [countervailing duty] determination, it is not clear why Commerce should disregard that remedy.").

As in the *Vicentin* cases, here, Commerce found that a particular market situation existed in Indonesia—based on the 2015 Export Levy—such that the domestic Indonesian price of crude palm oil did not accurately reflect the cost of production in the ordinary course of trade. Final IDM at 21-24. Commerce therefore used an alternative method for calculating constructed value under 19 U.S.C. § 1677b(e). *Id.* As part of its chosen method, Commerce relied on world market crude palm oil prices instead of domestic Indonesian crude palm oil prices for purposes of constructing normal value.[31] *Id.*

Under the statute, when relying on constructed value (as normal value) Commerce may resort to "another calculation methodology" if a particular market situation renders the cost of materials and fabrication (or other processing of any kind) outside the ordinary course of trade.[32]

---

[31]      In the previous section the court has found Commerce's actions to be in accordance with law.

[32]      Section 1677b(e) provides that:

if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology.

19 U.S.C. § 1677b(e).

19 U.S.C. § 1677b(e). While Commerce "may" choose any other method for determining normal value, its chosen method must be reasonable. *See Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1342 ("[A]lthough Commerce may choose any calculation methodology, 19 U.S.C. § 1677b(e), it is bound by reasonableness."). This Court has held that "[b]oth Congress's use of the word 'may,' as well as principles fundamental to review under the substantial evidence standard require that Commerce's determination be reasonable." *Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1342 (first citing 19 U.S.C. § 1677b(e); then citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); and then citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Although record evidence establishes that the 2015 Export Levy distorted the costs of domestic crude palm oil in Indonesia and rendered Wilmar's home market sales values useless for determining normal value, it is unclear why the effects of such distortion were not remedied by the imposition of countervailing duties in the companion countervailing duty investigation. *See generally Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1348-57.[33] Commerce countervailed the difference between the Indonesian and world market crude palm oil prices in *Wilmar CVD*, just as it substituted the world market price for the price that Wilmar paid for crude palm oil in Indonesia when constructing Wilmar's normal value in the antidumping duty investigation. In other words, Commerce's imposition of a higher antidumping duty rate due to the rejection of Wilmar's home market sales and costs based on the 2015 Export Levy, as well as a countervailing

---

[33]    In the companion countervailing duty case here, Commerce imposed countervailing duties based on, *inter alia*, the Government of Indonesia's 2015 Export Levy, which Commerce determined was a countervailable program that provided crude palm oil for less than adequate remuneration. *See Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1348-49. There, the Department calculated an individual subsidy rate for Wilmar of 34.45%. *Id.* at __, 466 F. Supp. 3d at 1341. For Wilmar's subsidy rate, 24.92% ad valorem was attributed to the Fund; 9.47% ad valorem was attributed to both the 2015 Export Levy and the 1994 Export Tariff (not at issue here); and 0.06% ad valorem was attributed to another, uncontested subsidy. *Id.*

duty rate based on the same 2015 Export Levy, seems to impose two remedies—once in the context of the antidumping duty proceeding and once in the context of the countervailing duty proceeding—for the same government program. Therefore, Commerce's alternative constructed value calculation method appears to have remedied at least some of the distortion in home market prices caused by the 2015 Export Levy that may have been accounted for in *Wilmar CVD*.

Commerce, however, has not sufficiently explained how any distortion created by the 2015 Export Levy has not already been remedied by the countervailing duties imposed in *Wilmar CVD* that were based on the same export tax regime. Instead, the Department claims that the statute in no way prohibits the application of the particular market situation provisions when determining constructed value in an antidumping duty investigation where there is a companion countervailing duty investigation. *See* Def.'s Resp. Pls.' Mots. J. Agency R. ("Def.'s Br.") at 43, ECF No. 50. In support of its claim, Commerce emphasizes the fact that "antidumping and countervailing duty investigations proceed under two separate statutes and involve individual determinations based on independent records." *Id.* at 40. Thus, for Commerce, "[t]he two distinct laws treat price discrimination as a separate act to be remedied separately." *Id.* at 41. The Department's observation, however, does not address the fact that the companion countervailing duty remedy appears to have remedied at least some of the distortions created by the same underlying export tax regime (i.e., the 2015 Export Levy).

Commerce primarily argues that Congress's silence on the issue of double remedies when enacting the particular market situation provisions necessarily leaves Wilmar without recourse. *See* Def.'s Br. at 44 ("[I]n amending the antidumping statute through the [Trade Preferences Extension Act] just three years after adding the non-market economy double-counting provision, Congress in expanding the particular market situation concept to incorporate costs involved in

calculating normal value *neither* provided an offset for an alleged doubly remedy *nor* expressed a concern about potential double counting stemming from the amended section 1677b(e).").

Commerce is correct that the statute does not expressly mandate offsetting countervailing duties from a companion countervailing duty investigation where the Department uses constructed value (or an alternative method) under 19 U.S.C. § 1677b(e). Such lack of statutory directive, however, does not relieve Commerce of its obligation to explain why its chosen method is a reasonable one. *See Vicentin II*, 44 CIT at __, 404 F. Supp.3d at 1243 ("Commerce and Defendant correctly observe that the statute does not mandate offsetting [countervailing duties] from a concurrent [countervailing duty] case where Commerce uses constructed value or an alternative under 19 U.S.C. § 1677b(e). However, the lack of a statutory directive does not render Commerce's alternative methodology reasonable." (citation omitted)).

Here, Commerce has failed to explain why its rejection of Indonesian crude palm oil costs—part of its chosen method under 19 U.S.C. § 1677b(e)—is reasonable given that Commerce may have remedied the distorted costs of crude palm oil caused by the 2015 Export Levy in *Wilmar CVD*. Nor has Commerce explained why it cannot adjust its chosen method to account for the countervailing duty remedy when constructing normal value. Commerce may have a reason to believe that the countervailing duties imposed in *Wilmar CVD* do not remedy the distortion of crude palm oil prices in the Indonesian market for purposes of the antidumping duty investigation; however, if Commerce has such a reason, it must explain it.

The court thus holds that Commerce's decision to disregard Indonesian crude palm oil prices—based on the 2015 Export Levy particular market situation—is unsupported by substantial evidence because the Department failed to sufficiently explain how any distortion created by the 2015 Export Levy in this case has not been remedied by the companion countervailing duty case.

Accordingly, on remand, Commerce must either reconsider its decision to disregard Indonesian

crude palm oil prices when constructing normal value for Wilmar or explain why doing so does

not result in a double remedy. *Cf.* 19 U.S.C. § 1677f-1(f)(1)(C) (instructing Commerce to offset a

potential double remedy caused by using surrogate values for determining normal value in a

non-market economy antidumping duty case).

### III.   Commerce's Method of Accounting for RINs, as an Adjustment to U.S. Price, Is Sustained

Renewable Identification Numbers or "RINs" are

> tradeable credits [created] pursuant to a U.S. regulatory scheme administered by
> the [Environmental Protection Agency, or "EPA"]. The EPA requires that biodiesel
> producers or importers ("obligated parties") meet an annual "renewable volume
> obligation," pursuant to which obligated parties must submit RINs equal to the
> number of gallons of renewable fuel comprising their renewable volume obligation.
> RINs are generated through biodiesel production in the United States or importation
> of biodiesel. The obligated party that generates RINs may use them to satisfy its
> renewable volume obligation, or it may trade or sell them to other obligated parties.

*Vicentin I*, 43 CIT at __, 404 F. Supp. 3d at 1328.

When certain biodiesel is imported into the United States, the purchaser of the biodiesel

receives an amount of RINs (usually one RIN per gallon of biodiesel imported) in addition to the

biodiesel itself. At the time RINs are created, they have no denominated dollar value. The RINs,

however, can be (and often are) traded or sold on a secondary market. Thus, despite having no

denominated dollar value, because the RINs can be traded or sold, they do, in fact, have actual

value. Therefore, the U.S. purchaser of biodiesel receives something of value (i.e., the value

associated with RINs) in addition to the value of the biodiesel itself (i.e., the value of the subject

merchandise). *See, e.g.*, *Vicentin S.A.I.C. v. United States*, 42 F.4th 1372, 1375 (Fed. Cir. 2022)

("RINs are tradeable credits created by the importation and domestic production of renewable

fuels. RINs are 'attached' to biodiesel at the time of importation, and importers can later sell them as 'detached' or 'separated' RINs.").

In the Final Determination, Commerce found that there was no "RIN value" included in the Indonesian biodiesel sales prices. In other words, Commerce "determined that the value of RINs embedded in the value of subject merchandise sold on the United States market creates an imbalance between [normal value] and U.S. price because there is no comparable value added to sales of biodiesel in Indonesia." Final IDM at 6.

Commerce therefore determined that it was appropriate to correct the imbalance between normal value (i.e., the RIN-exclusive Indonesia prices) and export price (i.e., the RIN-inclusive U.S. purchase price) in order to make a fair "apples-to-apples" comparison when determining a dumping margin. Commerce did this by making an upward adjustment to constructed value (as normal value), pursuant to 19 C.F.R. § 351.401(c), to offset the value of the RINs embedded in the U.S. sales price. Final IDM at 6-8.

In *Wilmar I*, the court concluded that remand was appropriate because Commerce failed to explain adequately why it made the RIN adjustment to constructed value (as normal value), rather than U.S. price, or cite sufficient legal authority for its adjustment. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1257-58. In fact, "Commerce cited no provision in the statute or in its own regulations authorizing the addition of an amount to constructed value (as normal value) to account for increases in U.S. price." *Id.* at __, 582 F. Supp. 3d at 1258. Thus, "Commerce's decision fail[ed] to establish the necessary legal authority for applying a price adjustment to normal value when the factual basis for its adjustment concerned U.S. price." *Id.* While the court noted that "the statutory path for an adjustment to export price (U.S. price) [to account for RINs] appears to be clear," it

ultimately held that Commerce failed to "demonstrate why [it] left U.S. sales unaffected in its calculations, when those are the sales that actually contain RIN values." *Id.*

On remand, Commerce reconsidered its decision to account for RINs by increasing constructed value (as normal value) as it had in the Final Determination in *Wilmar I*, and instead accounted for RINs by decreasing U.S. price. *See* Remand Results at 6-7. Commerce relied upon 19 U.S.C. § 1677a(a) (export price) and (b) (constructed export price),[34] along with 19 C.F.R. § 351.401(c),[35] as the legal basis for its decision to account for RINs by adjusting U.S. price— rather than adjusting normal value. *See id.* at 7. Commerce made its adjustment by taking the same RIN values used in the Final Determination and deducting those values from U.S. price—rather than adding them to normal value as it had in *Wilmar I. See id.* at 10. Although Commerce changed its method for accounting for RIN values on remand, the rates determined for Wilmar (92.52%) and the separate rate companies (92.52%) remain the same. *See id.* at 12. The Department maintains that accounting for RINs in this manner is consistent with the *Vicentin* line of cases. *See id.* at 6-7.

