A-560-830
Remand
Slip Op. 23-165
POI:  01/01/2016 – 12/31/2016
**Public Document**
E&C/OVII:  TGG

*Wilmar Trading PTE Ltd., et al. v. United States*,
**Consol. Court No. 18-00121, Slip Op. 23-165 (CIT November 21, 2023)**
**Biodiesel from Indonesia**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the

Court).[1]  These final results of redetermination concern the final determination issued in the less-

than-fair-value (LTFV) investigation on biodiesel from Indonesia.[2]  The petitioner is the

National Biodiesel Board Fair Trade Coalition.  The respondents selected for individual

examination were Wilmar Trading PTE Ltd. (Wilmar) and PT Musim Mas (Musim Mas).[3]

## II.    BACKGROUND

On June 9, 2022, the Court remanded certain aspects of the *Final Determination* to

Commerce for further consideration.  First, the Court held that Commerce failed to establish the

legal basis empowering it to adjust normal value to account for the value of renewable

---

[1] *See Wilmar Trading PTE Ltd., et al. v. United States*, Consol. Court No. 18-00121, Slip Op. 23-165 (CIT November 21, 2023) (*Second Remand Order*).
[2] *See Biodiesel from Indonesia:  Final Determination of Sales at Less Than Fair Value*, 83 FR 8835 (March 1, 2018) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); s*ee also Biodiesel from Argentina and Indonesia:  Antidumping Duty Orders*, 83 FR 18278 (April 26, 2018)*.
[3] *See Biodiesel from Indonesia:  Preliminary Affirmative Determination of Sales at Less Than Fair Value,* 82 FR 50379 (October 31, 2017) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM), unchanged in *Final Determination*.

identification numbers (RINs) for Wilmar.[4]  Second, the Court sustained Commerce's finding that a sales-based particular market situation (PMS) rendered Public Service Obligation (PSO) program home market sales outside the ordinary course of trade.  However, the Court remanded Commerce's determination that non-PSO home market sales were outside the ordinary course of trade such that they could not serve as a basis for normal value.[5]  The Court also found that substantial evidence supported Commerce's determination that the cost of crude palm oil was distorted by a cost-based PMS, but held that Commerce failed to show how the price paid for biodiesel sold in non-PSO sales was affected by the distorted cost of crude palm oil or that the non-PSO prices were not determined by the market.[6]  Finally, the Court reserved decision on Musim Mas' challenges to Commerce's use of adverse facts available (AFA) until the results of redetermination are before the Court.[7]

Pursuant to the Court's *First Remand Order*, Commerce addressed the issues described above.  Based on this analysis, Commerce:  (1) clarified and explained the legal authority empowering it to make a RIN adjustment to export price, as opposed to normal value; and (2) provided further explanation supporting both the sales-based and cost-based PMS determinations.[8]  After accounting for such changes, the rate upon remand for Wilmar remained identical to the rate in the *Final Determination*.[9]

---

[4] *See Wilmar Trading PTE Ltd, et al. v. United States,* 582 F. Supp. 3d 1243, 1256-59 (CIT 2022) (*First Remand Order*).
[5] *Id.* at 1253-54.
[6] *Id.* at 1254-56.
[7] *Id.* at 1259.
[8] *See Final Results of Redetermination Pursuant to Court Remand*, Consol. Court No. 18-00121, Slip Op. 22-64 (CIT June 9, 2022), dated September 22, 2022 (*First Remand Redetermination*), at 26, available at https://access.trade.gov/resources/remands/22-64.pdf.
[9] *See* Memorandum*,* "Draft Remand Analysis – Wilmar Trading PTE Ltd.," dated August 16, 2022.

On November 21, 2023, the Court issued the *Second Remand Order*.[10]   The Court

sustained Commerce's determination to make a RIN adjustment to export price pursuant to 19

CFR 351.401(c) and 19 CFR 351.102(b)(38), as well as the calculation methodology used in the

*First Remand Redetermination*.[11]   The Court also sustained Commerce's application of facts

available with an adverse inference to Musim Mas[12] and the AFA rate applied in the *Final

Determination*.[13]   Additionally, the Court sustained Commerce's sales-based and cost-based

PMS determinations[14] based on Commerce's further explanation that a 2015 Export Levy on

crude palm oil imposed by the Government of Indonesia (GOI) created a sales-based PMS that

rendered non-PSO sales unusable for purposes of normal value and also created a cost-based

PMS that rendered Wilmar's crude palm oil costs unusable for calculating constructed value.[15]

However, the Court held that "Commerce's decision to disregard Indonesian crude palm

oil prices—based on the 2015 Export Levy particular market situation—is unsupported by

substantial evidence because {Commerce} failed to sufficiently explain how any distortion

created by the 2015 Export Levy in this case has not been remedied by the companion

countervailing duty case."[16]   The Court ordered that "on remand, Commerce must either

reconsider its decision to disregard Indonesian crude palm oil prices when constructing normal

value for Wilmar or explain why doing so does not result in a double remedy."[17]   On January 18,

2024, Commerce issued its Second Draft Remand Redetermination[18] explaining why

---

[10] *See Second Remand Order.*
[11] *Id.* at 32-41.
[12] *Id.* at 41-70.
[13] *Id.* at 71-74.
[14] *Id.* at 18-26.
[15] *Id.* at 18-26.
[16] *Id.* at 31.
[17] *Id.* at 26-32.
[18] *See* Draft Results of Remand Redetermination, *Wilmar Trading PTE Ltd., et al. v. United States*, Consol. Court No. 18-00121, Slip Op. 23-165, dated January 18, 2024 (*Second Draft Remand Redetermination*).

disregarding Indonesian crude palm oil prices when constructing normal value for Wilmar does not result in a double remedy.  On January 25, 2024, Wilmar and Petitioners each submitted comments.[19]  All comments are addressed below after the final analysis section.

