Slip Op. 24–70

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| WILMAR TRADING PTE LTD., PT WILMAR BIOENERGI INDONESIA, and WILMAR OLEO NORTH AMERICA LLC, <br><br> Plaintiffs, <br><br> and <br><br> P.T. MUSIM MAS and GOVERNMENT OF THE REPUBLIC OF INDONESIA, <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NATIONAL BIODIESEL BOARD FAIR TRADE COALITION, <br><br> Defendant-Intervenor. | Before: Richard K. Eaton, Judge <br><br> Consol. Court No. 18-00121 |

**OPINION**

[U.S. Department of Commerce's remand results are sustained.]

Dated: June 11, 2024

*Devin S. Sikes*, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, D.C., for Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC. With him on the brief was *Bernd G. Janzen*.

*Lynn G. Kamarck*, Hughes Hubbard & Reed LLP, of Washington, D.C., for Consolidated Plaintiff Government of the Republic of Indonesia. With her on the brief were *Matthew R. Nicely* and *Julia K. Eppard*.

*Edmund W. Sim*, Appleton Luff Pte Ltd., of Washington, D.C., for Consolidated Plaintiff P.T. Musim Mas. With him on the brief were *Kelly A. Slater* and *Jay Y. Nee*.

*Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant the United States. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *L. Misha Preheim*, Assistant Director. Of counsel on the brief was *Jessica R. DiPietro*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Myles S. Getlan*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor National Biodiesel Board Fair Trade Coalition. With him on the brief were *Jeffrey B. Denning*, *Jack A. Levy*, *Ulrika K. Swanson*, and *James E. Ransdell*.

Eaton, Judge: Before the court is the U.S. Department of Commerce's ("Commerce" or the "Department") second remand redetermination pursuant to the court's order in *Wilmar Trading Pte Ltd. v. United States*, 47 CIT __, 675 F. Supp. 3d 1215 (2023) ("*Wilmar II*").[1] *See* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 125.

In *Wilmar II*, the court remanded one issue to Commerce: "On remand, Commerce must either reconsider its decision to disregard Indonesian crude palm oil prices when constructing normal value for Wilmar or explain why doing so does not impose a double remedy." *Wilmar II*, 47 CIT __, 675 F. Supp. 3d at 1263.

On March 12, 2024, Commerce issued the Remand Results. The deadline for comments was April 12, 2024. Defendant-Intervenor National Biodiesel Board Fair Trade Coalition filed comments asking the court to sustain the Remand Results. *See* Def.-Int.'s Cmts., ECF No. 128. No comments have been filed by Plaintiffs Wilmar Trading Pte Ltd., PT Wilmar Bioenergi Indonesia, and Wilmar Oleo North America LLC, or any other party. *See* Letter to Court from Akin, Gump,

---

[1] This case involves Commerce's final determination in the antidumping investigation of biodiesel from Indonesia. *Biodiesel From Indon.*, 83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) and accompanying Issues and Decision Mem. (Feb. 20, 2018), PR 303.

Strauss, Hauer & Feld, LLP (Mar. 29, 2024), ECF No. 127 (notifying the court that "Plaintiffs will not submit comments in opposition to the U.S. Department of Commerce's Second Final Results of Redetermination Pursuant to Court Remand"). There being no further dispute for the court to decide, and for the reasons discussed herein, the court sustains the Remand Results.

## BACKGROUND

The court presumes familiarity with its prior opinions in this case. *See Wilmar Trading Pte Ltd. v. United States*, 46 CIT __, 582 F. Supp. 3d 1243 (2022) ("*Wilmar I*"); *Wilmar II*, 47 CIT __, 675 F. Supp. 3d 1215.

Briefly, the facts relevant here are that the Government of Indonesia's "2015 Export Levy" imposed a $50 per metric ton tax on all exports of crude palm oil, the primary input of biodiesel. *See Wilmar I*, 46 CIT at __, 582 F. Supp. 3d at 1247 (citing *Wilmar Trading Pte Ltd. v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1334, 1339 (2020) ("*Wilmar CVD*")). In *Wilmar CVD*, a companion countervailing duty case, Commerce found that the 2015 Export Levy was a countervailable program that provided crude palm oil for less than adequate remuneration, a finding that this Court upheld.[2] *Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1350.