---

[34]     19 U.S.C. § 1677a(a) and (b) define export price and constructed export price, respectively. *See supra* notes 4 and 5 providing the statutory definitions of export price and constructed export price.

[35]     19 C.F.R. § 351.401(c) concerns the "[u]se of price net of price adjustments" when calculating U.S. price as part of Commerce's antidumping duty analysis. It states:

> In calculating export price, constructed export price, and normal value (where normal value is based on price), [Commerce] normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable). [Commerce] will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the [Department], its entitlement to such an adjustment.

19 C.F.R. § 351.401(c).

Wilmar contends that Commerce's RIN adjustment on remand—despite making the adjustment to U.S. price, instead of normal value as in the Final Determination—remains unsupported by substantial evidence. Pls.' Cmts. at 6. Wilmar makes two arguments in support of this contention. First, it argues that Commerce erroneously relied on 19 C.F.R. § 351.401(c) because RINs are not the types of "price adjustments," contemplated by the regulation, that permit Commerce to adjust export price. In fact, Wilmar claims that the RINs are not price adjustments at all, but are instead "a fundamental and inextricable component of the full value of the imported biodiesel," which cannot be isolated under 19 C.F.R. § 351.401(c). *See id.* at 7 ("RINs are not adjustments to the buyer's 'net outlay,' but rather an integral component of the full price (or 'net outlay') paid [by] the buyer"; thus, for Wilmar, "RIN values do not reflect 'a change' in the buyer's net outlay under 19 C.F.R. § 351.102(b)(38), but rather form part of 'the price at which the subject merchandise is first sold' under 19 U.S.C. § 1677a(a), (b)."). Second, Wilmar argues that Commerce's reliance on the *Vicentin* line of cases is misguided because the facts in *Vicentin* are inapposite. Specifically, Wilmar asserts that *Vicentin* is distinguishable because this line of cases "does not address the undisputed fact that the starting price for Wilmar's RIN-inclusive biodiesel includes the value of RINs." *Id.* at 8.

For the following reasons, the court sustains Commerce's adjustment to U.S. price to account for RINs.

### A. Commerce's Determination That RIN Values Are Price Adjustments Under the Relevant Statutory and Regulatory Framework Is Supported by Substantial Evidence

To determine whether subject merchandise—here, biodiesel from Indonesia—is being sold at less than fair value, Commerce must make "a fair comparison . . . between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). Put another way, Commerce

must make a comparison of the price at which the subject merchandise is first sold (to an unaffiliated purchaser) in the United States with the price at which the same merchandise is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country. *See* 19 U.S.C. § 1677a(a), (b); *see also id.* § 1677b(a)(1)(B)(i). There is no statutory formula that dictates how Commerce should determine "the price at which the subject merchandise is first sold." *See id.* § 1677a(a), (b). Instead, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986) (citations omitted).

Here, Commerce cited 19 C.F.R. § 351.401(c) as the regulatory basis for its decision to treat the RINs as "price adjustments" when determining "the price at which the subject merchandise . . . [was] first sold (or agreed to be sold) in the United States" (i.e., the U.S. biodiesel price) under 19 U.S.C. § 1677a.[36] Remand Results at 22. Section 351.401(c) provides that "[i]n calculating export price, constructed export price, and normal value (where normal value is based on price), [Commerce] normally will use a price that is net of price adjustments . . . ." 19 C.F.R. § 351.401(c). Commerce's regulations define "price adjustment" as "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or *other adjustment*, including, under certain circumstances, a change that is made after the time of sale . . . that is

---

[36]         As discussed in the following subsection, this method is consistent with Federal Circuit precedent. *See Vicentin*, 42 F.4th at 1379 (holding that "19 C.F.R. §§ 351.401(c) and 351.102(b)(38) allow [Commerce] to subtract the value of RINs from export price as a 'price adjustment'").

reflected in the purchaser's *net outlay*." 19 C.F.R. § 351.102(b)(38) (emphasis added). This definition of "price adjustment" is not limited to just "discounts" and "rebates"—it encompasses other types of adjustments as well. *See Vicentin*, 42 F.4th at 1378 ("The two phrases 'such as' and 'or other adjustment' convey that the definition is not limited to discounts and rebates.").

In support of its determination that RIN values constitute price adjustments under 19 C.F.R. §§ 351.401(c) and 351.102(b)(38), Commerce cited a Congressional Research Report, which provides:

> The [Renewable Fuel Standard] is a market-based compliance system in which obligated parties (generally refiners and/or terminal operators) must submit credits to cover their obligations. These credits—Renewable Identification Numbers, or RINs—are *effectively commodities that can be bought or sold* like other commodities. For each gallon of renewable fuel in the RFS program, one RIN is generated.

Remand Results at 9 (emphasis added).

The Department also referenced a report produced by the U.S. International Trade Commission as further support for its claim that the biodiesel invoice price contains an upward adjustment to account for RIN values. The data in that report showed that "B99 (a biodiesel blend containing 99.0 to 99.9 percent biodiesel) sold in the United States for $2.27 per gallon in 2016 on average with RINs included, and for $1.01 per gallon when sold without RINs." *Id.* at 9.

Based on these reports, Commerce determined that the

> RIN values embedded in United States biodiesel prices are best characterized as a price adjustment "already included in the reported invoice price for biodiesel" and, therefore, that they must be netted out under section 351.401(c) because RIN-eligible biodiesel prices are adjusted upwards by the buyer and seller to account for the RINs.

Def.'s Cmts. at 7 (citing Remand Results at 7-10). That is, Commerce considered RIN value to be a "price adjustment" as defined under 19 C.F.R. § 351.102(b)(38) because the invoice price did not reflect the price at which the *subject merchandise* (i.e., the biodiesel itself) was first sold—

because the invoice price is adjusted upward to include the value of RINs. Thus, for Commerce, "[f]ailing to use a United States price that is 'net of price adjustments' [(i.e., RIN values)] would thus prevent a fair comparison between the United States price and normal value, as is required." *Id.* at 7; *see, e.g.*, *NEXTEEL Co. v. United States*, 43 CIT __, __, 355 F. Supp. 3d 1336, 1359 (2019) ("Section 1677a requires Commerce to make adjustments when calculating export price or constructed export price 'to create a fair, 'apples-to-apples' comparison between U.S. price and foreign market value." (citation omitted)).

The court agrees with Commerce that 19 C.F.R. §§ 351.401(c) and 351.102(b)(38) permits it to subtract the value of RINs from U.S. price as a "price adjustment."

Moreover, Commerce's determination that RINs have a value of their own is supported by substantial evidence. The reports cited by Commerce show (1) that RINs have their own value that is distinct from the value of the subject biodiesel itself and (2) that RIN value is reflected by an upward adjustment to the invoice price for biodiesel exported to the United States. Thus, when purchasing RIN-eligible biodiesel an importer receives a fungible credit (i.e., RINs) affecting its "net outlay" for the biodiesel. Therefore, RIN value is a type of "adjustment" that "is reflected in the purchaser's net outlay," fitting squarely within the definition of a "price adjustment" under 19 C.F.R. § 351.102(b)(38) to be "netted out" pursuant to 19 C.F.R. § 351.401(c) when determining export or constructed export price under 19 U.S.C. § 1677a(a) and (b).

### B.    Commerce Permissibly Relied on the *Vicentin* Line of Cases

Here, Commerce relied on the same "price adjustment" method recently upheld by the Federal Circuit in *Vicentin*. As is the case here, *Vicentin* considered whether Commerce could rely on 19 U.S.C. § 1677a(a) and (b)—as well as 19 C.F.R. § 351.401(c)—to deduct the value of RINs from U.S. price as a "price adjustment" to isolate the starting price of biodiesel for purposes of

making an accurate comparison between U.S. price and normal value. *See Vicentin*, 42 F.4th at 1378-79. There, the Court held that "[g]iven the similarities between RINs and rebates [(an example of a type of "price adjustment" listed under 19 C.F.R. § 351.102(b)(38))], the non-limiting language of the regulation, and the fact that Commerce's calculation effects the overall statutory scheme, the regulation *unambiguously* permits Commerce to subtract the RINs values." *Vicentin*, 42 F.4th at 1379 (emphasis added). Thus, the Federal Circuit's holding in *Vicentin* authorizes Commerce to do exactly what it did, on remand, here. That is, to treat RINs as "price adjustments" and deduct the estimated value of the RINs from U.S. price in order to make an accurate "apples-to-apples" comparison between U.S. price and normal value. *See id.* at 1374 ("Certain renewable fuels, such as the biodiesel at issue here, are entitled to tradeable tax credits. In calculating export price, Commerce subtracted the value of these tradeable credits, calling the credits "price adjustments" under 19 C.F.R. § 351.401(c). Because the credits fall within the regulatory definition of a "price adjustment" and substantial evidence supports the value Commerce used for the credits, we affirm Commerce's export price calculation.").

According to Wilmar, however, Commerce's reliance on *Vicentin* is misguided because that case "does not address the undisputed fact that the starting price for Wilmar's RIN-inclusive biodiesel includes the value of RINs." Pls.' Cmts. at 8. In other words, Wilmar maintains that *Vicentin* is "inapposite" because that case does not address its argument that "RINs are 'actual values' that are included in 'the gross or starting prices reported to Commerce,'" which means that they "form part of 'the price at which the subject merchandise is first sold'" and therefore "do not reflect 'a change' in the buyer's net outlay under 19 C.F.R. § 351.102(b)(38)." *Id.* at 7.