## III.    FINAL ANALYSIS

1.    Double Remedy

*A. Legal Framework*

Section 773(a)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act) defines normal value as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  Pursuant to section 771(15) of the Act, Commerce shall find "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or constructed export price."  Section 504 of the TPEA added the concept of "particular market situation" to the definition of the term "ordinary course of trade" in section 771(15) of the Act, as well as to section 773(e) of the Act pertaining to constructed value.[20] Section 773(e) of the Act directs that constructed value is the sum of the costs of materials and fabrication employed in producing the subject merchandise, plus amounts for general and administrative expenses, interest, profit, selling expenses, and U.S. packing costs.  Section 773(e) of the Act also provides that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of

---

[19] *See* Wilmar's Letter, "Comments on Second Draft Results of Redetermination Pursuant to Court Remand," dated January 25, 2024 (Wilmar's Comments);  *see also* Petitioner's Letter, "Petitioners' Comments on Draft Remand Results," dated January 25, 2024 (Petitioner's Comments).
[20] *See* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA).

production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."

In the *Preliminary Determination*, as upheld in the *Final Determination*, Commerce determined that a PMS exists with regard to the price of crude palm oil, a constituent element of the cost of production of biodiesel in Indonesia, because of the GOI's export tax regime on crude palm oil.[21]  As a result, Commerce did not rely on the crude palm oil prices paid by Wilmar as part of the cost of production calculation, finding that such prices did not accurately reflect the cost of production in the ordinary course of trade.   Instead, Commerce relied on market-determined prices.[22]

In the *Second Remand Order*, the Court found that "Commerce reasonably relied on an alternative method of constructing normal value under {section 773(e) of the Act}, which used world market prices for crude palm oil – instead of domestic crude palm oil prices – when calculating constructed value."[23]  However, it found that Commerce failed to explain why the distortion created by 2015 Export Levy[24] has not been remedied by the companion countervailing duty (CVD) investigation and does not result in the imposition of a double remedy.[25]

### B.  Background

In the *Final Determination*, Commerce explained that there is no statutory directive in the Act curtailing Commerce's authority to adjust constructed value based on a PMS simply because Commerce also determined in a separate investigation that a government provided a

---

[21] *See Final Determination* IDM at 21-24.
[22] *Id*.
[23] *See Second Remand Order* at 25.
[24] The program is also known as "Provision of Palm Oil Feedstock for Less Than Adequate Remuneration."  *See Biodiesel from the Republic of Indonesia:  Final Affirmative Countervailing Duty Determination*, 82 FR 53471 (November 16, 2017) (*Indonesia Biodiesel CVD Inv Final*), and accompanying IDM.
[25] *See Second Remand Order* at 26-32.

countervailable subsidy.[26]  Commerce explained that although the Act contains provisions directing Commerce to address potential double remedies in certain limited situations, it does not do so in this context.[27]  Thus, Commerce explained that Congressional silence on "double remedy" concerns in promulgating section 773(e) of the Act supports the reasonableness of Commerce's determination not to make any double remedy adjustment.[28]

Indeed, we note that the antidumping duty (AD) and CVD laws are separate regimes that provide separate remedies for distinct unfair trade practices.  In particular, the AD law imposes duties in an amount equal to the amount by which normal value (or "fair value") exceeds the export price or constructed export price for Indonesian biodiesel in the United States.  On the other hand, the CVD law imposes duties in an amount equal to the subsidy, rather than the effects of the subsidy, and does not remedy sales at less than fair value.  Unlike the AD law, the CVD law is not designed to remedy unfairly low-priced U.S. sales.  Therefore, the CVD remedy imposed to countervail a subsidy is not intended to address the differential between the U.S. price and normal value.

Moreover, neither the statute nor the record would support a downward adjustment of the AD remedy to account for a putative overlap with the CVD remedy.  The statute only requires Commerce to consider the overlap of AD and CVD remedies in two narrow circumstances that do not apply here (*i.e.*, export subsidies pursuant to section 772(c)(1)(C) of the Act, and non-market economies (NME) pursuant to section 777A(f) of the Act).  Congressional silence on "double remedy" concerns in promulgating section 773(e) of the Act, three years after the

---

[26] *See Final Determination* IDM at 28.
[27] *Id.*
[28] *Id.*

6

litigation involving double remedies in NME proceedings,[29] supports the reasonableness of Commerce's decision in the *Final Determination* not to make any double remedy adjustment.

In the *Second Remand Order*, the Court acknowledged that "Commerce is correct that the statute does not expressly mandate offsetting countervailing duties from a companion countervailing duty investigation where {Commerce} uses constructed value (or an alternative method) under {section 773(e) of the Act}."[30]  However, citing its decision in *Vicentin II*, the Court stated that this "does not relieve Commerce of its obligation to explain why its chosen method is a reasonable one."[31]  Thus, it held that Commerce "must either reconsider its decision to disregard Indonesian crude palm oil prices when constructing normal value for Wilmar or explain why doing so does not result in a double remedy."[32]

### C.  The 2015 Export Levy on Crude Palm Oil Does Not Affect U.S. Prices for Indonesian Biodiesel

To comply with the Court's order, under respectful protest,[33] we have performed the analysis below to further explain why disregarding Indonesian crude palm oil prices when calculating constructed value does not impose a double-remedy.  If the subsidy's effect on the LTFV equation is limited to lowering U.S. price (as would be the case if the subsidy's influence

---

[29] Commerce explained in the *Final Determination* that "in 2012, Congress responded to the {U.S. Court of Appeals for the Federal Circuit's (Federal Circuit)} opinion in *GPX Int'l Tire Corp. v. United States* by creating the possibility of an offset in NME AD proceedings to avoid double remedies arising from findings made in companion CVD cases.  Only three years later, however, Congress did not even mention the possibility of a double remedy or a correction for a double remedy when it passed the TPEA, which included explicit authority for Commerce to address a PMS in the CV context."  *See Final Determination* IDM at 28 (citing P.L. 112-99, 126 Stat. 265 (2012); and *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732 (Fed. Cir. 2011)).  Thus, Commerce reasoned that "the TPEA's silence on this matter suggests that Congress intended Commerce's finding and adjustment for a PMS in an AD determination to apply independently of a CVD determination, each being the result of separate proceedings without regard to potential double remedies."  *Id.*  In other words, Congress was aware of double remedy concerns when it enacted the new PMS provision in section 773(e) of the Act, but notably, it did not direct Commerce to consider whether a double remedy exists in this scenario.