In *Wilmar II*, the court sustained Commerce's finding that the 2015 Export Levy created a particular market situation that "distorted the costs of domestic crude palm oil in Indonesia and rendered Wilmar's home market sales values useless for determining normal value." *Wilmar II*, 47 CIT at __, 675 F. Supp. 3d at 1236 (citing *Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at

---

[2]　　In *Wilmar CVD*, Commerce imposed countervailing duties based on, inter alia, the 2015 Export Levy. The Department calculated an individual subsidy rate for Wilmar of 34.45%, of which 9.47% ad valorem was attributed to the 2015 Export Levy and the 1994 Export Tariff (not at issue here). *See Wilmar CVD*, 44 CIT at __, 466 F. Supp. 3d at 1341.

1348-57). The court also found that "it [was] unclear why the effects of such distortion were not remedied by the imposition of countervailing duties in the companion countervailing duty investigation." *Id.* at __, 675 F. Supp. 3d at 1236.

The court thus remanded the Department's "decision to disregard Indonesian crude palm oil prices—based on the 2015 Export Levy particular market situation—[as] unsupported by substantial evidence." *Id.* at __, 675 F. Supp. 3d at 1263. The court directed that, "[o]n remand, Commerce must either reconsider its decision to disregard Indonesian crude palm oil prices when constructing normal value for Wilmar or explain why doing so does not impose a double remedy." *Id.*

## DISCUSSION

In the Remand Results, Commerce explained why disregarding Indonesian crude palm oil prices when constructing normal value for Wilmar did not impose a double remedy. It did so under protest[3]:

> To comply with the Court's order, under respectful protest, we have performed the analysis below to further explain why disregarding Indonesian crude palm oil prices when calculating constructed value does not impose a double-remedy. If the subsidy's effect on the [less than fair value] equation is limited to lowering U.S. price (as would be the case if the subsidy's influence on normal value is removed through the use of a world market value[4]), some portion of the

---

[3] The basis of Commerce's protest appears to be the agency's belief that the court's remand order placed upon the Department an evidentiary burden that is not required by the antidumping statute. In reality, however, the court's order simply required additional explanation of Commerce's double remedy finding.

[4] Here, "Commerce relied on the world market prices for crude palm oil instead of domestic Indonesian crude palm oil prices when constructing normal value for Wilmar." *Wilmar II*, 47 CIT at __, 675 F. Supp. 3d at 1226-27. Commerce did so based on its finding that "the 2015 Export Levy created a cost-based particular market situation that caused Wilmar's crude palm oil costs to inaccurately reflect the cost of production of biodiesel in the ordinary course of trade and therefore unusable for determining constructed value." *Id.* at __, 675 F. Supp. 3d at 1226.

differential determined by the [less than fair value] equation is the result of the countervailed subsidy. If, however, the countervailed subsidy affects neither U.S. price nor normal value, the evenhandedness of the countervailed subsidy's effects is maintained and no portion of the [less than fair value] differential can be attributed to the subsidy.

The key finding in this context (i.e., when normal value is unaffected by the countervailed subsidy), therefore, is whether the countervailed subsidy has affected U.S. price. In other words, Commerce must determine whether the countervailed subsidy has "passed through" to U.S. price. In administering [19 U.S.C. § 1677f-1(f)(1)], the only section of the Act requiring and delineating a pass-through analysis, Commerce has required the producer or exporter under examination to demonstrate: a "subsidies-to-cost link," e.g., the subsidy's effect on cost of manufacture; and a "cost-to-price link," e.g., the producer or exporter's prices changed as a result of changes in cost of manufacture. Commerce also examines whether countervailable subsidies have been demonstrated to have reduced the average price of imports during the period under examination.

As an initial matter, Indonesian prices for U.S. shipments were higher in the fourth quarter of 2016 than the first quarter of 2016. Thus, the countervailed subsidy has not reduced the average price of imports of the class or kind of merchandise during the January 1, 2016, through December 31, 2016 period of investigation (POI), as required by [19 U.S.C. § 1677f-1(f)(1)]. This fact is an indication that the domestic subsidy at issue has not been passed through to the U.S. price.