Wilmar misreads the precedent. In *Vicentin*, the Federal Circuit explained that record evidence showed "that the invoice price does not reflect the 'price at which the *subject*

*merchandise* is first sold,' as required by 19 U.S.C. § 1677a(a) 'because [the invoice price] includes a RIN value.'" *Vicentin*, 42 F.4th at 1378. The Court then went on to reject the appellant's argument that the regulations require either a "starting price actually paid by a customer" (i.e., the RIN-inclusive invoice price that Wilmar argues for), or an "adjusted price agreed between the buyer and the seller." *Id.* at 1379. Thus, contrary to Wilmar's assertions, *Vicentin* does indeed address the fact that the invoice or "starting" price includes the value of RINs. The invoice price for sales made to the United States reflected the price for the biodiesel itself plus RINs. That is why the value of the RINs must be subtracted from the invoice price—so that a comparison of normal value and U.S. price is for biodiesel only. The Federal Circuit's pellucid reasoning makes perfect sense and is directly applicable to this case. Even if Commerce had used the non-Program sales price for normal value (rather than using constructed value) that sales price would have been for biodiesel only, not for biodiesel plus RINs.

Therefore, Wilmar's argument must fail because in *Vicentin*—which involved nearly identical facts and the same regulatory scheme at issue in this case—the Federal Circuit affirmed that Commerce could adjust U.S. price to account for RIN values, just as it did here. *Id.* ("We agree with Commerce that 19 C.F.R. §§ 351.401(c) and 351.102(b)(38) allow it to subtract the value of RINs from export price as a 'price adjustment.'").

Based on the foregoing, the court sustains Commerce's adjustment for RIN values as a deduction to U.S. price because it is supported by substantial evidence and in accordance with law.

### IV.   Commerce's Application of Adverse Facts Available to Determine Musim Mas's Dumping Margin Is Sustained

The court next turns to Musim Mas's challenge to Commerce's decision to disregard all of the information that the company placed on the record and, instead, select an adverse facts available rate of 276.65%—Wilmar's highest transaction-specific margin on the record.[37]

"It is well-established that Commerce is required to calculate antidumping duty margins as accurately as possible in each segment of a proceeding." *U.S. Steel Corp. v. United States*, 34 CIT 252, 280, 712 F. Supp. 2d 1330, 1354-55 (2010) (citation omitted). During an antidumping proceeding, Commerce asks the parties for the information that the Department deems necessary to make its margin determinations through questionnaires. *See BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019). The burden of creating the administrative record, on which Commerce will base its factual findings, lies with the interested parties. *Id.* (citation omitted).

During an administrative investigation, "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]," "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," or "significantly impedes a proceeding," Commerce uses the facts otherwise available in place of the missing information. 19 U.S.C. § 1677e(a)(1)-(2)(A)-(C).

Where Commerce determines that the use of facts available is warranted, it may apply adverse inferences to those facts when replacing an interested party's information only if it makes the requisite additional finding that that party has "failed to cooperate by not acting to the best of

---

[37]     Musim Mas does not contest its adverse facts available rate as punitive. Instead, it contests Commerce's decision to use adverse facts available in the first place.

its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). To find a respondent

has failed to cooperate to the best of its ability, the Department performs two tasks:

> First, it must make an objective showing that a reasonable and responsible [respondent] would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (citation omitted).

"It is worth noting that the subjective component of the 'best of its ability' standard judges

what constitutes the maximum effort that a particular respondent is capable of doing, not some

hypothetical, well-resourced respondent." *Nat'l Nail Corp. v. United States*, 43 CIT __, __, 390 F.

Supp. 3d 1356, 1373 (2019). Thus, "[a]n adverse inference may not be drawn merely from a failure

to respond, but only under circumstances in which it is reasonable for Commerce to expect that

more forthcoming responses should have been made; i.e., under circumstances in which it is

reasonable to conclude that less than full cooperation has been shown." *Nippon Steel*, 337 F.3d at

1383.

The application of *adverse* facts available is, then, a two-step process. *See Nippon Steel*,

337 F.3d at 1381 ("The statute has two distinct parts respectively addressing two distinct

circumstances under which Commerce has received less than the full and complete facts needed

to make a determination. . . . The focus of subsection (a) is respondent's *failure to provide

information*. The reason for the failure is of no moment."). Thus, generally only after Commerce

has determined that there is information missing, creating a gap in the record, can it apply an

adverse inference when selecting among the facts otherwise available. *See id.* ("As a separate

matter, subsection (b) permits Commerce to 'use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available,' only if Commerce makes the separate determination that the respondent 'has failed to cooperate by not acting to the best of its ability to comply.' The focus of subsection (b) is respondent's *failure to cooperate to the best of its ability,* not its failure to provide requested information." (alteration in original)). Importantly, the use of facts available generally requires a finding of missing information. The application of an adverse inference is based on a respondent's behavior.

Finally, the assignment of an adverse facts available rate to a respondent is meant to encourage future compliance, not to punish. *See Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1242 (2021).

In the Final Determination, Commerce found that the information the company placed on the record was so incomplete that it was impossible to perform a dumping analysis. Specifically, Commerce found that the record was missing information that it needed to determine either normal value or U.S. price. Regarding normal value, the record was missing (1) a usable home market sales reconciliation and (2) cost of production data, specifically CONNUM-specific[38] production quantity information. As for U.S. price, the record was missing estimated RIN value information for Musim Mas's U.S. sales. According to Commerce, "[t]he information that [was] missing render[ed] the information that Musim Mas . . . provided to the Department too incomplete to serve as a reliable basis for [the] . . . dumping margin analysis." PDM at 7. Commerce further stated that

---

[38]     A control number, or "CONNUM," is a number composed of a series of digits each of which corresponds to a physical characteristic of a product, as defined by Commerce in a questionnaire. Each CONNUM is assigned to a unique product and is "designed to reflect the 'hierarchy of certain characteristics used to sort subject merchandise into groups' and allow Commerce to match identical and similar products across markets." *Manchester Tank & Equip. Co. v. United States*, 44 CIT __, __ n.3, 483 F. Supp. 3d 1309, 1312 n.3 (2020) (quoting *Bohler Bleche GmbH & Co. KG v. United States*, 42 CIT ___, ___, 324 F. Supp. 3d 1344, 1347 (2018)).

"all of this [missing] information" was necessary because it was "core to Commerce's ability to

calculate Musim Mas' dumping margin." Final IDM at 49.

Because, for Commerce, without the missing information, the information that Musim Mas

did place on the record was unusable, and thus it found that the use of facts otherwise available

was required.[39] *See id.* In addition, Commerce concluded that Musim Mas had failed to cooperate

to the best of its ability and applied an adverse inference when selecting from among the facts

available to fill gaps in the record, under 19 U.S.C. § 1677e(b).[40] *See id.*

Musim Mas argues that substantial evidence does not support the Department's finding

that the record was missing (1) a home market sales reconciliation, (2) CONNUM-specific

production quantities in the company's cost of production information, or (3) estimated RIN values

for the company's U.S. sales. Musim Mas further maintains that it did its best to provide

Commerce with the information it requested.

### A. Substantial Evidence Supports Commerce's Decision to Use Facts Available with Respect to All of Musim Mas's Reported Information

#### 1. Home Market Sales Reconciliation

Commerce first found that Musim Mas had failed to provide a usable reconciliation of its

total home market sales and its general ledger and financial statements so that the Department

could determine the quantity and value of all sales during the period of investigation. *See* Final

IDM at 49-50. For Commerce, "a usable home market sales reconciliation is core to a margin

---

[39]     "If . . . necessary information is not available on the record . . . [Commerce] *shall* . . . use the facts otherwise available in reaching the applicable determination." 19 U.S.C. § 1677e(a)(1) (emphasis added).

[40]     "If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce], the [Department] . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A).

calculation because it is one of the 'essential building blocks' used to verify a respondent's data." *Id.*

Musim Mas argues that it submitted sufficient data for Commerce to reconcile its home market sales with its general sales information. *See* Mem. Supp. Musim Mas's Mot. J. Agency R. ("Musim Mas's Br.") at 4, ECF No. 32. That is, for Musim Mas, the information it supplied was adequate for Commerce to perform a proper sales reconciliation at verification.

In addition, Musim Mas argues that, even if Commerce found deficiencies in the company's home market sales reporting, those deficiencies could have been resolved at verification, if Commerce had scheduled one for the company.[41] *See id.* at 5 ("[E]ven if [Musim Mas] had submitted the most detailed, voluminous documentation in its questionnaire responses, Commerce still would have conducted an extensive review of the reconciliation methodology and the underlying information in [Musim Mas's] records at on-site verification."). In a related argument, Musim Mas contends that Commerce should have been able to verify the information submitted because it was able to verify the company's home market information in the parallel

---

[41]        Musim Mas does not argue that Commerce failed to comply with the requirements of 19 U.S.C. § 1677m(d), which states that Commerce "shall promptly inform" the respondent who has submitted a deficient response "of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews." 19 U.S.C. § 1677m(d). It is undisputed that for each response that Commerce found to be deficient here, the Department issued a supplemental questionnaire alerting Musim Mas to the deficiencies Commerce identified in the company's initial responses. *See* Musim Mas Suppl. Secs. B & C Quest. (Aug. 10, 2017), PR 153; Musim Mas Suppl. Sec. D Quest. (Aug. 7, 2017), PR 149. Thus, unlike in *Hitachi Energy USA Inc. v. United States*, 19 U.S.C. § 1677m(d) would not require Commerce to provide Musim Mas with the opportunity to supplement the record at verification—had verification been conducted—because Commerce already provided Musim Mas with notice and the opportunity to remedy the deficiencies in the company's reported information that led the Department to apply facts available. *Cf.* 34 F.4th 1375, 1383-85 (Fed. Cir. 2022), *modified on denial of reh'g*, No. 20-2114, 2022 WL 17175134 (Fed. Cir. Nov. 23, 2022) (holding that "the statutory entitlement to notice and opportunity to remedy any deficiency [under 19 U.S.C. § 1677m(d)] is unqualified in the circumstances of this case").

countervailing duty proceeding. *See* Musim Mas's Br. at 6 ("Commerce successfully accepted and verified [Musim Mas's] submitted reconciliation data in the [countervailing duty] investigation.").