[30] *See Second Remand Order* at 31.

[31] *Id.* at 27-31 (citing *Vicentin S.A.I.C. v. United States,* 466 F. Supp. 3d 1227, 1243 (CIT 2020) (*Vicentin II*)).

[32] *Id.* at 32.

[33] *See Viraj Group Ltd. v. United States*, 343 F.3d 1371, 1376-77 (Fed. Cir. 2003).

on normal value is removed through the use of a world market value), some portion of the differential determined by the LTFV equation is the result of the countervailed subsidy.   If, however, the countervailed subsidy affects neither U.S. price nor normal value, the even-handedness of the countervailed subsidy's effects is maintained and no portion of the LTFV differential can be attributed to the subsidy.

The key finding in this context (*i.e.*, when normal value is unaffected by the countervailed subsidy), therefore, is whether the countervailed subsidy has affected U.S. price. In other words, Commerce must determine whether the countervailed subsidy has "passed through" to U.S. price.   In administering section 777A(f)(1) of the Act, the only section of the Act requiring and delineating a pass-through analysis, Commerce has required the producer or exporter under examination to demonstrate:   a "subsidies-to-cost link," *e.g.*, the subsidy's effect on cost of manufacture; and a "cost-to-price link," *e.g.*, the producer or exporter's prices changed as a result of changes in cost of manufacture.[34]   Commerce also examines whether countervailable subsidies have been demonstrated to have reduced the average price of imports during the period under examination.

As an initial matter, Indonesian prices for U.S. shipments were higher in the fourth quarter of 2016 than the first quarter of 2016.[35]   Thus, the countervailed subsidy has not reduced the average price of imports of the class or kind of merchandise during the January 1, 2016,

---

[34] *See, e.g., Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China:  Affirmative Final Determination of Sales at Less-Than-Fair Value*, 83 FR 57421 (November 15, 2018), and accompanying IDM at 5-6; *see also Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part*, 82 FR 28629 (June 23, 2017), and accompanying PDM at 42-43 (finding the mandatory respondents failed to establish a cost-to-price link); and *Forged Steel Fittings from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 83 FR 22948 (May 17, 2018), and accompanying PDM at 30-31 (finding the mandatory respondents failed to establish either subsidy- to-cost link or a cost-to-price link).

[35] *See* Petitioner's Letter, "Biodiesel from Argentina and Indonesia; Antidumping and Countervailing Duty Petitions," dated March 23, 2017 (Petition), at Volume II (Exhibit GEN-28).

through December 31, 2016 period of investigation (POI), as required by section 777A(f)(1)(B) of the Act. This fact is an indication that the domestic subsidy at issue has not been passed through to the U.S. price.

Moreover, the record demonstrates that there is no cost-to-price link, *i.e.*, the producer's or exporter's prices do not change as a result of changes in cost of manufacture. Rather, the record shows that U.S. and foreign producers base the price of biodiesel sold in the United States on the price of Ultra Low Sulfur Diesel (ULSD) futures contracts traded on the New York Mercantile Exchange (NYMEX).[36] Moreover, the record demonstrates that Wilmar prices its biodiesel sold in the United States based on the price of ULSD futures contracts traded on the NYMEX.[37] Commerce verified that Wilmar prices its U.S. sales based on these NYMEX heating oil futures plus or minus a specified premium.[38]

In addition, the *ITC Preliminary Report* provides a description of the industry in general that confirms the explanation provided by Wilmar. The report finds that, "{b}iodiesel has traditionally been marketed primarily as an additive or alternative to petroleum-based diesel fuel, and, as a result, biodiesel prices have been influenced by the price of petroleum-based diesel fuel, adjusted for government incentives supporting renewable fuels, rather than biomass based diesel production costs."[39]

---

[36] *See Biodiesel from Argentina and Indonesia*, Investigation Nos. 701-TA-571-572 and 731-TA-1347-1348 (Preliminary), USITC Publication 4690 (May 2017) (*ITC Preliminary Report*), at 24 (placed on the record of the investigation in the Petitioner's Letter, "Petitioner's Particular Market Situation Allegation Regarding Respondents' Home Market Sales and Costs of Production," dated July 25, 2017, at Exhibit 4.

[37] *See* Wilmar's Letters, "Section A Questionnaire Response (Part 2)," dated June 6, 2017, at A-11 and A-19; *see also* "Supplemental Section A Questionnaire Response," dated August 11, 2017, at 21, 29-30, and Exhibits SA-15, 16, 27, and 28; and "Supplemental Sections B-C Questionnaire Response," dated August 18, 2017, at 14-16.

[38] *See* Memorandum, "Verification of the Sales Response of Wilmar Trading PTE Ltd. and PT Wilmar Bioenergi Indonesia in the Antidumping Investigation of Biodiesel from Indonesia," dated November 22, 2017 (Wilmar Sales Verification Report) at 6.

[39] *See ITC Preliminary Report* at VI-7.

Finally, information published by the U.S. Department of Agriculture and the U.S. Census Bureau indicates a correlation between U.S., Argentine, and Indonesian prices in the United States during each quarter from 2014 through 2016.[40]  Pricing information demonstrates that Indonesian prices for U.S. shipments appear to correspond to the overall U.S. market (including imports from Argentina, Canada, and all other countries)[41] and not to the cost of crude palm oil in Indonesia.

As the record demonstrates that Wilmar prices its U.S. shipments in a manner designed to compete with (or undercut) U.S. prices for petro-diesel and biodiesel, and are not based on production costs affected by the domestic subsidy, Commerce concludes there is no significant link between the subsidy and U.S. prices.  Therefore, as both sides of the LTFV equation in this instance are unaffected by the export tax on crude palm oil, the differential between U.S. prices and normal value (*i.e.*, the dumping margin) is not partially the result of the countervailed subsidy, and thus the PMS adjustment to fair value does not remedy the subsidy.