Moreover, the record demonstrates that there is no cost-to-price link, i.e., the producer's or exporter's prices do not change as a result of changes in cost of manufacture. Rather, the record shows that U.S. and foreign producers base the price of biodiesel sold in the United States on the price of Ultra Low Sulfur Diesel (ULSD) futures contracts traded on the New York Mercantile Exchange (NYMEX). Moreover, the record demonstrates that Wilmar prices its biodiesel sold in the United States based on the price of ULSD futures contracts traded on the NYMEX. Commerce verified that Wilmar prices its U.S. sales based on these NYMEX heating oil futures plus or minus a specified premium.

In addition, the [International Trade Commission] Preliminary Report provides a description of the industry in general that confirms the explanation provided by Wilmar. The report finds that, "{b}iodiesel has traditionally been marketed primarily as an additive or alternative to petroleum-based diesel fuel, and, as a result, biodiesel prices have been influenced by the price of petroleum-based diesel fuel, adjusted for government incentives supporting renewable fuels, rather than biomass based diesel production costs."

Finally, information published by the U.S. Department of Agriculture and the U.S. Census Bureau indicates a correlation between U.S., Argentine, and Indonesian prices in the United States during each quarter from 2014 through 2016.

> Pricing information demonstrates that Indonesian prices for U.S. shipments appear to correspond to the overall U.S. market (including imports from Argentina, Canada, and all other countries) and not to the cost of crude palm oil in Indonesia.
>
> As the record demonstrates that Wilmar prices its U.S. shipments in a manner designed to compete with (or undercut) U.S. prices for petro-diesel and biodiesel, and are not based on production costs affected by the domestic subsidy, Commerce concludes there is no significant link between the subsidy and U.S. prices. Therefore, as both sides of the [less than fair value] equation in this instance are unaffected by the export tax on crude palm oil [i.e., the 2015 Export Levy], the differential between U.S. prices and normal value (i.e., the dumping margin) is not partially the result of the countervailed subsidy, and thus the [particular market situation] adjustment to fair value does not remedy the subsidy.

Remand Results at 7-10.

In other words, Commerce found that there was no double remedy here because neither side of the dumping equation was affected by the 2015 Export Levy. The normal value side was not affected because Commerce used a world market price as constructed value, i.e., a price unaffected by the levy, a domestic Indonesian subsidy. Remand Results at 7; *see also Wilmar II*, 47 CIT at \_\_, 675 F. Supp. 3d at 1226-27 ("Commerce relied on the world market prices for crude palm oil instead of domestic Indonesian crude palm oil prices when constructing normal value for Wilmar."). And the U.S. price side was not affected because, as the record shows, the price of biodiesel sold in the United States by both U.S. and foreign producers (such as Wilmar) is based on heating oil (Ultra Low Sulfur Diesel) futures traded on the New York Mercantile Exchange. Remand Results at 7-8. Indeed, as Commerce verified, "Wilmar prices its U.S. sales based on . . . NYMEX heating oil futures plus or minus a specified premium." *Id.*

Thus, the court finds that Commerce has adequately explained, and supported with substantial record evidence, its finding that disregarding Indonesian crude palm oil prices when constructing normal value for Wilmar, based on the finding that the 2015 Export Levy resulted in a cost-based particular market situation, did not impose a double remedy—that is, "the differential

between U.S. prices and normal value (i.e., the dumping margin) is not partially the result of the countervailed subsidy, and thus the [particular market situation] adjustment to fair value does not remedy the subsidy." *Id.* at 10.

The court finds that the Remand Results comply with the court's order and are supported by substantial evidence. As they are uncontested, entry of judgment is appropriate, because there are no further issues for the court to adjudicate.

## CONCLUSION

There being no substantive challenge to the Remand Results, and that decision being otherwise in compliance with the court's remand order and supported by substantial evidence, it is sustained. Judgment will be entered accordingly.

/s/ Richard K. Eaton
Judge

Dated: June 11, 2024
New York, New York