For its part, Commerce maintains that Musim Mas submitted only total home market sales *quantities*, not total sales *values*—and thus the worksheet and supporting documentation provided by the company could not "be tied to [its] financial statements or ledgers." Final IDM at 50. Accordingly, for Commerce, absent a usable reconciliation of the home market sales data and the general ledger and financial statements, verification would have been "impossible." *Id.* The Department emphasized that "[v]erification is not a forum for Commerce to resolve issues that have not been resolved in questionnaire responses, especially when the issues pertain to the integrity and accuracy of the totality of the data." *Id.*

The court finds that Commerce reasonably determined that necessary information, in the form of a usable home market sales reconciliation, was missing from the record.[42] Thus, the Department's decision to disregard Musim Mas's submitted home market sales data in its use of facts available was supported by substantial evidence.

When determining whether to use facts available because a respondent has not provided usable information, Commerce must explain "exactly what information is missing from the record." *Jiangsu Zhongji Lamination Materials Co. v. United States*, 43 CIT __, __, 405 F. Supp.

---

[42]       Musim Mas does not dispute that a home market sales reconciliation is necessary to Commerce's antidumping analysis generally. In a footnote, however, the company claims that, because "Commerce ultimately decided to apply [a] 'particular market situation' . . . to disregard all home market sales in the Final Determination," it was "penalized for not submitting a reconciliation for data which would have never been used under Commerce's methodology." Musim Mas's Br. at 6 n.3. This assertion puts the cart before the horse. As the court previously noted, when discussing Wilmar's home market sales, Commerce is required to determine whether a company's home market sales are both viable in terms of quantity, and made in the ordinary course of trade, before relying on constructed value as normal value. *See* 19 U.S.C. § 1677b(a)(1)(B)(i), (4); *see also* 19 C.F.R. § 351.404(a), (b)(1)-(2). Therefore, a home market sales reconciliation was necessary to Commerce's antidumping analysis.

3d 1317, 1333 (2019); *see also* 19 U.S.C. § 1677e(a)(2). Here, Commerce found that Musim Mas

had failed to provide a usable home market sales reconciliation because the chart(s) the company

submitted did not include sales values that could be tied to its general ledger and financial

statements. *See* Final IDM at 50 ("The exhibit that Musim Mas points to includes a chart that does

not show any sales values; thus, the chart and 'supporting documentation' cannot be tied to Musim

Mas' financial statements or ledgers. Therefore, we find that it would be impossible for Commerce

to perform a proper sales reconciliation at verification.").

The record supports the Department's conclusions. Both Commerce's initial questionnaire

and supplemental questionnaire asked Musim Mas to

> [p]lease provide a complete package of documents and worksheets demonstrating
> how you identified the sales you reported to the Department and reconciling the
> reported sales to the total sales listed in your general ledger. Include a copy of all
> computer programs used to separate the reported sales from your total sales and to
> calculate expenses. In your response, *please tie the reported sales back to Musim
> Mas and IBP's*[43] *general sales ledgers, and tie those amounts to the financial
> statements in your section A response.*

Musim Mas Suppl. Secs. B & C Quest. (Aug. 10, 2017) at 3, PR 153 (emphasis added); *see also*

Musim Mas Secs. B-E Quest. (May 16, 2017), PR 57.

Musim Mas submitted two "reconciliations" of its home market sales, (1) one in response

to the Department's initial questionnaire for home market information; and (2) another in response

to the supplemental questionnaire, which sought to clarify the prior submission. *See* Musim Mas's

Resp. Secs. B & C Quest. (June 29, 2017) at 4 & Ex. 2, PR 100; Musim Mas's Resp. Suppl. Secs.

B & C Quest. (Aug. 24, 2017) at 1 & Ex. 1, PR 173.

---

[43]        P.T. Intibenua Perkasatama or "IBP" is an affiliate company of Musim Mas. Both
Musim Mas and IBP are subsidiaries of the same holding company, Musim Mas Holdings Pte Ltd.
*See* Musim Mas's Partial Resp. Sec. A Quest. (May 19, 2017), PR 65.

Musim Mas relies primarily on the second submission when arguing that it submitted sufficient information for reconciliation. *See* Musim Mas's Br. at 4. Both "reconciliations," however, lack identifiable sales *values*, as Commerce found in the Final Determination. Musim Mas's first submitted response is inadequate, for example, because it does not identify the significance of the numbers it included in its reconciliation. *See* Musim Mas's Resp. Secs. B & C Quest. Ex. 2. Thus, the data provided in Musim Mas's initial response could not be tied to the company's financial statements or ledgers. Therefore, Commerce could not perform a proper sales reconciliation.

The second submission, on which Musim Mas relies, contains a worksheet purporting to reconcile the total home market sales, but the worksheet shows only total sales quantities. It does not show any sales values, just as Commerce found. *See* Musim Mas's Resp. Suppl. Secs. B & C Quest. Ex. 1. As for the company's claims that the second submission "also contains 14 additional pages that indicate the value of sales associated with the above-referenced quantities," these pages do not support Musim Mas's argument. *See* Musim Mas's Br. at 4. It is unclear to the court, as it was to Commerce, how the totals listed in the worksheet (total quantities listed as metric tons and kilograms) link to the attached, confidential exhibits (appearing to show screen-captures of company software, with numbers possibly representing some individual sales values). *See* Musim Mas's Resp. Suppl. Secs. B & C Quest. Ex. 1.

Before Commerce, Musim Mas did not provide any explanation as to how its documents could be read together, or how a reconciliation could be created based on the underlying information. Nor did Musim Mas explain how to link its reconciliation worksheets with any other home market information, such as its home market sales database. In both narrative questionnaire responses to the Department's request to "tie the reported sales back to [your] general sales ledgers,

and tie those amounts to the financial statements in your section A response," Musim Mas only pointed Commerce to the worksheets, without explaining what the numbers reported there represented, or showing Commerce where corresponding sales values could be found and linked to the reported quantities. *See* Musim Mas's Resp. Secs. B & C Suppl. Quest. at 1 ("Please see Exhibit 1."); *see also* Musim Mas's Resp. Secs. B & C Quest. at 4 ("Please see Exhibit 2 for the sales reconciliation package.").

Accordingly, Commerce's conclusion that the worksheet(s) and supporting documentation did not constitute a usable home market sales reconciliation was reasonable. Moreover, even if Commerce were to try to create a reconciliation based on the additional data submitted with Musim Mas's supplemental questionnaire response (i.e., the screen-captures of Musim Mas's software), there does not seem to be a way for Commerce to identify the sales values that correspond with the total reported quantities. Indeed, in its brief before the court, Musim Mas concedes that the submissions it provided do not match completely: "The first page is a worksheet demonstrating the reconciliation of sales as reported in [Musim Mas's] databases, *which were based on the contract date*, with the sales figures recorded in [Musim Mas's] records maintained in the ordinary course of business, *which were based on invoice date*." Musim Mas's Br. at 4 (emphasis added). While Musim Mas provides this explanation before the court, it does not reveal how contract date sales can be matched with invoice date entries. Further, Musim Mas did not include even this inadequate statement in its narrative responses to Commerce. Therefore, in the absence of *any* narrative explanation to Commerce as to how to tie together contract date quantities and invoice date sales, it is impossible to see how Commerce could have reconciled the information.

Next, Musim Mas's argument that Commerce should have conducted verification of its home market information to resolve the issue of the missing reconciliation and unidentified sales

values can only be understood as a request to submit new information at verification. This argument fails, however, because verification "represents a point of no return," where information *already submitted* is tested "for accuracy and completeness."[44] *Ghigi 1870 S.p.A. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1332, 1334 (2021) (quoting *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021)). Therefore, the Department's determination that it need not conduct verification where there was no usable reconciliation to be checked for accuracy and completeness was reasonable.

Finally, Musim Mas's contention that the information it submitted was verifiable because Commerce conducted verification in the parallel countervailing duty investigation is unpersuasive. "[A]ntidumping duty and countervailing duty investigations operate pursuant to different statutory provisions, are separate administrative proceedings, and as such, each investigation has its own unique and separate administrative record." *Yama Ribbons & Bows Co. v. United States*, 36 CIT 1250, 1256, 865 F. Supp. 2d 1294, 1300 (2012) (citation omitted). Musim Mas's argument assumes, without establishing any basis in the law or in the record, that Commerce's analysis of information should be identical in two distinct investigations. *See* Musim Mas's Br. at 6 ("[W]here Commerce successfully accepted and verified [Musim Mas's] submitted reconciliation data in the [countervailing duty] investigation, while using the very same reconciliation data in the companion [antidumping] investigation as a basis for an [adverse facts available] finding, logically seems

---

[44]      It is, of course, the case that Commerce has accepted new information at verification. *See, e.g.*, *Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 93, 44 F. Supp. 2d 229, 236 (1999) (where Commerce accepted new information at verification to correct and supplement minor errors and omissions in respondent's questionnaires responses, "Commerce's action conforms with the statutory directive of 19 U.S.C. § 1677m(d) (1994) which allows for the submission of new information at verification in order to 'remedy or explain' a deficiency"). Verification occurs so late in the administrative process that courts should be particularly wary of intervening in a way that would direct the introduction of new information.

absurd."). This argument, however, ignores the Department's finding that the home market information Musim Mas submitted *on this record* lacked sales values that could be reconciled with sales quantities. Musim Mas's submissions in another investigation are not relevant where the deficiency here lies in its failure to explain and clarify its submissions in this proceeding.

Musim Mas's argument is also not credible because it has not established—or even consistently claimed—that the information it submitted in the two investigations was identical. *See* Musim Mas's Case Br. (Nov. 29, 2017) at 4, PR 275 ("In [the countervailing duty] proceeding, [Musim Mas] submitted a worksheet *similar* to what had been submitted in this proceeding." (emphasis added)); *see also* Final IDM at 50 ("[T]here is no information on the record that supports Musim Mas' contention that its deficient home market sales reconciliation submitted on this record is similar to information submitted on the record of the concurrent [countervailing duty] investigation."). Musim Mas's argument amounts to an attempt to impermissibly shift its burden of developing the record to Commerce. *See Hyundai Steel Co. v. United States*, 45 CIT __, __, 518 F. Supp. 3d 1309, 1321 (2021) ("The burden of creating the administrative record lies with the interested parties." (citing *BMW*, 926 F.3d at 1295)).