We note that a similar pass-through analysis was conducted on remand in the biodiesel from Argentina proceeding.[42]  In that case, Commerce also determined based on record evidence that the domestic subsidy at issue did not reduce U.S. prices during the POI.[43]  The Court sustained as reasonable Commerce's redetermination that the pass-through analysis demonstrated Commerce did not provide a double remedy,[44] and the Federal Circuit affirmed the Court's decision, holding that "Commerce demonstrated with substantial evidence that its

---

[40] *See* Petition at Volume II (Exhibit GEN-28).
[41] *See ITC Preliminary Report* at table IV-2.
[42] *See Final Results of Redetermination Pursuant to Court Remand, Vicentin S.A.I.C. et al. v. United States*, Consol. Court No. 18-00111 (CIT July 1, 2020), dated November 12, 2020, available at https://access.trade.gov/resources/remands/20-91.pdf.
[43] *Id*.
[44] *See Vicentin S.A.I.C. v. United States*, 503 F. Supp. 3d 1255, 1261-68 (CIT 2021) (*Vicentin III*).

constructed value calculation does not result in a double remedy."[45]  Thus, Commerce's pass-through analysis based on similar facts has been upheld by the Court and the Federal Circuit.

       D.   *A Pass-Through Analysis Is Based on Presumptions Not Contained in the Act or Supported by Legislative History, Is an Evidentiary Burden that Should Not Be Placed on Commerce, and Risks Undermining the Relief to which Domestic Parties Are Entitled Under Subtitle B of the Act*

As noted above, the Court required Commerce to either reconsider its decision to disregard Indonesian crude palm oil prices when constructing normal value for Wilmar or explain why doing so does not result in a double remedy.[46]  The Court held that Commerce has not explained why its alternative methodology is reasonable.[47]  Whether it is reasonable for Commerce to proceed with the PMS adjustment without undertaking the type of analysis described above depends on whether certain assumptions about "pass-through" are valid.  In particular, this depends on whether it is sufficiently clear that domestic subsidies typically reduce U.S. prices such that it is incumbent upon Commerce to demonstrate otherwise, and, if so, whether the extent of the reduction can be determined accurately, such that an appropriate adjustment can be made.  The assumption that all domestic subsidies are fully passed through to export prices or that the effect of subsidies on export prices can be determined with any degree of certainty is misplaced.

For example, while section 772(c)(1)(C) of the Act requires a full adjustment for export subsidy countervailing duties in AD proceedings, the legislative history provides no grounds for concluding that Congress' action was based upon specific and rigid presumptions about the pass-through effect of subsidies on export prices other than a seeming recognition that export subsidies could affect price comparability for dumping purposes (presumably by lowering export

---

[45] *See Vicentin S.A.I.C. v. United States*, 42 F.4th 1372 (Fed. Cir. 2022).
[46] *See Second Remand Order* at 32.
[47] *Id.* at 31-32.

prices) whereas domestic subsidies would affect the price (and cost) of the merchandise sold in both markets equally.[48]  This recognition does not mean, however, that Congress assumed that 100 percent of export subsidies automatically pass through to U.S. prices or that 100 percent of domestic subsidies automatically pass through to prices (and costs) of products sold in both the home and U.S. markets.  In fact, in enacting section 772(c)(1)(C) of the Act, Congress may have recognized the complexity of the issues that would need to be resolved to estimate the specific offset, and thus, opted for a full offset for export subsidies to avoid such potential problems.[49]

By comparison, the more recent provisions of section 777A(f) of the Act pertaining to subsidy offsets in NME proceedings are significantly more complex.  In particular, pursuant to this section, Commerce only provides an offset if, *inter alia*, the subsidy has been *demonstrated* to have reduced the average price of imports of subject merchandise during the period of investigation or review and Commerce can reasonably estimate the extent to which the subsidy has increased the dumping margin.  In other words, there is no presumption of pass-through and no automatic adjustment is made to account for the potential overlap in ADs and CVDs.  There must be a demonstration, with affirmative evidence, that such an adjustment is warranted and to

---

[48] *See* Senate Report on the Trade Agreements Act of 1979, S. Rep. No. 96-249 (1979), at 94 ("The purpose of the amendment regarding additions to {U.S. price} with respect to countervailing duties also being assessed because of an export subsidy is designed to clarify that such adjustment is made only to the extent that the exported merchandise, and not the other production of the foreign manufacturer or producer or other merchandise handled by the seller in the foreign country, benefits from a particular subsidy{}.  The princip{le} behind adjustments to the price paid in these instances is to achieve comparability between the price{s}which are being compared.  Where the situation is the same … {the merchandise in both markets benefits from the subsidy} then no adjustment is appropriate.").  Congress added section 772(c)(1)(C) to the statute in the Trade Act of 1979 (1979 Act), Pub. Law 96-39, Title I § 101, 93 Stat. 181 (1979).

[49] Indeed, given the variety of export subsidy programs, certain export subsidies may have a greater or lesser effect upon export prices.  For example, the granting government can explicitly condition the receipt of the subsidy upon the export of a specific quantity of merchandise.  Alternatively, a government can grant subsidies to exporters by virtue of their status or past performance as exporters generally, but without any condition concerning their future export performance.  The first type of subsidy provides a clear incentive to increase exports, whereas the second type does not.  Consequently, the second type may have a smaller effect upon export prices.  Where the exporter is already a low-price supplier and the terms of the subsidy do not require increased exports, there may be little benefit to the exporter in lowering its price further.

what extent. That requirement actually creates a presumption of no pass-through, which must be rebutted before an offset is made, the opposite of a requirement that Commerce affirmatively demonstrate no pass-through.

We do not believe that Congress intended for Commerce to attempt to measure or alleviate any double remedy through the discretion delegated to Commerce under section 773(e) of the Act. However, beyond that conclusion, there seems to be no basis to find that Congress intended to create a presumption of pass-through and to place a burden on Commerce to rebut that presumption, in contradiction to its design of section 777A(f) of the Act. It is not difficult to conceive why Congress would choose not to place such a burden on Commerce. There is no reason to assume—even in general—that domestic subsidies automatically reduce U.S. prices. In fact, Commerce has demonstrated above that, in the instant case, the subsidy at issue is not linked to reduced U.S. prices. Moreover, within the context of section 777A(f) of the Act and the current PMS context under the TPEA, Congress may have simply not wanted to incur the risk that Commerce would "overcorrect" the possible double remedy by either denying the PMS adjustment altogether or by estimating too large of an offsetting deduction to the AD cash deposit rate. Such efforts risk arbitrarily lowering the trade remedy protection available to the domestic industry under the Act.