In sum, Commerce reasonably found that the specific information it repeatedly requested— a reconciliation of Musim Mas's home market sales quantity and value, linking sales values to quantities—was missing from the record. Accordingly, because it was not possible for the Department to identify, at a minimum, the value of Musim Mas's home market sales and reconcile them with the company's general ledger and financial statements, the Department's use of facts available to fill gaps with respect to Musim Mas's home market sales information was supported by substantial evidence.

## 2.    CONNUM-Specific Production Quantities

The next category of information that Commerce found missing from the record concerned Musim Mas's reporting of CONNUM-specific production quantities.

As an initial matter, the court notes that Musim Mas reported five CONNUMs in its Section B (home market sales) and Section C (U.S. sales) questionnaire responses.[45] *See* Musim Mas's Resp. Sec. D Quest. (July 3, 2017) at D-25, PR 102 ("We acknowledge that application of the Department's CONNUM characteristics have resulted in 5 CONNUMs in the Section B and C databases."). Because Musim Mas represented that it made sales having characteristics of five different CONNUMs, Commerce quite naturally framed its questions with those CONNUMs in mind.

In its Section D questionnaire, Commerce asked Musim Mas to identify and report CONNUM-specific production quantities in its reporting of costs (i.e., to report not only the costs, but also the quantities associated with those costs, on a CONNUM-specific basis). For example, Commerce asked Musim Mas (1) to report cost of production and constructed value figures, on a weighted-average basis, using the CONNUM-specific production quantity as the weighting factor;

---

[45]    According to Musim Mas, each of the five CONNUMs correlates to a different product characteristic, but all CONNUMs are fundamentally the same product:

> [Musim Mas] does not record costs on a basis that would allow it to assign cost differences to each product characteristic. This reflects the fact that the merchandise under consideration is fundamentally the same product, regardless of destination market or customer. [Musim Mas] does sell products that are certified as having meeting [sic] different industrial standards. However, this reflects the customer's certification requirement, rather than any actual differences in the product (or any resulting cost differences).

Musim Mas's Resp. Sec. D Quest. (July 3, 2017) at D-25, PR 102. Thus, the CONNUMs "reflect differences in the standards being certified in the sale, rather than actual differences in product characteristics and any resulting differences in production costs." *Id.*

(2) to describe how the company used its normal cost and accounting records to compute production quantity; and (3) to report the quantity produced, for each CONNUM, during the cost calculation period, under the PRODQTY[46] field name. *See* Final IDM at 50-51. If Musim Mas had any questions, the questionnaire instructed the company to notify Commerce before preparing its responses.

In response, Musim Mas (1) reported cost of production and constructed value figures as a weighted-average of its and its affiliate's costs, but it did not report the quantities, for each CONNUM, associated with those costs; (2) reported that it used the actual weight of inputs and outputs to compute production quantity, without addressing whether and how it used cost and accounting records; and (3) reported the "total company-wide biodiesel production quantity in the PRODQTY field of every CONNUM reported in the cost file," but not "the quantity produced for each CONNUM." Final IDM at 51. In other words, when reporting quantity Musim Mas reported the sum quantity of all CONNUMs despite having been asked to report quantity on an individual (per CONNUM) basis, and despite having identified its products as possessing the characteristics of five different CONNUMs.

With respect to the PRODQTY field, Commerce issued a supplemental questionnaire instructing Musim Mas "to report in the PRODQTY data field of each CONNUM the quantity of the products produced during the cost calculation period and included under the CONNUM." *Id.* This question is similar to that found in the initial questionnaire, which asked for CONNUM-specific quantities and *not* the "total company-wide biodiesel production quantity." *Id.*

---

[46]    PRODQTY represents the production quantity data field (to be reported in metric tons), for each CONNUM, under which Musim Mas was asked to report "the quantity of the products produced during the cost calculation period." *See* Musim Mas Suppl. Sec. D Quest. (Aug. 7, 2017) at 10, PR 149.

Musim Mas responded by directing Commerce to previously submitted cost files that reported "company-wide" biodiesel production quantities, but "failed to show the aggregate quantities of individual products it classified to the individual CONNUMs." *Id.*; *see also* Musim Mas's Resp. Sec. D Quest. Ex. 12; Musim Mas's Resp. Suppl. Sec. D Quest. (Aug. 23, 2017) Ex. 25, PR 172.

In the Final Determination, Commerce found that though Musim Mas had provided "some cost differentiation between CONNUMs," it had "failed to report the associated CONNUM-specific production quantities" that the Department requested. *See* Final IDM at 51. For Commerce, "[w]ithout this data, [the Department] cannot reconcile reported CONNUM costs to a company's normal books and records. Further, without verifiable costs, Commerce cannot perform an accurate cost test, cannot make appropriate selections for price-to-price comparisons, and cannot determine accurate constructed values for use as normal value." *Id.* Commerce noted that although Musim Mas reported CONNUM-specific sales quantities in its Sections B and C responses, the company "did not attempt to derive the CONNUM-specific production quantities from its CONNUM-specific sales quantities." *Id.* at 52. Ultimately, Commerce found that CONNUM-specific production quantities were missing from the record. Because CONNUM-specific production quantities were never provided, Commerce determined that it could not verify the reported costs of production or verify that all costs of production were included in Musim Mas's responses. *See id.*

Musim Mas does not claim that it provided the information Commerce requested—only that it was impossible for it to do so. *See* Musim Mas's Br. at 6 ("[Musim Mas] explained repeatedly in its responses [to Commerce's questionnaires] that it did not record production costs on a CONNUM-specific basis and that it was incapable of reporting costs on a CONNUM-specific basis."). Musim Mas points to its initial and supplemental responses to Commerce's cost of

production questionnaires, where the company stated that it did not provide the information requested. Musim Mas claimed that it "does not record *costs* on a basis that would allow it to assign *cost differences to each product characteristic*." Musim Mas's Resp. Sec. D Quest. at D-25 (emphasis added). Apparently, this was because the subject merchandise—the biodiesel—"is fundamentally the same product," even though Musim Mas conceded that it sold "products that are certified as having [met] different industrial standards," as required by its customers. *Id.*

The record shows, however, that Musim Mas's explanations miss the mark because the company failed to provide—or explain why it could not provide—the actual information Commerce was seeking. As summarized in the Final Determination, Commerce did not ask for CONNUM-specific *costs*, but rather, CONNUM-specific *production quantities* associated with its biodiesel cost of production information. *See* Final IDM at 51; Musim Mas Sec. B-E Quest. at D-17 ("For each CONNUM, *report the quantity produced during the cost calculation period*." (emphasis added)). Musim Mas conceded that it made distinctions among types of biodiesel when selling to its customers. *See* Musim Mas's Resp. Suppl. Sec. D Quest. at 21. For example, to some customers Musim Mas may have identified biodiesel by sulfur content, and to other customers by its monoglyceride content. *See id.*

Because Musim Mas reported that it sold products that it identified under five different CONNUMS, it was not unreasonable for Commerce to ask the company to report the quantities produced on a CONNUM-specific basis—i.e., to break down its production quantities according to the characteristics it certified to various customers. Based on Musim Mas's failure to provide such a breakdown—instead, repeating the total figure for quantity produced for all CONNUMs in its submissions—the Department reasonably concluded that CONNUM-specific product quantities were missing from the record.

In sum, the record shows that despite having multiple opportunities to do so, Musim Mas failed to provide CONNUM-specific production quantities for its biodiesel. Under the statute, "Commerce is required to verify all information it relies upon in making a final determination in an investigation, 19 U.S.C. § 1677m(i), and is prohibited from relying on unverified information." *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 45 CIT __, __, 498 F. Supp. 3d 1345, 1360 (2021) (citation omitted). Here, Commerce could not verify Musim Mas's reported cost information because of the company's failure to provide CONNUM-specific production quantities associated with its biodiesel cost of production. Without verifiable cost information, Commerce could not perform an accurate cost test for calculating normal value. Nor could Commerce construct normal value absent its ability to calculate a home market sales price. The Department was therefore deprived of necessary information crucial to its normal value calculations—an essential component of the Department's dumping analysis. As such, the court finds that Commerce's determination that necessary information was missing from the record is supported by substantial evidence, and the use of facts available was required as to Musim Mas's CONNUM-specific production quantities.

### 3.     Estimated RIN Values for U.S. Sales

Finally, the court turns to Commerce's finding that necessary information was missing from the record in the form of Musim Mas's estimated RIN values. In its questionnaires, the Department asked Musim Mas for RINs information for its U.S. sales during the period of investigation, including estimates of RIN values.[47] As summarized by Commerce:

---

[47]     As described above, RINs are tradeable credits that a purchaser generates by the importation of biodiesel into the United States. In its initial questionnaire concerning product characteristics, Commerce asked Musim Mas to "[r]eport the value of the RINs included with each gallon of biodiesel sold" for its U.S. sales, stating that, "[i]f a RIN value is not recorded on the

> [T]he original section B questionnaire instructed Musim Mas to provide the value of the RINs included with each sale of biodiesel to the U.S. market. RINs are credits issued by the Environmental Protection Agency . . . that have fluctuating values, and can be traded and sold on the open market. The questionnaire also stated that if Musim Mas did not know the value of the RINs, then to "report an estimated value and explain how this was obtained." Musim Mas originally omitted this column in the sales database stating, "the RIN was issued by an unaffiliated importer, so we do not know the RIN value of the shipment." In a supplemental questionnaire, we again asked Musim Mas to provide an estimated RIN value for each U.S. sale. Musim Mas responded that they "cannot estimate the RIN value."

PDM at 7 (footnotes omitted). The Department preliminarily found it incredible that Musim Mas

could not report an estimated RIN value:

> Musim Mas should have been able to at least provide the Department with an estimate as to the value of the RINs attached to their sales of biodiesel to the United States during the [period of investigation]. We note that the other mandatory respondent, Wilmar, was able to estimate the RIN values as to its U.S. sales without difficulty. Moreover, counsel for Musim Mas stated at the ITC staff conference, "the price includes the liquid. It includes the RIN. It includes a tax credit. No matter how many ways you slice it, it's all built into the product." We find that this statement further supports that Musim Mas took the value of the RINs into account when negotiating its U.S. sales prices and should have been able to provide the RIN values, as requested.