## IV.    COMMENTS ON DRAFT REMAND

### 1.  Commerce's Position on its Alleged Lack of Legal Authority to Account for Double Remedies is Incorrect and Inconsistent with Practice

*Wilmar's Comments:*

- In the *Second Draft Remand Redetermination*, Commerce contested the Court's conclusions in *Wilmar II* and advanced several arguments to justify why it has no

13

legal authority to adjust for double remedies (even though the Court in *Wilmar II* already rejected many of these arguments). None of these arguments are valid.[50]

- Commerce argued that the statute "would {not} support a downward adjustment of the AD remedy to account for a putative overlap with the CVD remedy" because "{t}he statute only requires {the Department} to consider the overlap of AD and CVD remedies in two narrow circumstances that do not apply" in this case.[51]

- Commerce also asserted that "{AD} and CVD laws are separate regimes that provide separate remedies for distinct unfair trade practices" and that its position is supported by "{c}ongressional silence on 'double remedy' concerns in promulgating section 773(e) of the Act."[52]

- The Court has rejected each of these arguments in *Wilmar II*. The Court recognized that, although "the statute does not expressly mandate offsetting countervailing duties from a companion countervailing duty investigation where the Department uses constructed value (or an alternative method) under {section 773(e)}," "{s}uch lack of statutory directive, however, does not relieve Commerce of its obligation to explain why its chosen method is a reasonable one."[53] The Court properly held that Commerce failed to meet the reasonableness requirement when it imposed a double remedy here based on the export levy on crude palm oil.[54]

---

[50] *See* Wilmar's Comments at 4.
[51] *Id.* at 4 (citing Second Draft Remand Redetermination at 6).
[52] *Id.* at 4 (citing Second Draft Remand Redetermination at 6).
[53] *See Id.* at 5 (citing *Second Remand Order* at 31).
[54] *Id.* at 5 (citing *Second Remand Order* at 29 ("This Court has held that both Congress's use of the word may, as well as principles fundamental to review under the substantial evidence standard require that Commerce's determination be reasonable.") (internal citations omitted).

*Petitioner's Comments:*

- The Court and Wilmar each acknowledge that there is no statutory presumption or assumed inference that a domestic subsidy results in lower export prices that warrants, or compels, Commerce to account for countervailing duties when calculating dumping margins.[55]

- Rather, Congress has identified two narrow circumstances where Commerce is instructed to consider such an offset: 1) with respect to export subsidies pursuant to section 772(c)(1)(C) of the Act; and 2) when specific criteria have been established in a NME case pursuant to section 777A(f)(1) of the Act.[56]

- In neither circumstance is there an inference or assumption; Congress instructed in these specific circumstances for Commerce to adjust U.S. price by the amount of an export subsidy or engage in further fact-finding to determine whether adjustments should be made when Commerce uses a surrogate value methodology for calculating normal value in NME cases.[57]

- Commerce is correct to note that the more recent provisions of the statute concerning NME cases "actually create a presumption of no pass-through, which must be rebutted before an offset is made."[58] Specifically, if Commerce finds a subsidy has been provided with respect to the merchandise under consideration it will make an adjustment under section 777A(f) to the antidumping duty margin only if "such countervailable subsidy has been demonstrated to have reduced the average price of

---

[55] *See* Petitioner's Comments at 4.
[56] *Id.* at 4-5.
[57] *Id.* at 5.
[58] *Id.* at 6 (citing Second Draft Remand Redetermination at 12-13).

imports" and Commerce "can reasonably estimate the extent to which the countervailable subsidy…has increased the weighted average dumping margin."[59]

- Accordingly, the Court has created a new evidentiary burden on Commerce that was not imposed, or even contemplated, by Congress and finds no support in Commerce's past practice. Therefore, Petitioner agrees with Commerce that the Court's *Second Remand Order* imposes an unreasonable burden on Commerce that "risks undermining the relief to which domestic parties are entitled under" the Act.[60]

**Commerce Position:** Commerce agrees with the comments of the Petitioner in support of the Second Draft Remand Redetermination and has left its analysis unchanged above. In particular, Commerce agrees there is no presumption in the Act or Commerce practice that subsidies pass through to U.S. prices, nor is there a presumption that the effects of subsidies on prices can be measured accurately with any certainty. As noted above, section 777A(f) of the Act actually creates a presumption of no pass-through, which must be rebutted before reducing the amount of the AD cash deposit rate. Despite the fact that there is no provision in the Act addressing an AD cash deposit rate adjustment in the current circumstances (a PMS adjustment overlapping a CVD finding), the Court has nevertheless created an additional evidentiary burden on Commerce that does not exist under the circumstances giving rise to section 777A(f) of the Act. In effect, this reads two additional provisions into the Act that Congress itself chose not to include: (1) that the potential for a double remedy renders a PMS adjustment impermissible when a parallel CVD investigation addresses the same behavior; and (2) that Commerce must first preclude such a possibility, or must make adjustments to its determinations accordingly, in order to render its AD determinations reasonable.

---

[59] *Id.* at 6 (citing section 777A(f)(1)(B) and (C) of the Act).
[60] *Id.* at 6-7 (citing Second Draft Remand Redetermination at 11).

**2. The Pass-Through Analysis is Not an Appropriate Test to Determine Whether Disregarding Wilmar's Crude Oil Prices in Indonesia Results in a Double Remedy**

*Wilmar's Comments:*

- In *Vicentin II*, the Court concluded that Commerce's use of "the pass-through analysis did not directly respond to the court's concerns that CVDs imposed in the concurrent proceeding cure the distortion giving rise to the cost-based PMS adjustment."[61] Here too, as Commerce concedes, the pass-through analysis fails to explain why its rejection of Indonesian crude palm oil costs in calculating Wilmar's normal value is reasonable (as a legal or factual matter).