*Id.* (footnotes omitted). Thus, in the Final Determination, Commerce continued to find that

necessary information was missing from the record:

---

invoice," the company should "report an estimated value and explain how this was obtained (*e.g.,* based on the RIN market prices at the time the purchase agreement was signed or the date of shipment)." Prod. Characteristics & Other Info. Quest. (May 19, 2017) at 5, PR 64. In response, Musim Mas declined to provide any information—even an estimate—of RIN values. *See* Musim Mas's Resp. Secs. B & C Quest. at 34-35 ("The RIN was issued by an unaffiliated importer, so we do not know the RIN value of the shipment. Accordingly, we have omitted this column.").

Thereafter, in a supplemental questionnaire, Commerce asked Musim Mas to provide an estimate of RIN values for its U.S. sales. *See* Musim Mas Suppl. Secs. B & C Quest. (Aug. 10, 2017) at 5, PR 153 ("Concerning field 3.11 (RINVALU), you reported that you 'do not know the RIN value of the shipment,' please provide the previously requested estimate and supporting documentation."). Musim Mas responded that, as it was not the RIN-generator or the importer of record, it could not "estimate the RIN value," because RIN-generation "takes place quite some time after the contract, after the shipment, after the invoice and after arrival in the United States." Musim Mas's Resp. Suppl. Secs. B & C Quest. at 10-11; *see also* Musim Mas's Br. at 9.

> Musim Mas' arguments concerning its inability to provide Commerce with estimated RIN values for its sales of biodiesel to the United States are unpersuasive. Musim Mas did, in fact, provide RIN values for [two types of] RINs from April 2013, through July 2017. However, the figures are not accompanied by any narrative or citations indicating where those values came from, nor did Musim Mas incorporate those figures into its U.S. sales database as instructed by Commerce. Musim Mas' submission of the RIN values shows that it was at least aware of the intrinsic value of RINs. We also note that during the public hearing for this investigation, counsel for Musim Mas stated, in response to a question from Commerce, that "of course . . . everyone does" have an understanding of RIN values. That statement provides more credence to the argument that Musim Mas should have been able to provide estimated RIN values for each sale of biodiesel to the United States. . . . [W]e have applied an adjustment to Wilmar's [normal value] to account for the imbalance between [normal value] and US price in order for a fair comparison to be made pursuant to [19 U.S.C. § 1677b(a)]. Musim Mas' refusal to provide estimated RIN values precluded Commerce from properly comparing [normal value] to US price.

Final IDM at 52 (footnotes omitted). In other words, for Commerce, because the value of the RINs was included in the sales price of the subject biodiesel that Musim Mas sold into the United States and the company knew there was some added value in each sale, the company should have been able to determine actual or estimated RIN values for its U.S. sales. *See id.* ("The fact that Musim Mas is not the importer of record for its sales of biodiesel to the United States is irrelevant. Musim Mas sold RIN eligible biodiesel to the United States, therefore, the value of the RINs was included in the sales price." (footnote omitted)).

For Commerce, Musim Mas's failure to provide RIN estimates created a gap in its reported U.S. sales information that, together with the other gaps in its questionnaire responses, rendered the information that Musim Mas did provide regarding its U.S. sales "too incomplete to serve as a reliable basis for our calculations, because the missing information is core to Commerce's ability to calculate a weighted-average dumping margin for the respondent." Final IDM at 53. Commerce therefore determined that "resorting to the facts available continues to be appropriate." *Id.*

As with the CONNUM information discussed above, there is no real dispute that Musim Mas never provided Commerce with any serious estimated RIN values.[48] While Musim Mas argues here that "Commerce penalized [Musim Mas] for failing to provide information which was not in its control," it does not claim that it actually provided the information Commerce requested. *See* Musim Mas's Br. at 8. In addition, for the values it did provide, it did not include the source. It may well be that any estimate Musim Mas gave would be of little value to the Department, but the court cannot monitor the value of Commerce's questions beyond stating that asking for Musim Mas to provide estimated RIN values is not unreasonable. Thus, because information was missing from the record creating a gap for Commerce to fill, the court finds no error with Commerce's finding that the use of facts available was required with respect to estimated RIN values.

### B. Commerce's Application of an Adverse Inference When Selecting from Among the Facts Available Was Supported by Substantial Evidence and in Accordance with Law

As noted, the court has found that Commerce lawfully used facts available with respect to all of Musim Mas's reported information based on the company's failure to provide (1) a usable reconciliation of its total home market sales, (2) CONNUM-specific production quantities, and (3) estimated RIN values for its U.S. sales. Regarding Commerce's adverse facts available finding,

---

[48]        Musim Mas notes in its brief that it submitted some RIN value data as a "good faith" attempt to cooperate with Commerce's request for RIN values. *See* Musim Mas's Br. at 10. The company concedes, however, that "the RIN values [it] submitted are more representative of publicly available data for RINs than of the transactional realities which in fact took place." *Id.* Because the provided values were "not the actual values associated with [Musim Mas's] sales, nor were they even potentially applicable to the sales," Musim Mas stated that "even assuming that one of the RIN values provided by [Musim Mas] could be used for a price adjustment, the choice of any of these RIN values would be arbitrary." *Id.* For its part, Commerce found the information unintelligible and unusable. *See* Final IDM at 52 ("Musim Mas did, in fact, provide RIN values for [two types of] RINs from April 2013, through July 2017. However, the figures are not accompanied by any narrative or citations indicating where those values came from, nor did Musim Mas incorporate those figures into its U.S. sales database as instructed by Commerce." (footnote omitted)).

Musim Mas does not argue that it provided all of the information that Commerce requested, but rather, that it was a cooperative respondent that provided the information it had at its disposal and was capable of producing. *See* Musim Mas's Br. at 3 ("[Musim Mas] submitted all information reasonably within its control, . . . there was no evidence to show that the information reported was not complete or accurate, and [Musim Mas] ultimately was a fully cooperative respondent at each and every stage of the proceeding. [Musim Mas's] participation in the proceeding included the provision of voluminous, timely filed questionnaire responses within a tight timeframe of less than 90 days.").

In this case, upon determining that the use of facts available was necessary, Commerce could apply an adverse inference only when it supported, with substantial evidence, its finding that Musim Mas "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). To apply an adverse inference to a non-cooperating respondent, Commerce must support two findings with substantial evidence: one objective, one subjective. That is, Commerce must

> [f]irst . . . make an objective showing that a reasonable and responsible [respondent] would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its *maximum efforts* to investigate and obtain the requested information from its records.

*Nippon Steel*, 337 F.3d at 1382-83 (emphasis added) (citation omitted). The "maximum effort" standard looks to "the maximum effort that a particular respondent is capable of doing, not some hypothetical, well-resourced respondent." *Nat'l Nail*, 43 CIT at __, 390 F. Supp. 3d at 1373. Put another way, "[a]n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming

responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Nippon Steel*, 337 F.3d at 1383; *see also Nat'l Nail*, 43 CIT at __, 390 F. Supp. 3d at 1373 ("While there is no required formula for Commerce to follow in reaching its conclusion, a reviewing court must be able to conclude that Commerce looked at the respondent's ability to comply as well as its performance in complying."). The adverse inference standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. That is, "[a] respondent does not cooperate to the best of its ability when it fails to put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." *Goodluck India Ltd. v. United States*, 43 CIT __, __, 393 F. Supp. 3d 1352, 1358 (2019) (cleaned up).

Here, Commerce found that Musim Mas failed to cooperate to the best of its ability with respect to all three categories of information found to be deficient: (1) home market sales (reconciliation), (2) cost of production (CONNUM-specific production quantities), and (3) estimated U.S. sales (RIN values). For the following reasons, the court finds that Commerce supported, with substantial evidence, its application of an adverse inference "in selecting from among the facts otherwise available." *See* 19 U.S.C. § 1677e(b)(1)(A). The court addresses each category of information in turn.

### 1.    Home Market Sales Reconciliation

With respect to the missing home market sales information, Commerce found that "Musim Mas failed to provide an adequate home market sales reconciliation, even after having been given the opportunity to remedy its deficient response." Final IDM at 55. For Commerce, "Musim Mas did not provide an explanation for why it failed to provide an adequate home market sales reconciliation." *Id.* Commerce acknowledged that a respondent's mere failure to respond was

insufficient to justify the use of adverse inferences, but that here, "the information Musim Mas failed to provide 'is the type of information that a large international company such as Musim Mas should reasonably be able to provide.' It was therefore appropriate to expect that Musim Mas would be more forthcoming with this information." *Id.* at 53-54 (footnote omitted).

Again, as noted, the missing sales reconciliation information is essential to the accurate calculation of an antidumping duty margin because a usable sales reconciliation is one of the essential building blocks used to verify a respondent's data. During the course of the investigation, Musim Mas had more than one opportunity to explain and supplement the reconciliation that Commerce had indicated was deficient.[49] It is clear from the record, however, that Musim Mas's questionnaire responses contain no narrative that would explain how Commerce (or the reviewing court) might understand the sales reconciliation information submitted by the company. In its brief, Musim Mas concedes that there were internal differences in the information it provided: "The first page is a worksheet [the chart] demonstrating the reconciliation of sales as reported in [Musim Mas's] databases, *which were based on contract date*, with the sales figures recorded in [Musim Mas's] records maintained in the ordinary course of business, *which were based on invoice date*." Musim Mas's Br. at 4 (emphasis added). This acknowledgement of internal differences, however, does not provide an explanation as to how Commerce should reconcile the incongruous information submitted by Musim Mas. What it does show is that Musim Mas could have provided more information in its narrative responses, beyond a single sentence pointing Commerce to the exhibits containing the company's sales reconciliation information.

---

[49] Musim Mas does not dispute that a home market sales reconciliation was required, or that it should have maintained records of its home market sales. As such, the reasonableness of Commerce's application of an adverse inference turns on the subjective prong under *Nippon Steel*: whether Musim Mas exerted its "maximum effort" in responding to the Department's questionnaires. *See* 337 F.3d at 1382-83.

Further, as Commerce points out, Musim Mas gave no indication that it was incapable of producing a home market sales reconciliation. Rather, instead of complying with Commerce's instructions to directly link sales quantities and values, Musim Mas argues that it would have been unnecessary to make more of an effort to comply, since Commerce could have solved any issues at verification. *See* Musim Mas's Br. at 4-5. Musim Mas argues that *Commerce* should have taken steps to rely on the company's submissions "as is," (i.e., verify them) while failing to explain why Musim Mas did not take steps *itself* to further explain its own information.