- Commerce's reliance in the Second Draft Remand Redetermination on the fact that the Court sustained, and the U.S. Court of Appeals for the Federal Circuit affirmed, its pass-through analysis in *Vicentin II* based on similar facts is misplaced.   It is unclear why Commerce regards its adopted test as reasonable if it does not accurately measure double remedies.[62]

*Petitioner's Comments:*

- Pursuant to the Court's instructions, Commerce conducted under protest a pass-through analysis consistent with its approach to determining whether an adjustment to antidumping duties is appropriate pursuant to section 777A(f)(1).[63]  Commerce's methodological approach is a reasonable response to the Court's *Second Remand Order*.[64]

---

[61] *See* Wilmar's Comments at 14-15 (citing *Vicentin III*, 503 F. Supp. 3d at 1261).
[62] *Id.* at 9 (citing *Mid Continent Steel & Wire v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019)).
[63] *See* Petitioner's Comments at 8.
[64] *Id.* at 7.

**Commerce Position:**  We disagree with Wilmar.  Here, like in the *Vicentin* cases, the parties and the Court referred to the problem as one involving the potential of a double remedy.  In *Vicentin III*, however, the Court  explained that "although parties have referred to the problem as one involving a potential double remedy, the problem as illustrated by Commerce's adoption of the pass-through methodology is one of determining whether the dumping margin is affected by duties imposed to countervail the domestic subsidy in the concurrent proceeding."[65]  Thus, there, as here, Commerce used the pass-through analysis to ascertain whether the imposition of a CVD in a subsidy case affects the analysis in the antidumping case, and only if the CVDs affect the dumping analysis would the potential for a double remedy arise.  Under this methodology, Commerce considers whether the record demonstrates:  1) a subsidies-to-cost link; 2) a cost-to-price link; and 3) the subsidies have been demonstrated to have reduced the average price of imports during the period under examination.[66]  In *Vicentin III*, the Court found Commerce's use of the pass-through methodology to determine whether the dumping margin was affected by domestic subsidies to be reasonable.[67]  The U.S. Court of Appeals for the Federal Circuit affirmed that finding.[68]  We continue, under respectful protest, to use the pass-through methodology for this final redetermination.

---

[65] *See Vicentin III,* 503 F. Supp. 3d at 1264-65.

[66] *See, e.g.*, *Fine Denier Polyester Staple Fiber from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24740 (May 30, 2018), and accompanying IDM at Comment 2.

[67] *See Vicentin III,* 503 F. Supp. 3d at 1265.

[68] *See Vicentin,* 42 F.4th at 1381 ("Framed another way, Commerce has relied on an international market price for soybeans in place of the Argentinian cost.  Because of this adjustment, the soybean subsidy did not affect the constructed normal value of biodiesel.  Commerce found that the respondents did not pass the soybean subsidy through to biodiesel exported to the United States, and therefore the subsidy did not affect the export price of biodiesel either.  These two facts support Commerce's inference that 'no portion of the {less-than-fair-value} differential can be attributed to the subsidy,' and therefore, the antidumping duty did not provide a remedy duplicative of the countervailing duty.").

### 3. The Record Shows that the 2015 Export Levy on Crude Palm Oil Affected U.S. Prices of Biodiesel

*Wilmar's Comments:*

- Commerce focused its analysis on the question of "whether the countervailed subsidy has affected U.S. price."[69]  Commerce answered that question by finding that the countervailed export levy on crude palm oil did not affect U.S. prices and that no double remedy exists.[70]

- The facts in *Vicentin III* are distinguishable from the facts in the instant case.  There, Commerce found that U.S. prices were "adequate for purposes of calculating ADDs because U.S. prices {were} set based on considerations unrelated to any cost-benefit provided by the domestic subsidy."[71]   In contrast, Wilmar does take into account its cost of manufacture when setting prices for U.S. sales of biodiesel as Commerce previously found.[72]

- Commerce's finding that "Indonesian prices for U.S. shipments were higher in the fourth quarter of 2016 than the first quarter of 2016," which "is an indication that the domestic subsidy at issue has not been passed through to the U.S. price"[73] demonstrates merely that import prices were higher at the end of the POI than at the beginning.  This comparison does not, by itself, demonstrate whether the export levy on crude palm oil – the alleged subsidy – had any effect on U.S. prices.[74]

---

[69] *See* Wilmar's Comments at 8 (citing Second Draft Remand Redetermination at 8).
[70] *Id.* at 8-10 (citing Second Draft Remand Redetermination at 8-10).
[71] *Id.* at 9 (citing *Vicentin III*, 503 F. Supp. 3d at 1265).
[72] *Id.* at 9-10 (citing Second Draft Remand Redetermination at 35).
[73] *Id.* at 10 (citing Second Draft Remand Redetermination at 8,citing Petitioner's Letter, "Biodiesel from Argentina and Indonesia; Antidumping and Countervailing Duty Petitions," (Mar. 23, 2017), at Vol. II (Exhibit. GEN-28)).
[74] *Id.* at 10.