This, however, is not the way the unfair trade administrative process works. First, "[t]he burden of creating the administrative record lies with the interested parties," not with Commerce. *Hyundai Steel*, 45 CIT at __, 518 F. Supp. 3d at 1321 (citing *BMW*, 926 F.3d at 1295). Musim Mas had Commerce's questions. It appears to have made little effort to help Commerce get the information it needed to complete the investigation. Nor did it make any serious effort to explain the information it did produce. Rather, the company threw up its corporate hands.

Next, as to Musim Mas's argument that Commerce could have resolved the deficiencies in the company's responses at verification, a respondent's opportunity to make the record is provided by way of questionnaire. As a general rule, verification looks at the record previously created and is not a time for completing a deficient record. *See Goodluck*, 11 F.4th at 1343 ("Verification represents a point of no return."). While it is certainly true that Commerce has put new information on the record at verification, a respondent travels at its own risk when hoping that it will do so in a particular case.

Because the record shows that Musim Mas could have produced a more complete response as to its home market reconciliation but for its lack of effort, and that it did not adequately explain the information it did produce, Commerce reasonably found that the company failed to cooperate

to the best of its ability. Therefore, the Department's application of an adverse inference when selecting from among facts available to fill gaps as to Musim Mas's home market information was supported by substantial evidence and in accordance with law.

### 2.    CONNUM-Specific Production Quantities

Next, Commerce concluded that Musim Mas's failure to provide CONNUM-specific production *quantities* in its cost of production responses showed a failure to cooperate because the company never tried to calculate the production quantities. For Commerce, the use of an adverse inference was supported by substantial evidence because:

> Musim Mas had multiple opportunities to explain to Commerce why it was not able to report CONNUM-specific production quantities, while it acknowledged that products receive different processing. Moreover, Musim Mas did not attempt to derive the CONNUM-specific production quantities from its CONNUM-specific sales quantities. . . . [Despite this,] *Musim Mas demonstrated that it was able to differentiate production by certain product characteristics*.

Final IDM at 52 (emphasis added).

The court finds that Commerce's application of an adverse inference was warranted. As noted above, the CONNUM-specific information was necessary for the Department to (1) reconcile reported CONNUM costs to Musim Mas's normal books and records, (2) perform an accurate cost test, (3) make appropriate selections for price-to-price comparisons, and (4) accurately determine normal value. *Id.* at 51. At all relevant times, Musim Mas ignored Commerce's directive to "report the *quantity produced* during the cost calculation period" for each CONNUM. *See* Musim Mas Sec. B-E Quest. at D-17 (emphasis added). Instead of trying to meet Commerce in the middle and make some attempt to report CONNUM-specific *production quantities*, Musim Mas insisted that it was futile for it to try to calculate CONNUM-specific *costs*. *See, e.g.*, Musim Mas's Resp. Sec. D Quest. at D-25 ("[Musim Mas's] production and accounting records do not provide any information with which to calculate any differences in production *costs*

on anything other than a speculative basis, and even then, [Musim Mas] speculates that any potential cost differences are not material . . . ." (emphasis added)). As noted, Commerce did not ask Musim Mas for CONNUM-specific *costs*. Rather, Commerce asked Musim Mas for CONNUM-specific *production quantities* associated with its biodiesel cost of production information.

Musim Mas's conduct further fails to meet the "maximum effort" standard because the company seems to have had in its control the very information that Commerce was seeking. In its responses to Commerce's questionnaires, Musim Mas admitted that "when selling [its] product to the customer, distinctions are indicated in the documentation and *were used to report the CONNUM product specifications*." Musim Mas's Resp. Suppl. Sec. D Quest. at 19, 21 (emphasis added) ("[T]he reported CONNUMs are based on the product specifications stated in the documentation given to the customer."). In fact, Musim Mas reported five CONNUMs in its Section B (home market sales) and Section C (U.S. sales) questionnaire responses. *See* Musim Mas's Resp. Sec. D Quest. at D-25 ("We acknowledge that application of the Department's CONNUM characteristics have resulted in 5 CONNUMs in the Section B and C databases."). In other words, Musim Mas *did* distinguish among its product(s) based on characteristics when it made specific sales. The company divided up its sales by CONNUMs based on these characteristics and it did report *some* CONNUM-specific information in its responses to Commerce. *See, e.g.*, Final IDM at 52 ("Musim Mas did not attempt to derive the CONNUM-specific production quantities from its CONNUM-specific sales quantities, which it was capable of reporting for sections B and C.").

In the relevant PRODQTY column of its spreadsheets, however, Musim Mas merely repeated the total production quantity for all CONNUMs in each CONNUM-specific row. As

Commerce concluded, Musim Mas "would have had to know what it needed to produce to meet customer needs and to know the quantities and processes it applied to obtain products of different physical characteristics." Final IDM at 51. In its questionnaire responses, though, Musim Mas failed to produce CONNUM-specific information or give an adequate explanation for being unable to track its specific sales. That is, Musim Mas did not explain why it could not calculate the CONNUM-specific production quantities underlying these sales to its customers and comply with Commerce's request.

Because the evidence on the record shows that Musim Mas could have responded to Commerce's request if it had made its maximum effort and cooperated to the best of its ability, the Department's application of an adverse inference when replacing the missing CONNUM-specific production quantities in Musim Mas's cost of production responses was justified.

### 3.    Estimated RIN Values for U.S. Sales

Finally, Commerce found that Musim Mas's failure to provide estimated RIN values was the result of a failure by the company to cooperate to the best of its ability because "Musim Mas was at least aware of the intrinsic value of RINs, and should have been able to provide Commerce the requested values in its U.S. sales database." Final IDM at 55. For Commerce, "[t]he fact that Musim Mas is not the importer of record for its sales of biodiesel to the United States is irrelevant. Musim Mas sold RIN eligible biodiesel to the United States, therefore, the value of the RINs was included in the sales price." *Id.* at 52 (footnote omitted). In other words, Musim Mas should have been able to estimate how much of its sales price to its customers was attributable to the biodiesel itself, and how much was attributable to the RINs. As a result of Commerce's finding that Musim Mas did not act to the best of its ability to comply with the Department's requests for RIN values,

Commerce applied an adverse inference when filling the gap in the record created by Musim Mas's failure to provide RIN value estimates.

Commerce's conclusion that Musim Mas was "aware of the intrinsic value of RINs" was founded on two bases in the record. Final IDM at 52. First, Commerce found that Musim Mas had provided "RIN values for [two types of] RINs from April 2013, through July 2017"—which Musim Mas itself concedes. *See id.* at 52; *see also* Musim Mas's Br. at 10. There is no real dispute, however, that these RIN values were unusable for Commerce's purposes. *See* Final IDM at 52; Musim Mas's Br. at 10 ("These RIN values [were] not the actual values associated with [Musim Mas's] sales, nor were they even potentially applicable to the sales . . . .").

Second, Commerce points to a statement by Musim Mas's counsel at the public hearing for the investigation. *See* Final IDM at 52 ("[C]ounsel for Musim Mas stated, in response to a question from Commerce, that 'of course . . . everyone does' have an understanding of RIN values.")). For Commerce, "[t]hat statement provides more credence to the argument that Musim Mas should have been able to provide estimated RIN values for each sale of biodiesel to the United States." *Id.*

The court finds that Commerce's use of an adverse inference when filling the gap created in the record by Musim Mas's failure to produce RIN value estimates was justified.

As a threshold matter, Commerce was aware that Musim Mas was not the importer of record when it requested estimated RIN values. After the company responded to the initial questionnaire by stating that it could not supply values because it did not have the information at its disposal, Commerce issued a supplemental questionnaire focused solely on *estimated* values. *See* Musim Mas's Resp. Suppl. Secs. B & C Quest. at 10 ("Concerning field 3.11 (RINVALU), you reported that you 'do not know the RIN value of the shipment,' please provide the previously

requested estimate and supporting documentation."). In other words, Commerce took into account the capability of the "particular respondent" before it, not a "hypothetical" respondent, and did not insist that Musim Mas provide actual values. *Nat'l Nail*, 43 CIT at __, 390 F. Supp. 3d at 1373. It is worth keeping in mind that Musim Mas was perfectly aware that its biodiesel was going to be imported into the United States, where, in addition to purchase price, the importer would receive RINs. Commerce also noted that during an International Trade Commission staff conference, Musim Mas's counsel stated "the price includes the liquid. It includes the RIN. It includes a tax credit. No matter how many ways you slice it, *it's all built into the product*." PDM at 7. Thus, it was not unreasonable for Commerce to assume that Musim Mas took RIN values into account when setting its sales price.

Under *Nippon Steel*, "[a]n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." 337 F.3d at 1383. Here, while Musim Mas repeatedly claimed that it could not comply in *any* way with the Department's request to provide actual or estimated RIN values, its conduct suggests that it could have produced a more complete response if it had made its "maximum effort."

Specifically, Musim Mas's submission of *some* RINs data, however imperfect, suggests that the company had information at its disposal that it could have used to estimate RIN values, as requested by the Department. Yet Musim Mas did not try to explain or otherwise link the RIN values it submitted to its own U.S. sales. Instead, it later stated that the information it had submitted was probably unusable. *See* Musim Mas's Br. at 10 ("[Musim Mas] did make a good faith effort to provide RIN values to the Department. . . . *These RIN values [were] not the actual values*

associated with [Musim Mas's] sales, nor were they even potentially applicable . . . ." (emphasis added)).

Musim Mas's contention that its submission of data *it believed to be inadequate* was evidence of cooperation ignores the actual reason that Commerce rejected the potentially inapplicable RIN values. *See* Musim Mas's Br. at 10; *see also* Final IDM at 52 ("[T]he figures *are not accompanied by any narrative or citations indicating where those values came from*, nor did Musim Mas incorporate those figures into its U.S. sales database as instructed by Commerce." (emphasis added)). In other words, Commerce rejected the RIN values because Musim Mas failed to take full advantage of its opportunity to submit narrative responses explaining its factual submissions. These narrative responses were clearly part of the question Musim Mas was instructed to answer. *See* Musim Mas's Resp. Secs. B-E Quest. at 34-35 ("If a RIN value is not recorded on the invoice, report an estimated value and explain how this was obtained (*e.g.,* based on the RIN market prices at the time the purchase agreement was signed or the date of shipment). Provide an explanation of how you obtained the estimate as well as any supporting documentation used to value your estimate."). Thus, the record shows that Musim Mas failed to make a meaningful effort to comply with Commerce's request even though it was fully aware that the value of RINs was built into the purchase price. Rather, the company simply claimed it could not comply with the questionnaire, without making any apparent effort to supply the missing information.