- Commerce concludes that there is "no cost-to-price link, *i.e.,* producer's or exporter's prices do not change as a result of changes in the cost of manufacture" because "the record demonstrates that Wilmar prices its biodiesel sold in the United States based on the price of ULSD futures contracts traded on the NYMEX."[75]

- However, Commerce's findings here contradict its *First Remand Redetermination*, where it stated "{t}he link between costs and sales prices is axiomatic."   Indeed, the record shows that Wilmar takes into account its manufacturing costs, including raw material costs, when determining the price of its products in the home market.[76] Those findings in the *First Remand Redetermination* square with what Commerce witnessed at verification, where it confirmed that Wilmar "considers {} multiple factors including raw material costs" when it "negotiat{es} U.S. sales prices."[77]

- Therefore, the record evidence and Commerce's previous findings demonstrate that there is a cost-to-price link because Wilmar's prices of U.S. sales of biodiesel are impacted by multiple factors, and Commerce's internally inconsistent rationale advanced in the Second Draft Remand Redetermination are arbitrary and capricious.[78]

- Commerce mistakenly finds that Wilmar's U.S. prices of biodiesel are not based on production costs impacted by domestic subsidies, so there is no significant link between subsidies and U.S. prices.[79]  As a result, Commerce reasons that neither side of the dumping margin equation is affected by the export levy on crude palm oil,

---

[75] *Id.* at 10 (discussing data from the U.S. Department of Agriculture and the U.S. Census Bureau).
[76] *Id.*at 10-11 (citing *First Remand Redetermination* at 35.).
[77] *Id.* at 11 (citing Wilmar Sales Verification Report at 6).
[78] *Id.* at 11 (citing *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.,* 865 F.3d 1348, 1354 (Fed. Cir. 2017) (finding the Patent Trial and Appeal Board's analysis arbitrary and capricious because its reasoning on an issue was "internally inconsistent"), and *ANR Storage Co. v. FERC,* 904 F.3d 1020, 1024 (D.C. Cir. 2018) (explaining that an agency acts arbitrarily and therefore unlawfully when its decision on an issue contains "internally inconsistent" reasoning).
[79] *Id.* at 12 (citing Second Draft Remand Redetermination at 10).

such that any differential between U.S. prices and normal value is not the result of the countervailed subsidy.[80]

- Commerce's conclusion here conflicts with its own prior findings during the AD investigation and the *First Remand Redetermination* that Wilmar takes into account its production costs when determining the price of U.S. sales of biodiesel.[81]

- Apart from contradicting its own findings in the underlying investigation and in the first remand results, the Department's finding also conflicts with its conclusions in the final determination of the companion countervailing duty investigation. There, Commerce found that the export levy on crude palm oil did affect the price of crude palm oil in Indonesia, which in turn affected the price of biodiesel in Indonesia. Here, Commerce does not explain how the price of crude palm oil in Indonesia, as the principal raw material input into the production of the foreign like product and the subject merchandise (*i.e.*, biodiesel), could affect the price of biodiesel in the home market but not in the U.S. market.[82]

- With respect to the normal value side of the dumping margin, Commerce concluded in the *First Remand Redetermination* that "absent the PMS with respect to crude palm oil costs in Indonesia, Wilmar would face significantly higher manufacturing costs; in order to sell biodiesel in Indonesia in the ordinary course of trade (*i.e.*, at above-cost prices), therefore, it would need to increase its prices to cover those higher manufacturing costs."[83]

---

[80] *Id.* at 12 (citing Second Draft Remand Redetermination at 10).
[81] *Id.* at 13 (citing *First Remand Redetermination* at 35.)
[82] *Id.* at 11-12 (citing *Indonesia Biodiesel CVD Inv Final* IDM.
[83] *Id.* at 13 (citing *First Remand Redetermination* at 35 fn 154).

*Petitioner's Comments:*

- Commerce correctly notes that the GOI's domestic subsidy program had little to no effect on the respondents' U.S. prices of biodiesel insofar as U.S. and foreign producers base the price of biodiesel sold in the United States on the price of ULSD futures contracts traded on the NYMEX, which are not tied to the cost of crude palm oil in Indonesia.[84]

- Consistent with this general pattern, Commerce "verified that Wilmar prices its U.S. sales based on these NYMEX heating oil futures plus or minus a specified premium."[85] Specifically, during the POI, Wilmar set the U.S. price for its biodiesel in reference to NYMEX futures."[86] Sample U.S. sales documentation on the record supports Wilmar's explanation.[87]

- Commerce also confirmed Wilmar's sales practices at verification, finding that Wilmar's "{p}ricing to the United States is always based on a formula" with the "base being NYMEX Heating Oil plus or minus a premium."[88]

- In other words, Wilmar admitted at verification, confirmed by its own sales documents, that its U.S. prices are tied to general U.S. market prices and not to their own costs of acquiring crude palm oil in Indonesia, nor to the extent such costs are distorted by the GOI's subsidy on crude palm oil.[89] The ITC's *Preliminary Report* in the underlying investigation, which found "biodiesel prices have been influenced by

---

[84] *See* Petitioner's Comments at 9 (citing Second Draft Remand Redetermination at 8-9).

[85] *Id.* at 9 (citing Second Draft Remand Redetermination at 9).

[86] *Id.* at 9 (citing Wilmar's Letter, "Supplemental Sections B-C Questionnaire Response," dated August 18, 2017 at 17).

[87] *Id.* at 9 (citing Wilmar Letter, "Supplemental Sections B-C Questionnaire Response," dated August 18, 2017 at 15).

[88] *Id.* at 9 (citing Wilmar Sales Verification Report at 6 ("Wilmar added that only if the sum of all these components equates to a positive margin, then Wilmar would engage in a sale.").

[89] *Id.* at 9-10 .

the price of petroleum-based diesel fuel…rather than biomass based diesel production costs,"[90] corroborates the respondent's verification statements and sales records.

- Finally, Commerce also correctly cited information published by the U.S. Department of Agriculture and the U.S. Census Bureau, which indicate import values for Indonesian biodiesel collected by the ITC do not correlate with the subsidy at issue. Rather, Commerce found these data "demonstrate{} that Indonesian prices for U.S. shipments appear to correspond to the overall U.S. market (including imports from Argentina, Canada, and all other countries) and not to the cost of crude palm oil in Indonesia."[91] The GOI's domestic subsidy program for crude palm oil had no material or direct impact on respondent's U.S. prices.

**Commerce Position:** We continue to find that the record demonstrates that Wilmar sets the prices of its U.S. sales based on a formula with the base being NYMEX Heating Oil plus or minus a premium, and that the GOI's domestic subsidy program for crude palm oil had no direct impact on these U.S. prices. Accordingly, Commerce's PMS adjustment to account for the GOI's domestic subsidy on crude palm oil does not result in a double remedy and is necessary to accurately measure normal value and calculate the respondent's dumping margins. The Federal Circuit affirmed Commerce's reliance on similar evidence in determining that a domestic subsidy did not affect U.S. prices.[92]

---

[90] *Id.* at 10 (citing Second Draft Remand Redetermination at 9).