Because Musim Mas failed to cooperate to the best of its ability, the Department's application of an adverse inference when filling gaps with respect to the missing estimated RIN values was justified.

### C.     Commerce's Selection of Musim Mas's Adverse Facts Available Rate Is Sustained

As discussed, Commerce determined that the record was missing Musim Mas's (1) home market sales reconciliation, (2) CONNUM-specific production quantities, and (3) estimated RIN vales for its U.S. sales:

> We continue to find that Musim Mas' home market sales reconciliation, CONNUM-specific production quantities, and estimated RIN vales for its U.S. sales constitute necessary information that is missing from the record within the meaning of [19 U.S.C. § 1677e(a)(1)]. . . . As we explained in the *Preliminary Determination*, all of this information is core to Commerce's ability to calculate Musim Mas' dumping margin.

Final IDM at 49.

For Commerce, the missing information was so significant that it rendered the information that Musim Mas provided to the Department too incomplete to serve as a reliable basis for determining normal value or U.S. price. *Id.* at 52-53. In situations, such as this, where there is missing information that cannot be supplied by facts otherwise available, and as a result either normal value or U.S. price, or both, cannot be determined, Commerce cannot perform a dumping analysis, i.e., a comparison of normal value and U.S. price.

Where there are no other facts on the record that can be substituted for the missing information, Commerce has been permitted to find that it cannot calculate a rate and substitute a rate for what would otherwise be a calculation. *See Hyundai Elec. & Energy Sys. Co. v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1303, 1309 (2020) (upholding Commerce's substitution of a previously calculated rate where "one of the major categories of information necessary to perform a dumping calculation (U.S. sales, home market sales, cost of production, or constructed value) has not been provided" (citing *Steel Auth. of India, Ltd. v. United States*, 25 CIT 482, 486, 149 F. Supp. 2d 921, 927-28 (2001))).

Commerce might say—as it has here—that, in these situations, it is entitled to apply what it calls "total" facts available and assign a rate, even an adverse rate. Here, Commerce, using "total" adverse facts available,[50] substituted a rate for what would otherwise be a calculation. Commerce did so because the missing information "render[ed] the information that Musim Mas did provide to Commerce too incomplete to serve as a reliable basis for [its] calculations, because the missing information [was] core to [its] ability to calculate a weighted-average dumping margin for [Musim Mas]." Final IDM at 53.

Although Commerce claims that it applied "total" adverse facts available, the court believes that, while the result is the same, the lawful reason for applying the rule is something different. Because of the missing information Commerce was unable to calculate normal value or U.S. price, and therefore could not perform a dumping analysis (i.e., a comparison of normal value and U.S. price). What results from these circumstances is akin to an impossibility. Thus, the proper analysis might be found in those cases holding that, given the lack of facts on the record, Commerce simply cannot perform its statutory task. *See, e.g.*, *Steel Auth. of India*, 25 CIT at 486, 149 F. Supp. 2d at 927-28 (upholding Commerce's decision to disregard all of a respondent's reported information and substitute a rate for what would otherwise be a calculation where "the absence of either cost of production, home market sales, or U.S. sales data makes it impossible for the Department to make price-to-price comparisons" necessary to determine an accurate dumping margin). In other words, where either normal value or U.S. price cannot be ascertained, it is simply

---

[50]      "Total" adverse facts available is not defined by statute or agency regulation. Commerce uses this term "to refer to [its] application of adverse facts available . . . to the facts respecting *all of respondents' production and sales information that the Department concludes is needed for an investigation or review*." *Nat'l Nail*, 43 CIT at __, 390 F. Supp. 3d at 1374 (emphasis added) (citation omitted). In other words, Commerce assigns an antidumping rate based entirely on facts selected using an adverse inference, ignoring all of a respondent's information.

not possible to determine a weighted-average dumping margin and hence an antidumping duty rate. *See id.* at 486, 149 F. Supp. 2d at 927 ("[I]n order to make a reliable antidumping determination, the Department needs the respondent's data on U.S. sales, home market sales, cost of production, and constructed value.").

Based on this analysis, Commerce may disregard all of Musim Mas's reported information and assign a rate because the missing home market sales quantities and values, production quantities, and estimated RIN information are necessary for the Department to make the comparisons essential to the calculation of a dumping margin. Because this information is missing from the record it is impossible for the Department to accurately calculate a dumping margin for Musim Mas. The court thus concludes that Commerce lawfully disregarded all of Musim Mas's information in favor of selecting a rate.

As noted by Commerce, "[t]he Department's practice is to select, as an [adverse facts available] rate, the higher of: (1) the highest dumping margin alleged in the petition, or (2) the highest calculated dumping margin of any respondent in the investigation." PDM at 9. If Commerce departs from its normal practice, however, it must adequately explain its decision to do so. *See PSC VSMPO-AVISMA Corp. v. United States*, 35 CIT 283, 291, 755 F. Supp. 2d 1330, 1339 (2011) ("[W]hen Commerce departs from its normal practice and bases an AFA rate on a single-transaction margin, it must explain its decision.").

Here, Commerce found that it could not apply the highest dumping margin alleged in the petition (28.11%) as Musim Mas's adverse facts available rate since it "would in fact reward Musim Mas for being uncooperative, because that rate is lower than fully cooperative respondent Wilmar's calculated margin." Final IDM at 55. Commerce also found that using the highest calculated dumping margin of any respondent in the investigation (i.e., Wilmar's calculated

dumping margin of 92.52%) as Musim Mas's adverse facts available rate was "insufficient to induce cooperation" and "unfair to Wilmar, since Wilmar cooperated fully with Commerce in this investigation" whereas Musim Mas did not. *Id.* at 54. Commerce thus departed from its normal practice and, pursuant to 19 U.S.C. § 1677e(d)(1)(B),[51] selected Wilmar's highest transaction-specific dumping margin of 276.65% as Musim Mas's total adverse facts available rate. The court finds that Commerce adequately explained its decision to depart from its normal practice in this instance. This is consistent with prior proceedings in which this Court has upheld Commerce's departure from its normal practice. *See Branco Peres Citrus, S.A. v. United States*, 25 CIT 1179, 1190-92, 173 F. Supp. 2d 1363, 1376-77 (2001) (upholding Commerce's departure from its normal practice because the Department reasonably explained why all previous weighted-average margins were too low to provide an incentive to cooperate).

The purpose of adverse facts available "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United* States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). For Commerce, because the 276.65% rate "does not involve an aberrational sale in terms of the type of product or quantity sold," and "is also within the mainstream of Wilmar's other calculated rates," it therefore "strikes an appropriate balance between the goal of inducing future cooperation by Musim Mas, and the rate not being punitive." Final IDM at 55. The court agrees.

Under the statute, Commerce may use "any dumping margin from any segment of the proceeding under the applicable antidumping order," 19 U.S.C. § 1677e(d)(1)(B), and may apply

---

[51]      Section 1677e(d)(1)(B) provides: "If [Commerce] uses an inference that is adverse to the interests of a party . . . in selecting among the facts otherwise available, [Commerce] may . . . in the case of an antidumping duty proceeding, use any dumping margin from any segment of the proceeding under the applicable antidumping order."

"the highest such rate or margin, based on the evaluation by [Commerce] of the situation that resulted in the [Department] using an adverse inference," *id.* § 1677e(d)(2). That is what Commerce did here.

A "dumping margin," as defined by the statute, is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). Here, the 276.65% transaction-specific margin equates to the amount by which the normal value exceeds the export price of the subject merchandise with respect to a single transaction. Thus, the 276.65% rate is a dumping margin within the plain meaning of the statute. The 276.65% rate is also from a "segment" of the proceeding under the applicable antidumping order. The term segment, while undefined by the statute, is defined by Commerce's regulations as "a portion of the proceeding that is reviewable under [19 U.S.C. § 1516a]." 19 C.F.R. § 351.102(b)(47)(i). Examples of a "segment" of a proceeding, as provided in Commerce's regulations, are "[a]n antidumping or countervailing duty *investigation* or a review of an [antidumping or countervailing duty] order . . . ." *Id.* § 351.102(b)(47)(ii) (emphasis added). Here, the 276.65% transaction-specific margin was calculated during the underlying antidumping duty investigation that is the subject of this case (i.e., a reviewable portion of the proceeding or "segment" of the proceeding).

Thus, it follows that the 276.65% rate is a dumping margin as defined by the statute, 19 U.S.C. § 1677(35)(A), and was pulled from a segment of the proceeding. Commerce therefore acted within its discretion in its selection of Musim Mas's non-aberrational adverse facts available rate. As a result, the court sustains the Department's rate selection.

## CONCLUSION AND ORDER

Based on the foregoing, it is hereby

**ORDERED** that the Remand Results, as well as the issues from the Final Determination upon which the court had previously reserved decision, are sustained, in part, and remanded; it is further

**ORDERED** that Commerce shall submit a redetermination upon remand that complies in all respects with this Opinion and Order; it is further

**ORDERED** that Commerce's particular market situation finding based on the 2015 Export Levy is sustained; however, its decision to disregard Indonesian crude palm oil prices—based on the 2015 Export Levy particular market situation—is unsupported by substantial evidence. On remand, Commerce must either reconsider its decision to disregard Indonesian crude palm oil prices when constructing normal value for Wilmar or explain why doing so does not impose a double remedy; it is further

**ORDERED** that Commerce's adjustment to U.S. price for an estimated value of RINs is sustained; it is further

**ORDERED** that Commerce's use of adverse facts available and selection of Musim Mas's rate is sustained; and it is further

**ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be due fifteen (15) days following the filing of the comments.

/s/ Richard K. Eaton
_____
Judge

Dated:          November 21, 2023
                New York, New York