[91] *Id.* at 10 (citing Second Draft Remand Redetermination at 9-10).

[92] *See Vicentin*, 42 F. 4th at 1381 ("Framed another way, Commerce has relied on an international market price for soybeans in place of the Argentinian cost. Because of this adjustment, the soybean subsidy did not affect the constructed normal value of biodiesel. Commerce found that the respondents did not pass the soybean subsidy through to biodiesel exported to the United States, and therefore the subsidy did not affect the export price of biodiesel either. These two facts support Commerce's inference that 'no portion of the {less-than-fair-value} differential can be attributed to the subsidy,' and therefore, the antidumping duty did not provide a remedy duplicative of the countervailing duty.").

We disagree with Wilmar's argument that Commerce's Second Draft Remand Redetermination somehow contradict its *First Remand Redetermination* with respect to the link between costs and how its sets its U.S. price. The U.S. sales verification report shows that Wilmar sets the price for a U.S. sale using a formula:

> Pricing to the United States is always based on a formula. The base being NYMEX Heating Oil plus or minus a premium. The premium is decided based on negotiations between the buyer and seller, and comprises of all costs and credit components associated with the product. Company officials explained that since all biodiesel it sells into the U.S. market is rinnable, the CIF USA biodiesel price offered by Wilmar considers the prevailing RIN value, the freight, conversion/execution costs, the blenders tax credit if applicable, and raw material costs. Wilmar added that only if the sum of all these components equates to a positive margin, then Wilmar would engage in a sale.[93]

While in the *First Remand Redetermination* we noted that Wilmar states it considers multiple factors, including raw material costs when making a U.S. sale,[94] Wilmar's U.S. prices for biodiesel fluctuate with general U.S. market prices for ULSD and not according to their own costs of acquiring crude palm oil in Indonesia.[95] There is no evidence that the GOI's domestic subsidy program for crude palm oil had a material or direct impact on Wilmar's U.S. prices. Thus, although Wilmar may consider additional costs for the premium when negotiating U.S. prices, there is no "internal inconsistency" between the *First Remand Redetermination* and the Second Draft Remand Redetermination with respect to U.S. price. In fact, the record demonstrates that there is no cost-to-price link, *i.e.*, the producer's or exporter's prices do not change as a result of changes in cost of manufacture. Rather, the record shows that U.S. and foreign producers base the price of biodiesel sold in the United States on something outside their control, *i.e.,* the price of ULSD futures contracts traded on the NYMEX.

---

[93] *See* Wilmar Sales Verification Report at 6.
[94] *See First Remand Redetermination* at 35 fn 154.
[95] *See*, *e.g.,* Wilmar Sales Verification Report at 6 and Wilmar Letter, "Supplemental Sections B-C Questionnaire Response," dated August 18, 2017 at 15.

Similarly, Wilmar's argument that Commerce's finding here that there is no cost-to-price link somehow conflicts with the final determination in the CVD investigation[96] where we found that the export levy affects the price of crude palm oil, and in turn affected the price of biodiesel in Indonesia is misplaced. Unlike the prices for its home market sales, the record here demonstrates that Wilmar prices its biodiesel sold in the United States based on the price of ULSD futures contracts traded on the NYMEX.[97] As Petitioner notes, the *ITC Preliminary Report* provides a description of the industry in general that confirms the explanation provided by Wilmar. The report finds that, "{b}iodiesel has traditionally been marketed primarily as an additive or alternative to petroleum-based diesel fuel, and, as a result, biodiesel prices have been influenced by the price of petroleum-based diesel fuel, adjusted for government incentives supporting renewable fuels, rather than biomass based diesel production costs."[98]

Further, as we state above, information published by the U.S. Department of Agriculture and the U.S. Census Bureau indicates a correlation between U.S., Argentine, and Indonesian prices in the United States during each quarter from 2014 through 2016.[99] Pricing information demonstrates that Indonesian prices for U.S. shipments appear to correspond to the overall U.S. market (including imports from Argentina, Canada, and all other countries)[100] and not to the cost of crude palm oil in Indonesia.

Finally, contrary to Wilmar's assertion, Commerce did not rely solely upon the fact that Indonesian prices for U.S. shipments were higher in the fourth quarter of 2016 than the first quarter of 2016 to demonstrate that domestic subsidy at issue has not been passed through to

---

[96] *See Indonesia Biodiesel CVD Inv Final* IDM.
[97] *See* Wilmar's Letters, "Section A Questionnaire Response (Part 2)," dated June 6, 2017, at A-11 and A-19; "Supplemental Section A Questionnaire Response," dated August 11, 2017, at 21, 29-30, and Exhibits SA-15, 16, 27, and 28; and "Supplemental Sections B-C Questionnaire Response," dated August 18, 2017, at 14-16.
[98] *See ITC Preliminary Report* at VI-7.
[99] *See* Petition at Volume II (Exhibit GEN-28).
[100] *See ITC Preliminary Report* at table IV-2.

Wilmar's U.S. price.  The pass-through analysis which is governed by section 777A(f)(1)(B) of

the Act requires an analysis of whether a countervailed subsidy has reduced the average price of

imports of the class or kind of merchandise during the period of investigation.  The fact that the

average price of imports of the class or kind of merchandise increased during the POI is further

indication that the domestic subsidy at issue has not been passed through to any exporter's U.S.

price, including Wilmar.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's order, Commerce examined the record, conducted a "pass-

through" analysis, under respectful protest, and determined that substantial evidence indicates the

domestic subsidy at issue did not reduce U.S. prices during the POI.  Commerce further

explained that such "pass-through" analysis is not required by the Act in this context, that there

is no presumption that subsidies pass through to U.S. prices (and thus, that there is no burden on

Commerce to demonstrate otherwise in order to render its determinations reasonable), and that

such analysis may actually risk lowering the trade remedy protection afforded to the domestic

industry to a level below that to which it is entitled.

Dated:    March 12, 2024

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance